UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CHRISTOPHER COPELAND, on Behalf of
Himself and All Others Similarly Situated,

                    Plaintiff,

      vs.

FORTIS, FORTIS BANK S.A./N.V., FORTIS
NV, HERMAN VERWILST, JEAN-PAUL
VOTRON, MAURICE LIPPENS, GILBERT
MITTLER and FILIP DIERCKX,

                  Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:08-cv-09060-DC

CLASS ACTION

AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ......................................................................1

II.     JURISDICTION AND VENUE ..................................................................6

III.    PARTIES ...................................................................................................10

    A.      Lead Plaintiffs ................................................................................10

    B.      Defendant Fortis..............................................................................10

        1.      Fortis's Formation .................................................................11

        2.      Fortis's Organizational Structure ..........................................11

    C.      The Individual Defendants ..............................................................12

IV.     CONFIDENTIAL SOURCES ...................................................................17

V.      SUBSTANTIVE ALLEGATIONS ...........................................................22

    A.      The Company and Its Business.........................................................22

        1.      The Acquisition ......................................................................23

        2.      The Company's Strong and Numerous Ties to the U.S............25

    B.      Fortis Was Experiencing Undisclosed Problems that Materially Affected
Its Business and Operations .............................................................29

        1.      Fortis Overextended Itself In Connection with the Acquisition ...............30

        2.      Fortis Adopted Procedures that Enabled It to Manipulate Its Risk
Ratings ...................................................................................31

        3.      Fortis Overvalued CDOs and Asset-Backed Securities............................33

    C.      Materially False and Misleading Statements Issued During the Class
Period and Key Developments.........................................................39

        1.      The September 21, 2007 Statements........................................40

        2.      The October 10, 2007 Statements ...........................................44

        3.      Mid-October/Early-November, 2007 Developments.................................47

**Page**

4.      The November 8, 2007 Statements ............................................................48

5.      Late-November/December, 2007 Developments......................................60

6.      The January 27, 2008 Statements ............................................................62

7.      The January 31 and February 21, 2008 Statements .................................68

8.      The February 28, 2008 Statements ..........................................................70

9.      The March 7, 2008 Statements ................................................................76

10.     The March 31, 2008 Statements ..............................................................96

11.     April 2008 Developments ........................................................................99

12.     The May 13, 2008 Statements ...............................................................100

13.     The May 22 and 23, 2008 Statements....................................................108

14.     The June 26, 2008 Statements ...............................................................110

15.     The July 2008 Statements ......................................................................118

16.     The August 1 and 4, 2008 Statements ...................................................123

17.     The September 2008 Statements.............................................................133

18.     The Benelux Governments' €11.2 billion Bailout of Fortis ...................136

19.     Fortis's Exit from the Banking Industry ................................................140

VI.     ADDITIONAL SCIENTER ALLEGATIONS...............................................144

VII.    LOSS CAUSATION/ECONOMIC LOSS .....................................................148

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE
        MARKET DOCTRINE ...................................................................................149

IX.     NO SAFE HARBOR .......................................................................................150

XVI.    CLASS ACTION ALLEGATIONS ................................................................151

XVII.   CLAIMS FOR RELIEF ..................................................................................152

**Page**

A.   COUNT I:  Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ............................................. 152

B.   COUNT II:  Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ............................................................................................. 153

JURY TRIAL DEMANDED ......................................................................................... 155

Lead Plaintiffs, Labourers' Pension Fund of Central and Eastern Canada ("Labourers' Pension Fund CEC") and Employers' Retirement System of the Government of the Virgin Islands ("U.S. Virgin Islands GER") (collectively, "Lead Plaintiffs"), allege the following based upon the investigation of Lead Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by, among others, Fortis, Fortis S.A./N.V. ("Fortis SA"), and Fortis NV (collectively, "Fortis" or the "Company"), as well as other filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company and interviews with former employees of Fortis, and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a federal securities fraud class action brought on behalf of purchasers of the securities of Fortis between September 17, 2007 and October 14, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, Fortis and certain of its executive officers and/or directors (collectively, "Defendants") misrepresented and failed to disclose material information concerning the Company's worsening financial condition in order to induce shareholders to purchase Fortis securities and insulate the Company from the adverse consequences that would ultimately befall it if the truth were disclosed.  Specifically, Defendants represented that the Company was relatively immune from the effects of the global credit crisis; that its capital position remained strong; and that its exposure to the subprime market was minimal.  Defendants also concealed the adverse effect that Fortis's acquisition of assets of ABN-AMRO Holding NV and its affiliates (collectively, "ABN AMRO") (the "Acquisition") would have, and was then having, on the Company's financial

condition.  At the same time, Defendants affirmatively misrepresented the progress associated with the integration of those assets, consistently claiming that the integration was "on track."

      3.     In actuality, the Company was not immune from the effects of the global credit crisis; its capital position was weak; and it managed a multibillion dollar structured credit portfolio that was highly exposed to the subprime market.  In fact, the Company's balance sheet was impaired by billions of dollars of poorly performing assets, including commercial debt obligations ("CDOs") and U.S. mortgage-backed securities, as well as other risky assets that it had acquired from ABN AMRO. In addition, the Acquisition was having a deleterious effect on Fortis's financial condition, because the Company had overextended itself in arranging billions of dollars in funding for the Acquisition, which further complicated the already complex and costly integration of ABN AMRO's operations. Defendants concealed these negative developments in order to induce the market to believe that Fortis was performing better than its peers, which, in turn, would artificially inflate the stock price and enable the Company to emerge unscathed from the global credit crisis.  In furtherance of this scheme, Defendants failed to timely or adequately write-down the value of Fortis's subprime-related assets, in order to maintain the appearance that the Company was not as severely affected as it was – or its competitors in the banking industry were.

      4.     As a consequence of this conduct, which was concealed from the market during the Class Period, Defendants drove the Company to its breaking point, which required them to sell its assets at fire-sale prices to raise substantial amounts of capital in order to remain a going concern.  In fact, the Company's condition had worsened so much by the end of the Class Period that Fortis was left as a shadow of itself and had virtually entirely exited the banking industry.  Indeed, it would only take another week for the Company to make a complete exit from the industry.

5.      By the end of the Class Period, the fraudulent scheme alleged herein was bearing down on Fortis.  For example, on July 2, 2008, Fortis announced that it had agreed to sell to Deutsche Bank a substantial portion of ABN AMRO's commercial banking operations in the Netherlands, **purchased less than one year earlier**, for €709 million in cash – a sale that De Nederlandsche Bank N.V. ("DNB"), the Dutch central bank, refused to approve at that time. Nevertheless, consistent with Defendants' conduct throughout the Class Period, Defendant Jean-Paul Votron ("Votron"), then Fortis's Chief Executive Officer ("CEO"), positively described the Deutsche Bank transaction as a "key milestone" and "essential step" that enabled the Company "to proceed with the integration" of ABN AMRO and "start realizing the synergies identified as a result of" the Acquisition.  In truth, Fortis's financial condition had deteriorated to the point that it absolutely *had* to sell the ABN AMRO assets in order to staunch its losses.  Other sales would follow.

6.      Then, on September 29, 2008, the governments of Belgium, the Netherlands and Luxembourg (collectively, the "Benelux Governments") agreed to provide Fortis with an emergency cash infusion of €11.2 billion in exchange for a 49% ownership interest in the Company, while the Deutsche Bank transaction remained subject to completion.  Moreover, the mainstream media reported that the Benelux Governments *demanded* that Fortis divest itself of the ABN AMRO assets – which it did, at a substantial loss.  This capital infusion was necessary because of significant losses that Fortis had sustained in its structured credit portfolio, as well as a weakening of the Company's capital position and a loss of confidence by the financial markets.  Incidentally, the substantial investment came only **three days** after Defendants reassured the market that the integration of ABN AMRO was "on track" and that the Company's financial position was sound.

- 3 -

7.      By the time that the Company was forced to nationalize a large portion of itself, three of the individual defendants –Votron, Fortis's Chief Executive Officer ("CEO"); Herman Verwilst ("Verwilst"), replacement CEO; and Maurice Lippens ("Lippens"), longtime Chairman of the Board of Directors and interim-CEO – were unceremoniously forced out of the Company amid enormous controversy and shareholder hostility.  Questions also arose concerning the exposure of Fortis's true financial condition, which Defendants were later widely believed to have concealed and misrepresented during the Class Period.  Ironically, Defendant Filip Dierckx ("Dierckx"), who was intimately involved with and oversaw Fortis's failing operations throughout the Class Period, received a promotion – from CEO of Merchant & Private Banking to Chairman and, later, CEO. Even his tenure was short-lived, however, as he was replaced several months after taking Fortis's helm as CEO in connection with the Benelux Governments' capital infusion.

8.      Ultimately, on March 31, 2009, the Company reported a €28 billion loss for full-year 2008.  According to Fortis, €27.4 billion of the loss was attributable to discontinued operations as a result of the sale of its banking operations, which took place in connection with the transactions associated with the €11 billion investment made by the Benelux Governments.  Fortis also sustained further losses as a result of turmoil in the financial markets, the effects of which Defendants had ironically denied during the Class Period until they could not any longer.  On May 12, 2009, after shareholders had previously voted down the deal, Fortis closed a transaction involving BNP Paribas's ("BNP") acquisition of 75% of Fortis Bank after finally obtaining the requisite shareholder approval.

9.      The following chart graphically provides an overview of key events that took place during the Class Period, as well as the devastating impact that Defendants' fraud had on investors:



## Fortis SA/NV
### January 2, 2007 to May 18, 2009

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), and personal jurisdiction over the Defendants is established, as many of the acts alleged herein, including the preparation and dissemination of the materially false and misleading information detailed herein, occurred in substantial part in this District.

13.    In addition, as noted below, New York regulatory and other authorities have oversight of various Fortis operations located in New York.  Moreover, the Company maintains substantial business operations in this District and has at least two offices located in New York, New York, at 520 Madison Avenue and 153 East 53rd Street.  Further, numerous entities that are or may be affiliated with Fortis are registered with the New York Department of State, as foreign corporations or otherwise, including the following (the state of incorporation of which is denoted in parentheses): Fortis (USA) Finance LLC (Delaware); Fortis (USA) Investment LLC (Delaware); Fortis Capital Corp. (Connecticut); Fortis Energy LLC (Delaware); Fortis Investment Services LLC (Delaware), Fortis PFS USA LLC (Delaware); Fortis Prime Fund Solutions (USA) LLC (Delaware); and Fortis Securities LLC (Delaware).  In fact, most (if not all) of these companies have 520 Madison Avenue listed as their address for the purpose of service of process by the New York Secretary of State.

14.    In addition, as detailed further herein, this Court has personal jurisdiction over Fortis and the other Defendants because of their strong and numerous ties to the U.S.  For example, Fortis

has several offices in the U.S. and, at all relevant times, obtained substantial financial and other benefits from its U.S. operations.  In fact, by the start of the Class Period, Fortis was earning hundreds of millions of dollars in revenue from the U.S.  Fortis also domestically employs a substantial American workforce.  The following graphic, taken from Fortis's 2008 Annual Review, illustrates the geographic distribution of the Company's offices, with New York serving as one of four central locations of operations:



| Americas | Europe | | | Asia and other |
|---|---|---|---|---|
| USA | United Kingdom | Switzerland | Italy | Singapore |
| Netherlands Antilles | Belgium | Luxembourg | Spain | Hong Kong |
| Cayman Islands | Guernsey | Norway | Denmark | Japan |
| British Virgin Islands | Isle of Man | France | Sweden | Australia |
| | Ireland | Poland | Turkey | |
| | Germany | | | |

15.    In addition, certain of Fortis's operations are subject to oversight in the U.S. by various regulatory authorities, including the SEC and state banking authorities.[1]  Specifically, according to Fortis:

---

[1]     For example, the New York State Banking Department has oversight of Fortis's New York City branch, located at 520 Madison Avenue.  *See* http://www.banking.state.ny.us/sifbranc.htm.

All Fortis entities in the United States are under the umbrella supervision of the Board of Governors of the Federal Reserve, and the branches of Fortis Bank SA/NV are further duly authorized and licensed by the relevant state banking departments. Fortis Bank SA/NV, Cayman Islands Branch, is duly licensed by the Cayman Islands Monetary Authority.  Fortis Securities LLC is regulated by the U.S. Securities and Exchange Commission (the "SEC") and is a member of Securities Investor Protection Corporation ("SIPC"), the National Association of Securities Dealers (the "NASD") as a broker-dealer and soon to be regulated by the U.S. Commodity Futures Trading Commission ("CFTC") as an introducing broker.  Fortis Clearing Americas LLC, among others, is primarily regulated by the SEC, the CFTC, the NASD, the New York Stock Exchange, the Chicago Board Options Exchange and the Chicago Mercantile Exchange and is also a member of SIPC.  Fortis Investment Management (USA) Inc. and Cadogan Management L.L.C. are regulated by the SEC as investment advisors.  Fortis Energy Marketing & Trading GP, an energy trading affiliate, is regulated by the SEC, the Federal Energy Regulatory Commission, the CFTC and the Texas Railroad Commission.

16.     Moreover, in press releases that it issued prior to, and in connection with, its pursuit of the Acquisition, Fortis acknowledged that in the event that it "enter[ed] into a transaction, [it] may be required to file relevant materials with the SEC."  In fact, Fortis has periodically made filings with the SEC and otherwise voluntarily subjected itself to such regulation.  For example, in connection with the Acquisition, Fortis and its business partners filed a Registration Statement on Form F-4 with the SEC on July 20, 2007, as well as numerous subsequent amendments thereto, which were made publicly available on the SEC's website (and elsewhere) and otherwise disseminated to U.S. investors.  They also filed a Tender Offer Statement on Schedule TO and other relevant materials.  These filings were necessary in connection with the Acquisition because the Consortium offered to purchase all of the securities of ABN AMRO, including those shares held by investors who were resident in the U.S.  Indeed, according to a Mutual Reliance Review System Decision issued by the Ontario Securities Commission, dated July 27, 2007, the U.S. aspect of the Acquisition was made "in compliance with the applicable requirements of Regulation 14D and Regulation 14E" under the Exchange Act.  In addition, the Consortium publicized its offer in publications, such as *The Wall Street Journal*, that were specifically directed at U.S. investors.

According to a study undertaken by the Consortium to determine the geographic concentration of ABN AMRO's shares, 17.2% of all institutional investors were located in North America.

17.     In addition, Fortis's securities trade in the U.S. as American Depositary Shares ("ADSs") on the over-the-counter ("OTC") market, as evidenced by American Depositary Receipts ("ADRs").  In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of a well-developed and efficient market.

18.     Moreover, while Fortis's domestic entities have routinely availed themselves of the U.S. judicial system, Fortis has also availed itself of the U.S. courts at its discretion.  For example, on July 9, 2004, Fortis brought an action in Maine federal court to recover on an $11.6 million loan agreement.  In that action, entitled *Fortis Bank (Nederland) N.V., et al. v. M/V Shamrock, et al.*, Fortis actively litigated its claims and eventually obtained final judgments in the amount of $9,595,482.12 and $4,757,637.72.  Presumably, Fortis has prosecuted other claims through the U.S. judicial system when it has benefited the Company to do so.

19.     Further, in Section 10.6(b) of the Draft Purchase and Sale Agreement that Fortis and its business partners proposed to ABN AMRO in connection with the Acquisition (the "Purchase Agreement"), Fortis "irrevocably submit[ted] to the exclusive jurisdiction" of the New York federal courts, and, if such jurisdiction was unavailable, the New York state courts.  Pursuant to the same provision, Fortis also expressly consented to personal jurisdiction in such courts, and waived, and agreed ***not*** to assert, a defense thereto or claim "that the venue thereof may be inappropriate or inconvenient . . . ."  Pursuant to Section 10.6(a) of the Purchase Agreement, Fortis further agreed that New York law would govern and apply to the interpretation and construction of the Purchase Agreement, without regard to conflict of law principles.  In addition, Fortis agreed that any claim

arising thereunder "has a significant connection with the United States and the State of New York," and that it "will not contend otherwise in any proceeding in any court of any other jurisdiction." Finally, Section 2.3(a) of the Purchase Agreement provided that the closing of the Acquisition would take place at the offices of ABN AMRO's counsel, the law firm of Davis Polk & Wardwell, at 450 Lexington Avenue, New York, New York.  Subsequent revisions to the document did not materially alter these provisions.

### III.   PARTIES

#### A.   Lead Plaintiffs

20.    By Order dated February 3, 2009, the Court appointed Labourers' Pension Fund CEC and U.S. Virgin Islands GER as Lead Plaintiffs.  As set forth in each of their previously-filed Certifications, incorporated by reference herein, Lead Plaintiffs purchased the Company's securities and were damaged thereby.

#### B.   Defendant Fortis

21.    Defendant Fortis describes itself as an international provider of banking and insurance services to personal, business and institutional customers.  It offers a comprehensive package of products and services through its own channels, in collaboration with intermediaries and through other distribution partners.  In press releases and marketing materials issued during the Class Period, Fortis variously touted its market capitalization and noted that it ranked "among the 15 largest financial institutions in Europe."  For example, Fortis indicated that its market capitalization was €39.7 billion as of December 31, 2007; €32.8 billion as of January 31, 2008; and €32.3 billion as of February 28, 2008.  The Company also consistently emphasized its "sound solvency position" and represented that its "presence in over 50 countries" and workforce of 60,000 enabled it to "combine global strength with local flexibility and provide [its] clients with optimum support."

### 1.    Fortis's Formation

22.    According to Fortis, the Company was created in 1990 "as a result of the merger of the Dutch bancassurance group AMEV and the Belgian insurer AG Groep."  Fortis substantially grew thereafter by acquiring other entities in the insurance, investment and banking industries.  For example, during 2006 alone, Fortis acquired Dreieck Industrie Leasing AG (Merchant & Private Banking); O'Connor & Company (Merchant & Private Banking); Von Essen KG Bankgesellschaft (Retail Banking); William Properties (Insurance Netherlands); Fortis Energy Marketing & Trading and FB Energy Canada, Corp. (Merchant & Private Banking); and Cadogen (70% interest/Retail Banking).  In addition, during 2007, Fortis purchased a majority ownership interest in Pacific Century Insurance and a 100% ownership interest in Dominet SA,,a full-service retail bank.

### 2.    Fortis's Organizational Structure

23.    In its 2008 Financial Statements,[2] Fortis described its organizational structure as follows:

> Fortis' two Parent Companies are Fortis SA/NV, incorporated in Belgium with its registered office at Rue Royale 20 / Koningsstraat 20, Brussels, Belgium and Fortis N.V., incorporated in the Netherlands with its registered office at Archimedeslaan 6, Utrecht, the Netherlands.  The parent companies own, on a 50/50 basis, all the shares of two holding companies, Fortis Brussels SA/NV and Fortis Utrecht N.V.  The holding companies are shareholders in operating companies and service companies, either directly or indirectly through subsidiaries.

24.    As the Company explained in its Corporate Governance Statement, Fortis' parent companies, although technically two separate legal entities, "actually operate as if they were one." Thus, while each parent company technically has its own board of directors, a CEO and an Executive Committee (referred to collectively by Fortis, and herein, as the "Group Executive

---

[2]    According to Fortis, "[t]he Fortis Financial Statements 2008, together with the Annual Review 2008 and the Auditors Reports to the Fortis Financial Statements 2008, constitute the Fortis Annual Report 2008."

Committee"), "[t]hese corporate bodies are identically composed and have identical powers in each of the two companies."  Consequently, Fortis's directors and officers concurrently govern and oversee all of its operations.

25.     As Fortis explained in the 2008 Financial Statements, Fortis shares actually represent a unit comprised of one Fortis SA share and one Fortis NV share.  These securities have a primary listing on the regulated markets of Euronext Brussels and Euronext Amsterdam, where they trade under the symbols "FORB BB" and "FORA NA," respectively.  In addition, these securities are tradable, in one form or another, on other markets, as well.  For example, Fortis has a secondary listing on the Luxembourg Stock Exchange (the "Luxembourg Exchange"), where the stock trades under the symbol "FOR LX," and a sponsored ADR program in the U.S., where the ADRs trade on the OTC market, or "Pink Sheets," under the symbol "FORSY."

**C.     The Individual Defendants**

26.     Defendant Votron served as Fortis's CEO from 2004 through his forced resignation in July 2008.  Prior to that time, he served in various capacities at Citibank and ABN AMRO, both in Europe and the U.S.  For example, between 1991 and 1997, Votron served in various positions at Citibank in Europe and the U.S., including, among others, the following:  President of Citibank Belgium and Marketing Director for Europe; Director of Marketing and technology U.S. and Europe Consumer Bank; Director Insurance in the U.S.; Head of U.S. Investment Business (Chicago); and Chairman and CEO of Citibank FSB, a branch network in the U.S.  After working at ABN AMRO as Senior Executive Vice-President International Consumer Banking and E-Commerce from 1997 until 2001, he rejoined Citigroup, where he was appointed a member of the Management Committee of Citigroup in 2002.  Votron participated in negotiating the Acquisition.  He regularly traveled to New York to handle Fortis-related business.

27.     Defendant Verwilst was a member of the Supervisory Board and, from 2004 until January 1, 2008, served as Chief Operating Officer ("COO").  In his role as COO, Verwilst was responsible for Company-wide oversight of Human Resources, Technologies, Operations & Process Services, Facility &Purchasing and PCA Shared Services.  In addition to his responsibilities as COO, Verwilst also served as Fortis's Deputy CEO since 2000 and Chairman of the Management Committee of Fortis Bank since its creation in 1998.  He has also served in various other capacities at Fortis in the past.  For example, he was Managing Director of AG 1824 (now Fortis Insurance Belgium) from 1997 to 1998; CEO of Fortis Belgium from 1997 to 1998; and Managing Director of Fortis (B) from 1997 to 2000.  After Fortis acquired Générale de Banque in 1998, Verwilst headed Banking activities as Chairman of Fortis Bank.  From July 2008 until Dierckx's "permanent" appointment to the position, Verwilst served as interim CEO of Fortis after Votron resigned from that position amidst a spate of controversy and shareholder dissatisfaction with management.  In December 2008, Verwilst resigned as a member of the Executive Committee and as executive member of the Board of Directors.

28.     Defendant Lippens served as the Executive Chairman of Fortis until 2000, and, subsequently, as the non-executive Chairman of the Board of Directors.  He served as Chairman of Fortis since 1990, and is credited with having co-founded the Company.  In addition, in September 2008, he was relieved of the position in connection with the Benelux Governments' bailout of the Company.  Lippens participated in negotiating the Acquisition.

29.     Defendant Dierckx served as the CEO of Merchant & Private banking, Regional Coordinator for North America, in which capacity he oversaw Fortis's troubled structured credit portfolio.  He was later promoted to Chairman and, later, CEO.  In 1998, he was appointed to the Executive Board of Fortis Bank with overall responsibility for retail banking. Since 2000, he has

been a member of Fortis's Executive Committee, with CEO responsibility for Merchant Banking. On January 1, 2008, he was appointed Chairman of Fortis Bank, and, as of September 26, 2008, he served as CEO of Fortis and was responsible for the day-to-day management of the Company. Dierckx served as CEO of Fortis until on or about December 2, 2008, when he was replaced by Karel De Boeck ("De Boeck"), former Chief Risk Officer of Fortis and former Vice Chairman of ABM AMRO.

30.     Defendant Gilbert Mittler ("Mittler") served as Fortis's Chief Financial Officer ("CFO") from 2000 until January 1, 2008, after which point he served as Chief of Finance and Risk and General Counsel.  He has also served in various other capacities at Fortis, including with certain of its affiliates.  For example, he served as Special Advisor of Fortis since August 2008, and also as CFO and a member of the Board of Directors of Fortis Insurance NV, and, until November 17, 2008, as a member of the Board of Directors of Fortis Bank.  He also served as CFO of Fortis (B) since 2000, and as Managing Director and CFO of ASLK Bank (now Fortis Bank) since 2001.  In addition, he served as Managing Director of Fortis (B) and Fortis (NL) since 1999, maintaining various responsibilities at group level.  Prior to that, he served as Head of Corporate Development of Fortis AG since 1988 and as Managing Director of Fortis Bank since 1993, responsible for Finance & Control and foreign operations.  Mittler joined AG Group, one of the founding companies of Fortis, in 1988, and became, at the inception of Fortis in 1990, Director of Fortis Group Finance and Development and Secretary of the Executive and Supervisory Boards.  He began his career as an Accountant at Arthur Andersen in 1974.  Mittler signed filings with the SEC on behalf of Fortis in connection with the Acquisition, including a Form F-4 and amendments thereto.  He participated in negotiating the Acquisition.

31.     All of the individual defendants named herein are collectively referred to as the "Individual Defendants."

32.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Fortis, were privy to confidential and proprietary information concerning Fortis, its operations, finances, financial condition, as well as present and future business prospects. Because of their positions with the Company, the Individual Defendants had access to material adverse non-public information concerning Fortis via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

33.     For example, according to Fortis's 2007 Annual Report, the Board "met on 21 occasions in 2007, more frequently then usual due to the ABN AMRO acquisition."  Eight of those meetings were regular Board meetings in which the Company's senior executives sometimes participated, and at which the following, among other matters, was addressed: (i) "the strategy pursued by Fortis as a whole and by each Fortis business"; (ii) "ongoing developments at each of the Fortis businesses"; (iii) "the 2007 budget"; (iv) "quarterly balance sheets and income statements, with additional information provided by the CFO and external auditors"; (v) "Fortis's ownership structure and associated investor relations strategy"; (vi) "reports of Board committees following each of their meetings"; (vii) "the economic and monetary environment"; (viii) "regulatory and legislative developments in the Benelux countries and their impact on Fortis"; and (ix) the

nomination of Board members, the appointment of Executive Committee members, and the remuneration of officers and directors.

34.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Fortis's business.

35.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

36.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered for trading on the OTC market and other markets worldwide, and which has subjected itself to certain regulatory requirements imposed by the federal securities laws from time to time, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Fortis's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements

that had become materially misleading or untrue, so that the market price of Fortis securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Fortis securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Fortis's business, operations and management and the intrinsic value of Fortis securities; and (ii) caused Plaintiff and members of the Class to purchase Fortis securities at artificially inflated prices.

## IV.    CONFIDENTIAL SOURCES

38.     In addition to the investigation undertaken by Lead Plaintiffs' counsel referenced above, the allegations made herein are supported by the firsthand knowledge of seven confidential witnesses ("Confidential Witness" or "CW"), each of whom was employed by Fortis at various times during the Class Period.  As detailed below, the CWs occupied positions that gave them access to the information they are alleged to possess concerning the Company's business and operations and the materially false and misleading statements that the Individual Defendants are alleged herein to have made during the Class Period.  In addition, several of the CWs communicated with those who reported directly to the Individual Defendants, such that the CWs had a reasonable basis upon which to describe information that the Individual Defendants knew or should have known.

39.     **Confidential Witness 1**:  CW1 is a former Senior Program Manager who was employed on a contract basis at Fortis Bank's headquarters in Brussels, Belgium, from August 2007 through March 2008.  In that capacity, CW1 was responsible for designing and implementing reporting processes in connection with Fortis's efforts to integrate ABN AMRO's business into its own.  For example, during the course of employment, CW1 developed processes for use in

- 17 -

managing and monitoring project status and time expenditures associated with various integration projects.  According to CW1, there were 175 Fortis and ABN AMRO project managers.

40.     Although CW1 did not regularly work with the Individual Defendants, CW1 was introduced to Defendant Votron in August 2007, at which time Votron was informed of CW1's responsibilities in connection with the integration activities.

41.     **Confidential Witness 2**:  CW2 is a former Assistant Vice President of Finance and Control who was employed in the Capital Management Department of Fortis's Global Markets Group ("GMK") in New York City, from May 2007 through March 2008, when CW2 was laid off along with approximately 20 other employees as a result of a large workforce reduction.[3]  CW2 reported to the Deputy CFO in New York, who, in turn, reported to Fortis's headquarters in Brussels, Belgium – possibly including defendant Mittler, the Company's CFO.

42.     CW2 was responsible for reviewing and analyzing capital levels (*i.e.*, cash-on-hand) and credit risks of nearly 21 entities affiliated with Fortis.  To perform the analyses, CW2 compared capital and credit risk data between the previous and current quarters to determine whether any discrepancies or missing data existed.  To facilitate the process, GMK used a "CRMA system" for risk assessment purposes.[4]  However, because many of GMK's products were complex, the system

---

[3]     According to Fortis, GMK "is a business section within Merchant Banking" and "is the beating heart of the capital markets within Fortis. GMK covers a wide variety of primary and secondary market activities in securities, securitized derivatives and derivatives."  In this regard, "[i]t delivers comprehensive, tailor-made and integrated solutions to governments & public entities, financial institutions, top corporate clients, midcaps and private banking clients worldwide."  In fact, GMK is also responsible for executing "Fortis Bank's structural liquidity risk management" and operating and contingent liquidity risk management," and is charged with funding Fortis's various entities, "including itself and special purpose vehicles."  During the Class Period, "[t]he GMK business section [wa]s the largest in Belgium," "employ[ed] about 1,200 people and [wa]s present in 25 countries across Europe, America and Asia."  Major business centers are also located in London, New York and Hong Kong.  According to the 2008 Annual Review, GMK now has 250 employees.  *See* Fortis's 2007 Financial Statements; *see also* http://www.lexgo.be/ViewPost.aspx? CID=EN1244.

[4]     In a document available on Fortis's website entitled "Basel II – Pillar 3; Qualitative disclosures by Fortis Bank – December 2007," dated May 19, 2008, Fortis defined the acronym CRMA as "Credit Risk Management Application."

- 18 -

could not process all of the factors necessary to perform the assessment for each product. As such, certain risk calculations had to be manually performed, which introduced "room for errors." In performing the analyses, CW2 reviewed risk data provided by the GMK trading floor supervisor, including any manual calculations. In addition, the risk calculations were based on ratios provided by the head office in Belgium and external ratings agencies, such as Standard &Poor's and Moody's. Ultimately, CW2 had to find explanations for any material discrepancies, which was complicated by the fact that back-up data was unavailable for manually-prepared calculations. According to CW2, significant variances from one period to the next usually represented losses.

43.     **Confidential Witness 3**: CW3 is a former Trader who was employed in the Front Office of Fortis's Equities Group in New York City, from February 2008 through September 2008. In that capacity, CW3 was responsible for executing an arbitrage trading strategy, which allowed Fortis to capture the price spread generated between purchasing stocks at a low price and selling stocks at a higher price.

44.     **Confidential Witness 4**: CW4 is a former Managing Director of Market Risk Management who was employed in Fortis's New York office from October 2006 through December 2007. In that capacity, CW4 supervised a team of eight Risk Managers responsible for managing market risks associated with the New York office's operations, with the exception of Energy Market activities. CW4 and the team also monitored the assets of Fortis's Investment Management division, also based in New York.

45.     Specifically, CW4's team was responsible for monitoring transactions, such as CDO trading activities by Asset Managers, as well as asset ratings provided by ratings agencies, such as Moody's and Standard & Poor's. CW4's team was also responsible for reviewing and assessing risks related to Fortis's CDO portfolio, *e.g.*, the portfolio's exposure to the subprime crisis in the

U.S.  To this end, CW4's expertise was in risk management related to Fortis's CDO business.  CW4 indicates that Market Risk Management utilized several computer systems in connection with these monitoring and assessment activities.

46.     CW4 reported to the Head of Risk for North America, who, in turn, reported to senior-level management from Fortis's Belgian headquarters.  In addition, the Market Risk Management team, under CW4's supervision and direction, regularly prepared and submitted reports to senior-level management in New York and Brussels on a biweekly – and sometimes weekly – basis.  These reports set forth the Market Risk Management team's assessments and conclusions regarding the CDO portfolio.  For example, the reports contained information regarding, among other things, the number of CDO assets that the New York operation had accumulated during the reporting period; assets that had been "put" on the market (but for which investors had not yet been found); the total number and names of buyers for the various CDO tranches; and Fortis's own investments in assets and unsold inventory.  CW4 further explained that the CDO information clearly delineated what were "subprime," "mezzanine" and "high-grade" assets.

47.     **Confidential Witness 5**:  CW5 is a former Corporate Loan and Credit Derivative Trading and Sales Associate who was employed in Fortis's New York office from February 2007 through March 2008, when CW5 was laid off along with other employees as a result of a large workforce reduction.  In that capacity, CW5 engaged in the purchase of low-priced, high-grade corporate loans, which CW5 then sold to smaller, often Asian or European banks.  CW5 reported directly to a Senior Vice President who was resident in the New York office.

48.     As detailed herein, CW5 believed that Fortis had major write-downs it needed to take for structured credit investments that were "slapping [it] in the face" by late-2007 and early-2008,

and, further, that Fortis failed to make adequate disclosure of its exposure to the subprime market and the financial impact of such exposure.

49.     **Confidential Witness 6**: CW6 is a former Director of Commodity Finance who was employed in Fortis's New York office from January 2005 through August 2008.  In that capacity, CW6's responsibilities involved arranging financing for companies that traded metals.  According to CW6, the Commodity Finance group regularly utilized a database called "OASIS," which enabled them to manage loan utilization reports they generated – and CW6 believed Fortis's European offices could access.  In addition to CW6's Commodity Finance group, CW6 indicated that Fortis's New York operations also consisted of the following groups, among others: Shipping and Energy; Media and Telecommunications; Project Finance; Leveraged Finance; Capital Markets; Tax Structuring; Corporate Finance; and Chemicals.  CW6 reported to both a U.S.-based executives and an Amsterdam-based executive.

50.     According to CW6, Fortis's New York operations held all-employee meetings at the end of each quarter, during which employees were informed about quarterly financial results.  The CEO of Fortis U.S., Waldo Abbot ("Abbot"), conducted the meetings, and the CFO of Fortis U.S., John Rieger ("Rieger"), typically presented the financial information.  CW6 further explained that Abbot regularly visited the head office in Brussels to discuss ongoing issues related to the U.S. operations, and that his visits increased in frequency as the losses suffered by the U.S. operations became more significant.

51.     **Confidential Witness 7**: CW7 is a former Cost Controller who was employed in Fortis's Jersey City, New Jersey office from November 2006 through February 2008.  In that capacity, CW7 generated monthly cost projections and reports concerning employee salaries and headcount for Fortis's Merchant Private Bank, based in New York City.  These reports covered

- 21 -

several groups that were regarded as part of the "Back Office" of the U.S. operations, including Risk Management; Compliance; Finance; and Legal.  CW7 reported to the U.S. Controller, who, in turn, reported to U.S. CFO Rieger.  CW7 indicated that Rieger reported to Abbot, who, in turn, CW7 believed reported to Defendant Votron.  CW7 indicated that Rieger "had his hands in everything" and was highly attuned to the problems that Fortis was facing during the Class Period.

52.     According to CW7, the New Jersey office maintained close contact with the Brussels office.  As CW7 explained, whenever the Brussels office needed something from the New Jersey office, such as an annual forecast or budget, it would provide templates and reports that the New Jersey office would complete and then return to Brussels.  CW7 had weekly communications with an employee in Brussels, mainly in relation to Back Office matters.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   The Company and Its Business

53.     Defendant Fortis describes itself as an international provider of banking and insurance services to personal, business and institutional customers.  During 2007, Fortis reported its financial results in two primary segments, Banking and Insurance, although the Company later organized itself on a worldwide basis into the following businesses – Retail Banking, Merchant & Private Banking (later split into Merchant Banking and Privet Banking & Asset Management), and Insurance – which were further subdivided into separate business segments.  Fortis separately reported financial results relating to other operations that did not fall under the purview of these businesses.

54.     In its Annual Review 2007, Fortis indicated that it ranked among Europe's top 20 financial institutions, with a market capitalization of €40 billion at year-end 2007.  Moreover, with the ABN AMRO assets that it acquired in connection with the Acquisition, Fortis claimed that it had

secured a presence in over 50 countries and a workforce of more than 85,000, purportedly making it

a leader in financial services in Europe, a top 3 private banker and a top tier asset manager.

55.    A significant aspect of Fortis's business during the Class Period was its Scaldis

Capital ("Scaldis") operations, which Fortis established in 1999 as part of its Merchant Banking unit

to facilitate the securitization of assets with a single "special purpose vehicle."  According to Fortis's

website (available at http://tinyurl.com/qa62gk):

> Scaldis makes it possible for companies to fund their portfolio quickly and
> efficiently. Drawing up the legal documents usually takes between one month and
> three months, depending partly on how quickly the company can provide the
> required data. Once the programme has been set up, and provided no "roadshows"
> have to be arranged, no prospectus has to be issued and stock-exchange listing is not
> required, the funding can be arranged in two days.  In addition, the funding is
> completely anonymous – only the bank, solicitors and ratings agencies are aware of
> it.

56.    Fortis also described Scaldis as a "multi-seller asset backed commercial paper

conduit" – one of the largest of such programs in the world.  Contrary to Defendants' representations

during the Class Period, Scaldis held subprime and other assets that were widely exposed to losses.

### 1.    The Acquisition

57.    On April 13, 2007, Fortis and a consortium of two other international banks, The

Royal Bank of Scotland plc ("RBS") and Banco Santander Central Hispano, S.A. ("Santander")

(collectively, the "Consortium"), issued a press release in which they jointly announced that they had

initiated efforts to pursue the Acquisition.[5]  Specifically, the Consortium acknowledged that it had

---

[5]    Although the press release includes a statement that it is "NOT FOR DISTRIBUTION IN OR INTO THE
UNITED STATES," it, along with numerous other press releases issued by the Consortium (presumably all of them), is
printed in English and is available on the website that Fortis established and continues to maintain with respect to the
Consortium.  *See* http://www.holding.fortis.com/shareholders/consortium_press_releases.asp.  In fact, Fortis's other
press releases, some of which include the same statement (and are also printed in English), are also publicly accessible
on its website and are maintained in a dedicated, and searchable, press release archive.  Also publicly viewable on
Fortis's website are detailed summaries of nearly every press release, including those for which Fortis purported to

submitted a letter dated April 12, 2007 to the Chairmen of the Supervisory and Managing boards of ABN AMRO, to express its interest in conducting due diligence with a view towards an acquisition transaction.  The Consortium claimed to have made the announcement in response to "recent press speculation," although ABN AMRO issued its own press release on April 13, 2007 acknowledging receipt of the Consortium's letter.

58.     Over the course of the following months, the Consortium negotiated the Acquisition with ABN AMRO, eventually causing ABN AMRO to abandon a negotiated deal with Barclays plc. Specifically, the Consortium agreed to acquire each share of ABN AMRO securities, wherever trading (including in the U.S., in the form of ADRs), in connection with a tender offer that commenced on or about July 23, 2007 and closed on October 5, 2007.  In exchange for each ordinary share of ABN AMRO securities, the Consortium offered aggregate consideration in the amount of €38.40, comprised of €35.60 in cash and 0.296 newly issued ordinary shares of RBS securities – for a total of €71 billion (*i.e*., \$101 billion).  The Consortium left its €38.40 per share offer in place, but raised the cash component from 79% to 93% of such consideration, even after ABN AMRO agreed to sell LaSalle Bank – a unit that the Consortium had at one time regarded as the "crown jewel" – to Bank of America.

59.     The Consortium formed RFS Holdings BV ("RFS Holdings"), a limited liability company incorporated under the laws of the Netherlands, for the sole purpose of effectuating the Acquisition.  Each member of the Consortium owned a share in RFS Holdings, and hence ABN AMRO, equal to its commitment to fund the Acquisition, as follows:  Fortis, 33.8%; RBS, 38.3%;

---

restrict access.  In addition, Fortis makes publicly available webcasts and other presentations concerning some of the very matters for which it purports to restrict access.

and Santander, 27.9%. Incidentally, Fortis obligated itself to contribute the most consideration, in the amount of approximately €24 billion (*i.e.*, $31.5 billion) in cash.

60.   According to the Registration Statement and Prospectus on Form S-4 that the Consortium, through RBS, filed with the SEC on July 20, 2007, Fortis agreed to finance its portion of the consideration with (a) "the net proceeds of an equity offering in an amount of up to €13 billion and the proceeds of the placement of conditional capital exchangeable notes [] of €2 billion; and (b) "the proceeds of a combination of (i) the issuance of various securities; (ii) the sale of specific non-core assets of Fortis that may complete prior to the completion of the offers; and (iii) other internal financial resources including but not limited to cash on Fortis's balance sheet."

## 2.   The Company's Strong and Numerous Ties to the U.S.

61.   Fortis has longstanding ties to the U.S. and has continued to invest in its U.S.-based infrastructure in order to better position itself to increase its market share and improve its operations here. In this regard, the importance of the U.S. market to Fortis's business operations is undeniable. In a marketing brochure directed specifically to the U.S. market, Votron, Fortis's CEO, was quoted as saying: "***North America is a key market for us, and one in which we will further invest and broaden the scope of our specialized Merchant Banking services***."[6] In that same brochure, Fortis touted its "culture of engagement" and "skill at integrating [its] global strengths with [its] specialized U.S. expertise."

62.   According to the front-page of a Company website geared to the U.S. market, which bears the heading "Fortis in the U.S.," "Fortis has a strong and growing presence in the U.S." as a result of providing, *inter alia*, "[t]ailored advice and financial services to corporate and institutional

---

[6]   All emphasis in bold and italics is added unless otherwise indicated; all other emphasis is derived from the original source.

clients, offering them investment and financing products as well as advisory services[,]" and "[a]sset management services to institutional and private clients."  *See* http://www.us.fortis.com/.  Indeed, Fortis provides a wide range of financial and other services to the U.S. market, including financing; transaction services; sales, trading and risk management; corporate finance; private equity; trust; and asset management.  Fortis also invests alongside its U.S. clients under certain circumstances.

63.     According to a separate webpage reachable at that website, Fortis has nine offices geographically dispersed throughout the U.S., two of which are located in New York City (as noted above).  A brochure that is publicly available at the website, entitled "Fortis in the U.S.: The scope and strength to meet your needs" (the "Brochure"), emphasizes Fortis's strong commitment to, and rapid expansion in, the U.S., noting that ***the Company earned $532 million in revenue from the U.S. in 2006 alone*** (up from $315 million in 2005), and had 1,055 full-time employees located here that year (up from 409 in 2005).  In fact, according to a page that Defendant Dierckx included in materials he prepared for Fortis's March 9, 2007 Investor Day, U.S. employees accounted for 8% of the Company's entire workforce and the U.S. itself represented 9% of its total income:



64.     In addition, as noted in the above graphic, Fortis had plans to significantly expand its

U.S. operations.  The Brochure further describes Fortis's "strategy" in the U.S., as follows:

**Our strategy**

Our ambition is to continue to build Fortis as a specialized, customer-focused merchant bank in the U.S. market.  To accomplish this, we are committed to delivering an integrated offering – a seamless array of products that builds on our leadership positions in industry niches and product specialties.  Specifically, we are committed to:

- Providing full merchant banking services, co-investing with our clients and serving as their bank financing partner.

- Further building our strong franchises in Energy, Commodities, and Transportation.

- Being the bank of choice for Fortune 1000 corporations in these and other key franchise sectors.

- Building a leading position as service provider to hedge funds and other institutional investors.

65.     The Brochure likewise describes the Company's rapid U.S. expansion, as well as the

factors contributing to it and the steps that the Company has taken to ensure that such expansion

continues.  In this regard, the Brochure indicates that Fortis has ***more than tripled its U.S. employee***

***base*** between 2004 and 2006, and made strategic acquisitions with the U.S. market in mind:

**Our rapid expansion**

Our growth in the U.S. underscores our commitment to our clients.  During the period from 2004 to 2006, we more than tripled our U.S. employee base in order to maintain our high quality of client service.  We also made strategic acquisitions that reflect our commitment to address U.S. client needs in our key franchise sectors:

- Cinergy Marketing & Trading LP, offering gas, power and oil marketing and trading services, which builds on our offering in Energy, Commodities and Transportation.

- Cadogan Management LLC, with whom we are combining our Fund of Hedge Funds activities in a new stand-alone asset management company.

- O'Connor & Company, a leader in clearing services on U.S. equity, futures and options markets, which when combined with our existing Chicago clearing operations more than tripled our size and presence in this market.

▪ Hedge Fund Services (HFS), the British Virgin Islands' largest independent full-service fund administrator. This acquisition underscores our commitment to grow further our presence in niche markets in the Americas, and strengthens the position of our fund servicing arm, Prime Fund Solutions, in the hedge funds industry.

66.     Under the same heading, the Brochure also describes the magnitude of the Company's operations in the U.S.:

The expansion of our U.S. business demonstrates that clients understand and respond to our commitment. From 2004 to 2006, our U.S. corporate client base nearly doubled, to more than 500 corporate clients, while our U.S. revenue more than doubled. Today, we have more than $100 billion in assets in the U.S., while our approved client lines of credit increased by 50 percent in 2006 alone.

67.     The following graphic, adapted from the 2007 Annual Report, shows how Fortis's Merchant Banking and other operations were dispersed throughout the U.S.:



68.     Moreover, as CW4 confirmed, Fortis's New York operations were closely controlled by executives who were resident in the Company's Belgian headquarters. According to CW4, the New York office did not have "ultimate" authority to approve its own operations and activities. Instead, all activities engaged in by the New York office, including subprime and CDO-related

transactions, had to be reviewed and approved by the Merchant and Private Banking Risk Committee ("MRC"), based in Brussels.  In this regard, the MRC determined the volume of assets that the New York operation was allowed to have on its books at any given time.  According to CW4, MRC would delegate some of its responsibilities to various subcommittees, such as the Securitization Risk Committee ("SRC") and, therefore, most transactions and activities of Fortis's New York operations were approved by the SRC.  For example, all CDOs had to be "individually" approved by the SRC.  CW4 indicated that the SRC's approval authority extended to transactions valued up to €500 million and that, at some point, this authority was extended to €1 billion.

69.    CW4 also explained that during October of each year, the New York office had to submit its annual business plan to the head office in Brussels for review and approval.  The annual plan had to be approved by the MRC, which was then chaired by the CEO of Merchant Banking, Dierckx (who became CEO of Fortis in September 2008).  In approving the annual plan, the MRC established the framework within which the New York office would operate during the upcoming year, although MRC management did not approve specific deals or transactions at that time.

70.    CW4 further indicated that the New York team was allowed to operate only within the "framework" approved by the Brussels office and could not offer transactions to clients that had not been approved as part of it.  According to CW4, there was constant and "complete" reporting by the New York operation to Fortis's head office in Brussels.  CW4 indicated that the frequency of this reporting increased in proportion to the volume of troubled assets on the New York office's books.

**B.    Fortis Was Experiencing Undisclosed Problems that Materially Affected Its Business and Operations**

71.    By the start of the Class Period, Fortis was experiencing undisclosed problems, and engaging in improper conduct, that materially affected its business and operations and would continue to have a long-lasting effect.  For example, Fortis had overextended itself in arranging

funding for its portion of the Acquisition, which required the Company to materially reduce the capital ratios of its U.S. and other operations and exposed it to further problems associated with weakening economic conditions.  At least in part, these problems required Fortis to terminate a substantial portion of its U.S. workforce.  Fortis also implemented a risk assessment framework that enabled it to manipulate its capital position, which allowed the Company to divert capital to the Acquisition and avoid scrutiny for having done so.  At the same time, Fortis overvalued CDOs and asset-backed securities, and failed to appropriately write-down their value when the Company announced its financial results and, later, write-downs.

### 1.      Fortis Overextended Itself In Connection with the Acquisition

72.      According to CW2, one of the factors that seriously impacted Fortis's capital position was the Acquisition.  CW2 explained that in order to fund the Acquisition, Fortis had to spend much more money than it had immediately available for the purpose and, in doing so, over-expended its capital budgets by drawing funds from its U.S. operations and possibly other operations, as well. CW2 believed that the New York office's failure to meet the required capital standard for Fortis's U.S. operations confirmed that Fortis overleveraged itself in connection with the Acquisition. According to CW2, by failing to maintain its capital standards, Fortis's U.S. operations were not in a position to perform or grow – a situation that contained to persist even as of the time of CW2's departure, in March 2008.

73.      CW6, a former Director of Commodity Finance, also believed that Fortis had overextended itself to fund the Acquisition.  According to CW6, the Commodity Finance group was experiencing capital constraints as early as fall-2007 as a result of the Company's diversion of funds to finance the Acquisition.  As a result, Commodity Finance had to prioritize and carefully screen deals for capital availability.  Ultimately, the lack of available capital stymied the group and

significantly impacted its profitability.  In fact, CW6 confirmed that the situation grew worse during 2008.

74.      In addition, CW1 confirmed that the integration was not going according to plan, presumably because of such overleveraging.  CW1 understood that there was no set budget for the integration work to which CW1 was assigned, which CW1 characterized as being somewhat strange. Moreover, as CW1 was leaving the Company's employ in March 2008, Fortis was ending contracts with a large number of contractual employees, which CW1 interpreted as "a sign that something was not right."  Indeed, according to CW1, Fortis employed "hundreds" of contractors for the purpose of executing various integration activities associated with the Acquisition.  Thus, CW1 believed that something was amiss when a substantial number of these contractors were let go in March 2008, particularly because a substantial amount of integration work had "obviously" not been completed as of that time.

### 2.      Fortis Adopted Procedures that Enabled It to Manipulate Its Risk Ratings

75.      During CW2's tenure, Fortis implemented Basel II for its U.S. operations.  In a document available on its website entitled "Basel II within Fortis in a nutshell," dated June 2008, Fortis explained that Basel II is a regulatory framework, developed by the Basel Committee of Banking Supervision (the "Basel Committee"), intended to "improve the stability and soundness of the financial system by more closely linking capital requirements to risks and by promoting a more forward-looking approach to capital management."  Fortis further explained that "the objectives of Basel II are broadly to maintain the aggregate level of minimum capital requirements, while also providing incentives to adopt more risk-sensitive approaches."  Basel II implemented the following three "pillars" "covering minimum capital requirements, supervisory review and market discipline":



76.     The main objective of Basel II, which replaced Basel I, was to enhance the capital requirement regulations by taking into consideration operation risks in addition to credit and market risks.  Because Basel II related to matters under CW2's responsibility, CW2 was involved in implementing it for Fortis's New York operations.

77.     In mid-2007, CW2 attended two Basel Committee seminars in New York on Fortis's behalf.  During the meetings, CW2 raised certain issues to the Basel Committee.  For example, according to CW2, Fortis was implementing the so-called Advanced Measurement Approach under Basel II (a fact confirmed by its Basel II primer), which allows a bank to calculate its own capital requirements by developing and applying its own internal risk rating models.  In contrast, a standard approach permits a bank to rely upon external agencies' risk ratings.  According to CW2, Fortis did not have internal rating models with minimum risk rating standards, having relied in the past on the standards set by external ratings agencies.

78.     At the seminars, CW2 told the Basel Committee that Fortis had no such models in place and believed that the Basel Committee should set and enforce its own models or thresholds for banks.  The Basel Committee led CW2 to believe that it did not want to set minimum standards for internal ratings, because it did not want to be liable or responsible "in case [its] minimum standards were wrong."  Given the situation and the Basel Committee's seeming unwillingness to enforce such minimum standards, CW2 said that banks took advantage of the situation and often under-rated their operational risk or so-called capital charges.  CW2 explained that the higher the risks are, the more capital a bank must maintain; therefore, it is in the bank's interest to have lower risk ratings.

### 3.     Fortis Overvalued CDOs and Asset-Backed Securities

79.     CW2, CW3, CW4 and CW5 each confirmed that Fortis overvalued CDOs and asset-backed securities both prior to and during the Class Period, and then failed to accurately disclose the total amount of the write-downs and losses associated with those assets in its public disclosures.  In addition, CW6 and CW7 had heard about Fortis's substantial subprime losses, and also confirmed that the Company knowingly or recklessly failed to write-down the value of its subprime-related assets as early as it should have.

80.     **CW3**:  In January 2008, CW3, a former Trader, learned that several senior-level managers in the New York office were leaving the Company.  A steady exodus of senior managers in the New York office continued until September 2008.  CW3 believed that these departures meant that Fortis was experiencing serious trouble and that senior-level managers knew about it.

81.     In an effort to determine the source of the problems, CW3 discussed the matter with a member of management in Fortis's New York office.  This executive explained to CW3 that Fortis's CDOs were not "properly" marked-to-market, which meant that they were "overvalued."  The executive also told CW3 that Fortis had "marked down" the value of the CDOs, but not "by much" – and certainly not enough to correctly reflect the true value of the CDOs.  According to this

executive, Fortis's Belgian management decided to mark the CDOs down by lesser amounts than they should have been in this late 2007/early 2008 timeframe.  According to CW3, the executive explained that Fortis's Brussels headquarters had sent an email to management in New York, advising the New York office of the "pricing strategy" for the CDOs, which resulted in the CDOs being insufficiently marked down.

82.    According to CW3, the value of structured products, such as CDOs, collateralized loan obligations ("CLOs"), residential mortgage-backed securities and asset-backed securities, was consistently decreasing throughout 2007, and, at some point, CW3 heard that Fortis's CDO portfolio lost approximately $2 billion in value in 2007 alone.

83.    **CW2**: CW2, a former Assistant Vice President of Finance and Control, corroborated CW3's account that Fortis failed to sufficiently mark down the value of the CDOs.  In fact, CW2 confirmed that Fortis failed to publicly disclose ***nearly half the losses*** associated with the CDOs and asset-backed securities reflected in the Company's accounts.  In January 2008, while analyzing capital performance for the fourth quarter of 2007, CW2 uncovered "losses in accounts with special access," which CW2 could only partially view.  CW2 explained that some of these accounts – such as those from the mortgage-backed securities desk, treasury desk and GMK desk – had *substantial* losses.

84.    After uncovering the losses, CW2 brought them to the attention of an immediate supervisor, the Deputy CFO, who responded that the information was "strictly confidential" and that CW2 could be terminated if the issues were raised with anyone else.  The Deputy CFO also instructed CW2 not to "leak" any information regarding the losses.  CW2 believed that the Deputy CFO was concerned that the disclosure of the information could negatively impact the Company's stock price.

85.     According to CW2, the Deputy CFO held a conference call (also in January 2008) with personnel from Fortis's Belgian headquarters to discuss these issues.  The Deputy CFO later informed CW2 that European management was going to "handle" the issue.

86.     Moreover, according to CW2, Fortis's executive officers knew or should have known about the losses because they failed to timely downgrade the products along with the decline in the value of the asset-backed securities at issue.  According to CW2, some of the securities were over-rated as "AAA" as late as the end of 2007, which CW2 believed was "ridiculous" in light of the onset of the subprime crisis.

87.     According to CW2, when Fortis reported its financial results in March 2008, **it disclosed only half of the total amount of impairments** that CW2 had observed in January 2008.

88.     **CW4**:  CW4, a former Managing Director of Market Risk Management, indicated that Fortis could not accurately value CDOs and asset-backed securities, which would have rendered inaccurate public disclosures about the losses.  CW4 also extensively explained the process by which Fortis valued these assets, as well as the fact that high-level management in Brussels knew about valuation discrepancies.

89.     CW4 indicated that the New York Risk Management team, which CW4 supervised, was "actively" involved in monitoring asset valuations and was responsible for reporting the valuations to management in Brussels (as detailed herein).  Although CDOs were valued on a *daily* basis, the formal review and audit of the parameters used in the asset valuations was conducted on a *monthly* basis.  The "initiation point" of the valuation process began in the Front Office, where Fortis's Traders assigned values to the assets based on the values they obtained from the dealers who purchase the assets.  Next, Fortis's "Middle Office" gathered data regarding the market value of similar assets, after which the Trader valuations were compared to the market values.  If a significant

variance existed between the values, the Middle Office reviewed them with the Traders in an attempt to determine a more accurate value. These "comparisons" took place at the beginning of every month. According to CW4, the overall objective of the valuation process was to determine the most accurate market value for the assets so that Fortis could mark-to-market them on a monthly basis and use the values for public financial reporting.

90.     According to CW4, the impact of the subprime crisis started to become evident to Fortis as early as February 2006. From that point onward, CW4 explained, it became harder and harder to put value on Fortis's assets – and CDOs, in particular – because it became difficult to determine their market value. Prior to 2006, however, CW4 explained that there were no significant disagreements between the Trader-assigned values and the market values verified by the Middle Office. As noted above, before the subprime crisis became fully apparent, a dealer would tell a trader what a particular asset could fetch on the open market, which the trader used to determine its value. This valuation methodology proved to be "bad" or inefficient, however, as the subprime crisis persisted. Indeed, CW4 explained that beginning in early 2006, two dealers could provide two substantially different values for the same asset. The gap between the valuations increasingly widened thereafter, and by 2007 it was quite common for two dealers to offer drastically different prices for the same or similar assets. As a result of the differences in values provided by dealers, Fortis's Traders had to determine average values and assign them to Fortis's assets, such as CDOs.

91.     Moreover, the increasing infrequency with which CDOs were purchased complicated a determination of their value, because Fortis and other financial institutions no longer routinely bought and sold the assets. This decline complicated the practice of marking-to-market the assets. According to CW4, the uncertainties caused by turbulent market conditions required changes to Fortis's valuation methodologies. In fact, by the second half of 2007, Fortis had to revise its asset

valuation guidelines and implement a new valuation methodology to deal with the changing market environment.  Previously, if the values for an asset were inconsistent with each other by, *e.g*., 5%, 10%, 15% and 20%, the lowest and highest values were "thrown out."  In contrast, the new model sought to derive an average value from the remaining values.  According to CW4, implementing such "drastic" changes to Fortis's valuation methodologies required a wide range of approvals.

92.     According to CW4, given the escalating market turbulence and the need to change valuation methodologies, the value of Fortis's CDO portfolio had to be changed "dramatically" throughout 2007.  Such revaluations and devaluations had to be approved by top management in New York and senior-level management in Brussels.  CW4 indicated that Fortis had to write-off losses related to CDOs every month, and noted that the write-offs began in spring 2007 and continued throughout the CW4's employment with Fortis, which ended in 2007.  According to CW4, Fortis even had to write-off the value of assets that had been set aside for inclusion in a CDO, which had been approved for creation but was not yet completed as of the time of CW4's departure.

93.     **CW5**:  Although CW5 did not work directly on Fortis's structured credit products, CW5 "sat across" from the group that worked on the investments and thus was exposed to detailed information concerning the group's practices while employed at Fortis.  According to CW5, who had an accounting background, Fortis had major write-downs that it needed to take for structured credit investments that were "slapping [it] in the face" as of late-2007 and early-2008.

94.     For example, several months prior to March 2008, CW5 knew that Fortis had at least one major CLO "marked at par" which had actually plummeted in value.  Specifically, CW5 had observed on a so-called "CLO sheet" that the CLO at issue was still "marked at par around $1.01," which was "nowhere near" its actual trading value of between $0.80 and $0.85 and therefore should have been written down, but was not.  CW5 further expressed the belief that when Fortis reported its

full-year 2007 financial results, the Company had still failed to write-down this major CLO or properly disclose its value.  The basis for CW5's belief was two-fold:

- First, according to CW5, the CLO sheet showed the CLO at its artificially high par value, which reflected a valuation that would have been included in Fortis's publicly reported financial results; and

- Second, Fortis reported much better results for 2007 than were anticipated by personnel in the New York office, where knowledge of the problematic CLO was sufficiently widespread that such personnel expected worse results.

95.    As CW5 pointed out, other financial entities that "were holding the same stuff had been getting annihilated," particularly those with large structured investment groups like Fortis's. Indeed, CW5 knew that Fortis had set up various structured investment vehicles associated with credit investments that had "implicit guarantees," which meant that certain liabilities could – and would – come back to Fortis.  However, during "a floor meeting" in early 2008, when the annual 2007 results were disclosed to personnel at the New York office, it came out that "somehow we [*i.e.*, Fortis] had weathered the storm" and reported results that were much better than CW5 and others had expected.  The turn of events supported CW5's conclusion that Fortis was "overvaluing those products" and failing to appropriately mark them down, especially since CW5 overheard that no write-downs had been taken.  In addition, personnel in the New York office largely believed that Fortis had elected to defer taking write-downs of impaired investments and assets until *after* the Acquisition had been completed.

96.    Moreover, whereas CW5's group was required to mark-down its assets to current market values, the structured credit group was not; however, CW5 contended that the structured credit group *should* have.  As CW5 explained, that group was supposed to "mark-to-market" its assets on a daily basis to reflect *actual* market values, regardless of what the "par value" of the assets was.  In this regard, according to CW5, the Middle Office was supposed to validate the valuations coming from the Traders in the Front Office.

- 38 -

97.    **CW6** and **CW7**:  Both CW6 and CW7 confirmed that Fortis failed to write-down the value of subprime-related assets as early as it should have.  For example, beginning in early-July 2007, CW7 heard that Fortis was experiencing losses due to its "large" exposure to the subprime crisis, which led to certain internal cost-reduction measures that CW7 was charged with implementing.  In addition, CW6 indicated that during an all-employee meeting at the end of the first quarter of 2007, New York management disclosed that the Company had to take a "relatively small" write-down as a result of subprime losses.  Following that meeting, the size of the losses and write-downs continued to grow.  However, CW6 learned from colleagues that the losses were much larger than Fortis had anticipated – or disclosed.  Indeed, CW6 learned from a supervisor that the losses were "a multiple of" the amounts shared during the quarterly meetings, and that the actual losses were, in fact, *much greater* than those announced.  The same supervisor told CW6 that the losses caused Fortis to become "insolvent."

C.    **Materially False and Misleading Statements Issued During the Class Period and Key Developments**

98.    The Class Period begins on September 17, 2007.  On that date, the Consortium issued a press release announcing that it had received Declarations of No Objection form the Dutch Minister of Finance, "on the advice of" DNB, with respect to the Acquisition.  One of the conditions to such consent was that the Consortium "commit to maintain target levels of capital and liquidity determined between DNB and ABN AMRO."  In this regard, the Consortium had to submit "[a]n adjusted capital and liquidity plan . . . to DNB for approval within thirty days of the entry into force of the Declarations of No Objection," which would occur at such time as the Consortium declared its offer unconditional.  As the Consortium proclaimed, "[t]his is an important step towards the completion of the [Consortium's] offer for ABN AMRO."  The market agreed.

99.    On September 18, 2007, the following trading day, the trading volume and price of Fortis's securities experienced a substantial, across-the-board increase on each trading exchange. For example, on the Euronext Brussels and Amsterdam, the trading price respectively increased from €21.06 and €21.07 per share the previous day, to €21.30 and €21.31 on September 18, 2007. Likewise, on the U.S. OTC market and the Luxembourg Exchange, the price respectively increased from $30.03 and €21.07 per share the previous day, to $31.06 and €21.31 on September 18, 2007. An even greater increase in price took place on September 19, 2007, as the market received comfort that Fortis had to ensure that it had in place appropriate capital and liquidity plans to facilitate the Acquisition.

### 1.    The September 21, 2007 Statements

100.    On September 21, 2007, Fortis issued two press releases, access to which was purportedly restricted to non-U.S. investors, concerning a rights issue intended to finance the Acquisition and the Company's expected results for the nine-month period ending September 30, 2007, respectively.  In the press release concerning the Company's expected financial results (which was in English and did not contain a written access disclaimer), the Company represented that it did not have any significant exposure to the subprime or CDO markets:

> Although Fortis does not have any direct mortgage financing activities in the US, it does have some exposure to the US sub-prime mortgage market through its ownership of mortgage-backed securities, asset-backed securities and CDOs. Approximately 95% of these MBS and ABS portfolios are AAA and AA rated. The impact on Fortis's full-year 2007 results is expected to be non-material thanks to its diversified portfolio, dynamic portfolio management and the credit risk protection purchased in 2006.

> *    *    *

> Fortis Investments is active in both CDO and CLO markets and manages around EUR 9 billion in third-party closed-end funds. It is also active in CDOs within the sub-prime market, although there is no significant direct risk in its exposure. To date, Fortis Investments has seen outstanding performance in its CDO business with no single tranches downgraded. ***Fortis Investments does not currently foresee any***

***negative consequences for its portfolios due to the recent market turmoil***. Even if the current subprime severity would deteriorate with a further 20%, the additional non-linear net profit impact is estimated at EUR 20 million.

101.     Following the issuance of these press releases, Fortis held a conference call with analysts and investors to discuss its rights issue of 896 million new shares at a price of €15 per share, in an effort to raise €13 billion.  In attendance from Fortis were, among others, Defendants Votron, Verwilst, Dierckx and Mittler; De Boeck, then Fortis's Chief Risk Officer; and other executives.

102.     During his opening remarks, Votron consistently made assurances that the Company could successfully integrate ABN AMRO as a result of its extensive experience in having done so with other acquisitions, and that De Boeck was spearheading the effort under his review:

> One important point, and I think this is what sure will be a question on your side, is what about execution? ***I said that we will execute this, because this is our competence***. This Company, Fortis, has been through the years built because of the ability of Fortis to go and look at a business, integrate it, give it the right size, move forward, create the synergies. ***The experience this Company has in acquiring and integrating business is absolutely immense***.
>
> ***Fortis would not exist if that core skill -- this is really in the genes of this Company. I can testify that I have seen Fortis operating in a number of these activities***. Let's take Disbank in Turkey. It was very quickly integrated; the brand name was changed in six months. Today, if you go to Istanbul, or wherever in Turkey, you will see Fortis all over. ***This is what we are very good at doing, is going and working with a business, making sure we can integrate, leverage, build going forward. This is really in the genes of our Company***.
>
> In the last months, there have been a number of folks, many, at our firm working on these transitions plans. How do you execute this deal? ***Karel De Boeck is on the front row here, has been writing thesis about it in the meantime. Hundreds and thousands of pages of extreme levels of details have been under Karel's leadership, prepared to look at the integration of these businesses going forward. They have done a master job***. It has been all done in a lot of consultation with the regulators, etc. So we feel that we really prepared for the challenge. And as I said, we love challenges.

103.     Votron further noted that De Boeck was "working extremely hard" with a Fortis team to motivate clients to do business with the Company, and that he and other Fortis personnel intended to reach out to the market through roadshows, explaining that "[w]e have a level of excitement to go

and meet all of our investors in our next couple of weeks of activity through roadshows. We will

have an intensive planning. We will be happy to meet you and to talk to you and to highlight any

other aspect of this venture which you may want to be seen more -- or explained."  Later in the call,

Votron noted that Fortis had "two teams which are going to cover as many geographies as possible

to try to have a chance to spend time with all of you."

       104.    In addition, Mittler, Fortis's CFO, made highly positive statements concerning the

Company's solvency and noted that "the entire financing plan has been built to take into account the

solvency of this Company."  In fact, Mittler represented that "we wanted to have the same solvency

before the transaction as after this transaction," and that, to that end, the Company employed "a

rather conservative approach . . . ."  He also represented that the assets that Fortis would acquire

from ABN AMRO had a low risk profile that justified a lower solvency requirement:

> ***The acquired assets have a low risk profile. And we could therefore have lowered
> our solvency requirement***. But that is something that we did not do. On top of that,
> we have not taken into account the impact as we will start to feel 2008, 2009, of
> Basel II. ***So in terms of solvency, we took a prudent Fortis approach***.
>
>                  *        *        *
>
> I have inserted this slide in order to underpin the claim I just made about buying low-
> risk assets. ***As Belgo-Dutch company, we are of course buying activities in a
> market that we know very well, as we are active in these markets since 1720***.
>
> As you can see from this pie, ***around two-thirds of the assets we're buying consist
> of Dutch mortgage loans, an asset class we are very familiar with and an asset
> class with historically only losses of a few basis points a year. I believe that this
> clearly proves my point of buying low-risk assets, and in fact, decreasing the risk
> profile of Fortis***. As a result, also we [back hopefully] one-third of the assets of ABN
> AMRO in terms of risk adjusted capital, we take only [23].

       105.    Mittler further represented that Fortis had sufficient financial backing to fund its share

of the Acquisition, explaining that "Fortis [had] secured all the aspects of the financing structure."

Specifically, he noted that "[Dresdner] and some other very important major European banks have

firmly underwritten the full EUR13.2 billion [sic -- see press release] Rights Issue. In addition, we

have also a backstop facility for EUR10 billion. And last but not least, we have also a stand-by underwriting agreement for capital instruments for another EUR5 billion." Mittler also noted that "we have already successfully placed in July EUR2 billion of convertible mandatory Fortis bonds and we have sold for EUR1.6 billion nonstrategic assets. At the end of the day, mid-October, when the consortium will have to settle this transaction, Fortis will be able to provide the liquidity to finance 34 billion shares."

106.    In the last of his opening remarks, Mittler emulated Votron's confidence and assured the market that Fortis would not be adversely affected by the turmoil in the financial markets during the third quarter of 2007, in relation to its subprime holdings or otherwise (a sentiment expressed in Fortis's earlier press release):

> The third quarter has been characterized by the global markets' turmoil, leading to increased volatility and a liquidity crunch. This has had consequences for the financial service industry and certain institutions in particular. ***Fortis has been weathering the storm quite well, testified by our results. Commercial performance remains robust. Investment and trading results benefit from their well-diversified composition. And as already stated, at the announcement of the half-year 2007 results, Fortis expects the current market turmoil not to have a material impact on the full 2007 results***. And as you know, this view, that is what we mentioned on this slide, is also shared, for example, by one of the famous rating agencies, Fitch.

> On this slide, we have summarized our exposures to six areas that have preoccupied the market in the last couple of weeks. Again, this is rather self-explanatory, and it is also well documented in the press release of this morning. My four key messages will therefore be, one, ***even in the current subprime market, if we would see a further deterioration of 20%, the additional net impact on the net profit of Fortis is estimated at only EUR20 million***. We manage a highly rated conduit called Scaldis. Maturing paper has again been fully externally financed. And in the extreme unlikely situation where we would have to consolidate Scaldis by the end of this year, the impact on our core Tier 1 ratio would be limited to a low 20 basis points.

> Three, ***Fortis has been managing its liquidity position tightly and has taken all the necessary and appropriate measures to maintain a high liquidity situation***. And we are very confident and very comfortable with this situation.

> Last but not least, ***our exposure to the LBO market, financing of hedge funds and first-party CDO investments is fairly limited and not an area of concern***.

- 43 -

As a conclusion, ladies and gentlemen, *I hope that our CEO, Jean-Paul Votron, and myself were able to convince you of the following messages*.

*Fortis is in excellent stage and shape, and the market turmoil in the third quarter has had no material impact on our results. The acquisitions of the selected ABN AMRO assets represents a unique opportunity to further strengthen our businesses in line with our laid-out strategy*, which will be value-creating for all stakeholders of our Company.

To finance this acquisition, we are launching a EUR13 billion Rights Issue. It has been fully underwritten and offers our shareholders to buy two new shares for each three existing shares at a price of EUR15 per share. We are convinced that this represents an attractive investment opportunity, as Fortis combines a lot of key elements. *We have an historic track record of high returns. We have excellent growth opportunities. We have a below-average risk profile and an above-average dividend yield, and, at least according to me, a very attractive valuation. By the way, this morning I think that the market agrees with this*.

107.   The September 21, 2007 statements were false and misleading because, among other things: (i) Fortis was precariously positioned to suffer far greater losses than Defendants had represented, as a result of its exposure to the subprime market and the failing credit markets; (ii) Defendants had reason to believe that Fortis's capital position was in danger, because of its exposure to the subprime market and the deteriorating credit market and broader economy; (iii) Fortis was poised to acquire certain assets from ABN AMRO that were risky in nature, which Defendants knew or should have known as a result of their due diligence and examination of certain aspects of ABN AMRO's financial results and assets; (iv) the Rights Issue was specifically necessary to finance the Acquisition, as a result of the Company's deteriorating liquidity and capital position; and (v) as a result of the foregoing, the "market turmoil" was substantially likely to have a materially adverse impact on the Company and its full-year 2007 results.

## 2.   The October 10, 2007 Statements

108.   On October 10, 2007, the Consortium issued a press release announcing that it had declared its offer "wholly unconditional," a significant step forward for the Acquisition.  It also

announced that, as of that date, it had received the tender of approximately 86% of ABN AMRO's ordinary shares.

109.    That afternoon, the Consortium held a conference call with analysts to discuss the Acquisition, in which it reassured the market that the companies' respective exposure to ABN AMRO's subprime holdings was known and under control.  For example, during the call, the following exchange took place between a *Bloomberg* analyst and Sir Fred Goodwin ("Goodwin"), RBS's CEO, who was speaking on behalf of the Consortium (including Fortis):

> **Ben Livesey – Bloomberg – Media**
>
> Have you been able to have a good enough look at the global clients and global markets business? ***Obviously, that's where some investors have got concerns, potentially stemming from the US subprime losses and credit tightening. Are you happy with what you see?***
>
> **Fred Goodwin – Royal Bank of Scotland – CEO**
>
> ***Yes, we're happy with what we've seen***. I [also] draw your attention to the public remarks and comments that ABN AMRO themselves have made. They are on the record with their reassurance in these areas.

110.    Votron, Fortis's CEO, concurred with Goodwin and confirmed that Fortis was comfortable with the performance of ABN AMRO's businesses, explaining, in response to a separate question, that they "were doing very well":

> ***We really look forward bringing the strengths of both organizations, which have shown in these businesses, as all the businesses of ABN AMRO, that they were doing very well***, and we will as Sir Fred was just saying before on plans, as the first date possible to join the -- define how we're going to move forward.

111.    Moreover, in response to yet another question, Votron dispelled the notion that Fortis should reassess how best to use the assets it was acquiring from ABN AMRO, stating that "[t]here's no reason to believe we should have a reassessment, and we don't change our projection.  ***These businesses are doing, by the way, very well*** . . . ."

- 45 -

112.    Further, also during the call, Votron explained that the Company was confident of its

plans as a result of dealing with a rights issue and participating in roadshows "all over the world":

> What I can say at this stage is that it's been a very, very interesting exercise which -- we've seen a lot of interest for the activities for business has started on the right issue. *As a matter of fact, the Company as a whole has been in two weeks of roadshows visiting investors all over the world*.
>
> And very much to what Sir Fred said, I think all of them were extremely enthusiastic about the opportunities we created for shareholders, and this even in what can be defined as turbulent markets. *If you look back at the reserves of our right issue to the share price and the right price, I think you will probably have a pretty good proxy of how we feel about this exercise*.

113.    The October 10, 2007 statements were false and misleading because, among other

things: (i) Fortis was poised to acquire certain assets from ABN AMRO that were risky in nature,

which Defendants knew or should have known as a result of their due diligence and examination of

ABN AMRO's financial results and assets; (ii) Defendants had reason to believe that the assets that

Fortis would receive from the Acquisition included subprime and other assets, undermining the

veracity of their statements; (iii) Defendants did not have a reasonable basis to believe that ABN

AMRO's business was doing well, let alone "very well"; and (iv) Defendants could not have

believed that the integration of ABN AMRO would proceed smoothly, in light of the assets that

Fortis was slated to receive and the deteriorating nature of the Company's liquidity position.

114.    In response to the October 10, 2007 statements, the price of Fortis's securities

increased the following day, as follows:  U.S. OTC market, from $33.16 to $33.35 per share;

Euronext Brussels, from €23.26 to €23.55 per share; Euronext Amsterdam, from €23.26 to €23.55

per share; Luxembourg Exchange, from €23.15 to €23.58 per share.  This suggests that the market

viewed Defendants' statements in a positive light, as Defendants had intended.

### 3.      Mid-October/Early-November, 2007 Developments

115.      On October 11, 2007, the Consortium, together with ABN AMRO, issued a press release announcing "the nominations for the new structure and membership of the Supervisory and Managing Boards of ABN AMRO, together with their proposed responsibilities."  Although Mark Fisher, Chief Executive of the Manufacturing Division and a member of the RBS Group Board and Group Executive Management Committee, was nominated to replace Rijkman Groenink as ABN AMRO's Chairman of the Managing Board, three Fortis executives – including Defendant Votron – were nominated for significant positions at ABN AMRO, as follows:

- Defendant Votron, then-CEO of Fortis, was nominated to ABN AMRO's Supervisory Board (along with one executive each from RBS and Santander);

- De Boeck, Fortis's Chief Risk Officer and a member of its Executive Committee, was nominated to ABN AMRO's Managing Board as Vice-Chair of Human Resources, Group Communications and Group Public Affairs; and

- Paul Dor, CEO of Special Financial Services at Fortis, was nominated to ABN AMRO's Managing Board, with oversight of the Asset Management and Private Clients Business Units.

116.      In the press release, the Consortium indicated that it intended to substantially strengthen ABN AMRO's business by making these management changes, indicating that "[f]or the Managing Board our intention is to increase both its resources and capabilities while providing increased leadership focus for Business Units and functions."  The Consortium further represented that "[i]n the period ahead we will be working on the allocation of further responsibilities to the leadership team as appropriate."

117.      In two separate press releases also issued on October 11, 2007, access to which Fortis purported to restrict in the U.S., the Company announced that it had received 97.995% acceptance of the Rights Issue and that it had obtained subscribers for the remaining shares through an accelerated private placement.  Shortly thereafter, in an October 18, 2007 press release, access to which Fortis

one again purported to restrict in the U.S., the Company announced that it had secured a €10 billion revolving credit facility that it intended to use to partially fund its portion of the cash consideration payable in connection with the Acquisition.  Later, on October 26, 2007, the Consortium confirmed receipt and acceptance of more than 95% of ABN AMRO's ordinary shares in connection with the Acquisition, which it characterized as a "further important milestone . . . ."

118.    Then, on November 1, 2007, ABN AMRO issued a press release confirming that shareholders had approved the ABN AMRO Supervisory and Managing Board nominations at an Extraordinary General Meeting of shareholders.  As such, Votron secured a high-level appointment to ABN AMRO's Supervisory Board, while the other two Fortis nominees secured high-level positions on its Managing Board, as reflected in the following chart:



4.      The November 8, 2007 Statements

119.    On November 8, 2007, Fortis issued a press release announcing its financial results for the third quarter of 2007, as well as the first nine-months ending 2007.  In the press release,

entitled "**Fortis nine-month net profit at EUR 3.6 billion, as banking and insurance continued strong commercial performance in summer months**," Fortis disclosed that it had a strong third quarter "despite turbulent market conditions," with net profits of €797 million.  In fact, the Company represented that it had been virtually unaffected by such conditions:

> **Fortis's nine-month 2007 net profit** of EUR 3,580 million is fully in line with the trading update of 21 September and with the exceptional profit level of the first nine months of 2006. ***Robust commercial performance more than compensated for the impacts of the global capital markets turmoil and extreme weather-related claims***.

120.    In the press release, Fortis also gave an "update" on its risk exposure and profit outlook, reassuring investors that "[t]he turmoil in the global capital markets has had no material impact on our overall results."  Moreover, the Company claimed that its "well diversified and highly rated structured credit investment portfolio" was immune from such turmoil (even though others in the same industry were not so lucky), that its subprime exposure was limited (even though its exposure was, in fact, substantial), and that it expected to turn a profit of €4.2 billion under current conditions:

### 1.2 Update on Fortis's risk exposure and profit outlook

Fortis' third quarter results are fully in line with the trading update, published at the start of our rights issue. ***The turmoil in the global capital markets has had no material impact on our overall results***.

The environment has deteriorated since mid October, as evidenced, for example, by the downgrade of more than 2,000 CDO's by the rating agencies and the fall of the ABX Index.

***Fortis has a well diversified and highly rated structured credit investment portfolio***. More than 97% of the EUR 53 billion assets are rated AAA, AA or A. This includes the EUR 18.2 billion assets of the Scaldis conduit.

***Scaldis is performing well***. None of its assets have been downgraded or put on negative watch. Maturing paper is fully financed externally while spreads have neared pre-crisis levels.

***If the current market environment persists, it is envisaged that by year-end the net exposure of the subprime CDO portfolio will be less than 10% of the total***

*structured credit portfolio* and will consist only of Super Senior tranches in High Grade and Mezzanine. The net exposure to Mezzanine tranches at year-end is expected to be around EUR 0.4 billion with a coverage ratio of approximately 40%.

*Taking these factors into account we still expect* - baring unforeseen circumstances and in particular no further deterioration in asset values - *to reach a net profit of EUR 4.2 billion before divestments*.

121.    As noted in the press release, however, **Fortis had at least €5.3 billion of subprime exposure** – *i.e.*, 10% of its structured credit portfolio (valued then at €53 billion in the aggregate). While this fact alone should have caused Defendants to issue more cautious statements about the effect that the deteriorating economy was then having on the structured credit portfolio (and the Company's health, in general), they downplayed its significance.  They also painted a positive picture of the Company's solvency even as its capital targets started to slip, no doubt a byproduct of engaging in the financial gymnastics necessary to secure funding for the Acquisition.

122.    Commenting on the results, Defendant Votron, quoted in the press release, reinforced the message that the Company was relatively immune from market conditions and, as a result of its "healthy liquidity position," was poised to withstand the adverse conditions that were then affecting virtually every other company in the banking industry:

> "*These results demonstrate Fortis's capacity to achieve resilient earnings even under exceptional conditions*. Despite the sustained commercial activity, our nine months net profit was virtually unchanged compared with last year, as extreme weather related claims and the global capital markets turmoil affected third quarter results.
>
> *Yet, even during this turbulent period, our strong balance sheet, robust recurrent earnings and sustained client activity have proven a virtuous mix*, as highlighted in the trading update issued prior to the launch of our rights issue. The sales performance at our insurance companies remains excellent, with gross inflow rising 21% to EUR 14.2 billion in the first nine months of this year. In our banking business underlying loan growth went up 17% and deposits gained 7% on the same period last year, as growth was sustained in the third quarter. Importantly, half of the total revenue growth on the banking side is now being generated by those activities earmarked as growth engines, with Asset Management, Energy, Commodities & Trading and Clearing, Funds & Custody turning in vigorous performances.

*Fortis has benefited from a strong funding base – crucial in safeguarding our healthy liquidity position - and from rigorous and autonomous risk management. This has allowed us to manage the turmoil without our results suffering a material impact.*

123.    Vortron further represented that "the consortium's priority is to ensure a smooth and diligent transformation and subsequent integration of the respective businesses of ABN AMRO" and that the Acquisition "*represents an important strategic step for Fortis.*"  In this regard, Votron assured investors that ABN AMRO's businesses were performing well and that integration efforts were underway:

*According to the financial information delivered to us, the ABN AMRO businesses which Fortis shall acquire following transition performed in line with ABN AMRO's trading update in September demonstrating the stability and recurrent nature of these profit streams. Client and staff attrition are in line with normal experience. Together with our new colleagues and consortium partners, we have started the first phase of the transition and integration process extremely positively and with strong cooperation and commitment across the ABN AMRO Managing and Supervisory Board. Good progress is being made on all fronts and we remain confident and committed to delivering the benefits we have promised to our stakeholders following separation and integration of the businesses. The next important milestone will be the submission of a detailed transition plan to the DNB by mid-December. We look forward to continuing our constructive and professional working relationship with all regulatory bodies to make this transition and the subsequent integration a success in the shortest possible time frame. We will of course continue to inform the financial markets on the progress we are making.*

124.    During the afternoon of November 8, 2007, the Company hosted a conference call with analysts and investors to discuss the third quarter results.  During that call, which Defendants Mittler and Dierckx conducted, the Company, through these executives, consistently represented that it had **extremely limited** subprime exposure.

125.    Specifically, Mittler represented in his opening remarks that "[t]he turmoil in the global capital markets has had **no material impact** on the overall results of Fortis," despite "the downgrade of more than 2,000 CDOs by the rating agencies and the fall in the well-known ABX index."  Mittler further represented that Scaldis, Fortis's structured credit investment conduit, was

performing well and had limited exposure to the subprime market consisting of relatively "high-grade" investments:

> Fortis a well-diversified and highly-rated structured credit investment portfolio. More than 97% of the EUR53 billion assets of this portfolio are rated AAA, AA or A. This includes the EUR18.2 billion assets of our well-known Scaldis conduit.
>
> ***Scaldis is performing very well. None of its assets have been downgraded or put on negative watch***. Maturing paper is fully financed externally, while spreads have neared pre-crisis levels. If the current market environment persists for the situation of early November, ***it is envisaged that by year end, the net exposure of our subprime CDO portfolio will be less than 10% of the total structured credit portfolio of EUR53 billion. It will consist only of super-senior tranches in both high-grade and mezzanine***. The net exposure for those mezzanine tranches at year end is expected to be around EUR300 million, with a coverage ratio of around 40%. Ladies and gentlemen, ***taking these factors into account, we, Fortis, still expect***, barring unforeseen circumstances and, in particular, no further deterioration in the asset values, ***to reach a net profit of EUR4.2 billion before divestment***.

126. Dierckx affirmed Mittler's statements and further represented that Scaldis "has a long history and a solid track record . . . ." According to Dierckx, "***at all times***, the essence of the portfolio was to be ***very diversified and to have strict credit policies***. As a consequence, you see that we have a 97% rating above A class." As of the time of the call, he represented that "90% of this is prime exposure, again [much geared] to AAA, well diversified, and we have had recently for an amount of [EUR114 million] of downgrades of one, in most cases one, in some cases two notches, ***so less than 0.5% of the portfolio has been downgraded***." Dierckx also described the method that Fortis used to value the assets in the structured credit portfolio, stating, in pertinent part:

> As you know, this is a portfolio which is, for most of it, in available for sale. In the available for sale, what you do is, ***at the end of each quarter you are going to value it, and most of it is valued in marked to market, the level one valuation***. That will go, then, to equity -- in this case, because the credit spreads went up in minus of the equity. This explains EUR700 million gross, EUR500 million net of reduction in equity, but ***it's also important to mention that this reduction does not [affect] the equity for solvency purposes***. So it's only a reduction of the equity from an accounting point of view.

127.    In commenting on the subprime assets contained in the portfolio, Dierckx attempted

to minimize the impact of impending downgrades, and losses from subprime exposure, as follows:

> So first part, 90% prime. **Then you have less than 10% of the portfolio which is subprime exposure to CDOs**. Here again, we have two categories. First of all, the EUR0.4 billion super-senior mezzanine, which in September was still in very good shape; there were no downgradings in September. But as you know, the rating agencies started to downgrade these portfolios, and **here in this portfolio you have serious downgrades, and it entered the sub-investment-grade area. So that means that at the end of the year we will, indeed, have a value reduction of this portfolio to have a net exposure of EUR0.4 billion, meaning that there is going to be a reduction of around 40% on this portfolio**.

128.    Defendants continued to marginalize the Company's exposure to subprime assets in a

question-and-answer session with an analyst, who could not understand how they could deny that the

assets, highly exposed to home equity loans, did not have even greater subprime exposure:

> **Jaap Meier** – *Dresdner Kleinwort* – *Analyst*
>
> Hello. This is Jaap Meier from Dresdner. A couple of questions. **Your home equity loan exposure of in your conduit -- you don't see that that as subprime? That's kind of strange, because the biggest part of the home equity loan market is subprime. So do you have a specific reason why these are prime assets?** Is there adequate cycle rates, but is it just simply a matter of high loan to fair value?
>
> *            *            *
>
> **Gilbert Mittler** – *Fortis* – *CFO*
>
> As far as the first question is concerned, it's quite clear that you have a wide variety of residential mortgage-backed securities, commercial mortgage-backed securities, and **clearly we have had only a very limited amount of subprime. Less than 1% is in our Scaldis portfolio**. So that's -- you have European RMBSs, you have all kinds of RMBSs. But I think that's the answer on the first question.

129.    When the analyst pressed his question and continued to assert that the Company had

to have more subprime exposure than they had represented, Defendants characterized the assertion

as a "misunderstanding" and assured him that Fortis "know[s] that market especially well":

> **Jaap Meier** – *Dresdner Kleinwort* – *Analyst*

But could I come back on the first question, the home equity loan exposure? Is that, then, only European assets, then? Or is it US assets? *Why do you think it's really prime? There must be a specific reason, because home equity loans is mostly categorized as subprime. So there must be a specific reason why this is not subprime*.

**Gilbert Mittler – *Fortis* – CFO**

*Honestly, I think there is a misunderstanding*. Home equity loans is, in fact, a generic name for all kinds of mortgage-backed securities you have, where you have, as you know, for example, a very strong market in the Netherlands in residential mortgage-backed securities. *In our Scaldis, we have (inaudible) much more to the non-US and, certainly, not to the subprime investments*.

**Filip Dierckx – *Fortis* – CEO, *Merchant & Private Banking, Regional Coordinator North America***

You should never forget that we are, *in our home markets, one of the biggest players* in that market with our large retail network and retail customer basis. *So we know that market especially well*.

130.    Throughout the rest of the call, Defendants continued to deny that any decline in the

value of the portfolio was primarily the result of subprime losses associated with the CDOs, claiming

instead that credit spreads were to blame:

**Michael van Wegen – *Société Générale – Analyst***

A couple of questions, particularly on your unrealized losses on the MBS and ABS portfolio. *These went up from around EUR100 million to EUR700 million Q2 to Q3. Could you indicate whether that is primarily the CDO subprime position?* Or is there something else in that portfolio that we would like to hear about?

\*      \*      \*

**Filip Dierckx – *Fortis* – CEO, Merchant & Private Banking, Regional Coordinator North America**

*As far as the first question is concerned, as I tried to explain, this deterioration in the impact on equity is coming mainly from the spread evolution*, because what happens is if you take this portfolio of EUR50 billion, you are going to value it at each end of the quarter, value mark to market. But when spreads on credit, on structured credits are going up, are widening and basically the value of the portfolio is going down. *This amount of EUR700 million, EUR500 million net, is for the main part due to this evolution of the credit spreads*.

\*      \*      \*

**Michael van Wegen – *Société Générale – Analyst***

Perhaps can I get back to the move from EUR100 million to EUR700 million in unrealized losses. You say it's mainly spread evolution. ***So you say that the unrealized loss on the CDO, the less than EUR5.3 billion is basically very small***. If it's EUR600 million, why don't we see this with other insurers that reported yesterday and today, in terms of their bond portfolio on realized losses?

**Filip Dierckx – *Fortis – CEO, Merchant & Private Banking, Regional Coordinator North America***

Maybe two words of explanation. ***One, I'm concerned that the subprime part is limited in that amount. Secondly, here we are talking about the credit spread portfolio***. I think a lot of insurers have a bond portfolio, which is linked to the evolution of the interest rates, and there you have another evolution of interest rates. The periods, the credit spreads we -- ***I don't know what others are doing. But we, at least, are valuing this on a mark-to-market basis through to equity***.

131. Defendants also refused to provide more detail on the actual make-up of the rest of the structured credit portfolio (or other assets that had potential subprime exposure, for that matter). Specifically, in response to a question about whether Fortis would provide "any more information on the remaining EUR47.6 billion of assets within that structured credit portfolio," Mittler indicated that the level of disclosure would increase "next quarter" and "at year end . . . ." Under further questioning, however, Dierckx admitted that nearly 60% of the assets in the portfolio were "geared" to the U.S. Nevertheless, he assured that the market was still liquid and the assets were highly rated, such that the assets could be appropriately valued and traded:

> I don't know the figures exactly. ***I think it's around 60% which is geared to the United States, of this portfolio***. But again, this is followed up. I think there's a large difference between some of the [categories], when you mentioned the subprime and (inaudible) because ***this portfolio still has a very -- there is an active market, and there is a mark to market. You can trade in them, so there should not be a worry on the portfolios, which are AAA and AA***.

132. Moreover, Defendants denied that Fortis had more subprime exposure than its peers or that it acquired subprime assets from ABN AMRO, and again touted the "quality" of its subprime assets:

- 55 -

**Carlo Ponfoort** – *AEK* – *Analyst*

Three short questions on subprime. My first question is, seeing your EUR5 billion exposure compared to a lot of your competitors in the Benelux that are around EUR3 billion or [KBC], even, on EUR0.5 billion, ***do you see yourself that your structurally too high in that kind of business in your portfolio?*** That's my first question.

My second question is, ***is it correct that you get not any new subprime exposure from ABN AMRO acquisition? Is it 0?***

My final question was, on the EUR5 billion, what is the percentage of AAA ratings in the EUR5 billion? So I'm only interested in AAA (multiple speakers).

**Gilbert Mittler** – *Fortis* – *CFO*

***I'll take the one ABN, and my answer will be it's [99]% sure that we have no.*** So I don't say 100% because you never know if there is not a small part of that that could be in wherever ALM policy, position and exposure. But the (inaudible) is very, very low.

So on the other two questions, compared –

**Filip Dierckx** – *Fortis* – *CEO, Merchant & Private Banking, Regional Coordinator North America*

I think, on the first question, again, (inaudible) I see with competitors, well there is also quite significant exposures in subprime. Then you have to go into the detail of the different kinds of subprime. ***But I really don't think we are overweighted in subprime compared to our competitors***.

When you look at the quality, I again repeat, the quality depends on two things. First of all, ***quality on the asset side, and the asset is on average AA, and on the liability side it's super-senior; it's even better than AAA***.

133.    In fact, Defendants represented that ABN AMRO's assets were "performing better than what we assumed" and that they continued to stand behind the Consortium's decision not to have ABN AMRO release additional financial information:  "[Y]ou know that we decided, ABN and the consortium, not to publish quarterly figures for ABN AMRO . . . [I]f things were different compared with the latest trading quarter, they should have done that.  They didn't, ***so that means that we are still in line with the initial statement of ABN***."   In his closing remarks, Mittler reinforced this message by claiming that "the ABN AMRO businesses which we acquired are

performing in line with ABN AMRO's trading update, demonstrating the ability and recurrent nature of the profit streams that we are acquiring."

134.    Finally, in response to an analyst's request for an "update on the dividend policy," Mittler attempted to assuage concerns that Fortis would be unable to continue paying dividends by pointing out that it has always done so in the past.  Characterizing Fortis as "a very dividend-paying Company," he noted that "in the first 18 years of existence of this company, only twice we kept the dividend stable.  We also increase.  *On average, for the last 10 years, the dividend increased by 14%, and the profit per share increased by 13%.*"  Moreover, while acknowledging that the Company could not predict what its dividend policy would be "for the full year of 2007," he nevertheless observed that "we follow the same pattern in terms of dividend payment increase as the one of profit increases, but we take that as a trend, on average."

135.    The November 8, 2007 statements were false and misleading because, among other things: (i) Fortis was at risk of experiencing substantial losses as a result of prevailing market conditions, particularly as a result of the subprime assets contained in its structured credit portfolio; (ii) Fortis's exposure to the subprime market was far greater than Defendants had represented, and the Company was not immune from the effects of the subprime crisis, as Defendants had suggested; (iii) Defendants had reason to believe that the assets that Fortis would receive from ABN AMRO included subprime assets and that ABN AMRO would have to substantially write-down the value of certain assets, undermining the veracity of their statements and further exposing the Company to losses as a result of market conditions; (iv) Defendants knew or reasonably should have known that the Company had under management assets whose value was declining to the point that write-downs were necessary; and (v) Defendants knew or recklessly disregarded that Fortis was not valuing assets

in the manner in which they represented it was, which had the effect of inflating the value of the assets and exposing Fortis to further losses.

136.     The falsity of these statements is also substantiated by contemporaneous analyst reports concerning the adequacy of Defendants' disclosure, although analysts, like investors, had no choice but to assume the truth of Defendants' representations.  For example, in a November 9, 2007 research report, entitled "OOPS Fortis did it again," Michael van Wegen of Société Générale noted that "*Fortis rocked the market with net profits 10% below consensus and more importantly the disclosure of <€5.3bn CDO sub-prime exposure just six weeks after the launch of the €13bn rights issue* (updated the market 21 September on Q3 results and credit exposure)."  It also noted that a lack of complete disclosure warranted a reduction in its price target for the Company:  "Based on the new details, *and continued lack of full disclosure*, we cut our price target to 18.5 (discount rate up to 100bps) from 20.0 and maintain our Hold rating.  *We see the stock as dead money due to a lack of trust and disclosure for both the ABS/MBS portfolio and ABN Amro.*"

137.     In a November 9, 2007 report entitled "Review Q3: Weak results, a bit more transparency," Herman Bots of Theodoor Gilissen Private Bankers maintained a "buy" rating on Fortis and noted that although "*[o]paque subprime exposure and capital structure remain issues*," they "do not justify the current discount.  Seizing on Defendants' disclosure that "Fortis is 99% certain it is not buying subprime exposure with ABN AMRO," he also noted that "*[d]isclosure on subprime improved modestly but more information is still required to assess the risk.*"  He further noted that "[c]apital ratios are solid for now, but additional Tier 1 capital needs to be issued to maintain comfortable levels post-ABN AMRO acquisition."

138.     In yet another November 9, 2007 report, entitled "Questions about asset booking," several analysts from Naxtis Securities questioned Fortis's election not to appropriately write-down

the value of its subprime assets.  According to the report, "*the surprise concerned the group's decision not to book any significant provisions against the subprime crisis even though its exposure to CDOs amounts to €5bn and its exposure to mezzanine CDOs amounts to €0.4bn*." The analyst further noted that "[g]iven the asset write-downs booked by certain other banking groups on such assets, one can only wonder how much the group's real unrealised losses on these assets amount to."  Nevertheless, the analyst maintained its valuation for the Company at €24 per share.

139.    In a November 12, 2007 report entitled "The kitchen sink and more is in the price," Farquhar Murray, of Fox-Pitt Kelton Cochran Caronia Waller ("Fox-Pitt"), lowered the price target for the Company by 2% and called for complete and transparent disclosure, the lack of which he noted had resulted in a depressed stock price that harmed investors.  Nevertheless, he bought Defendants' representations and characterized the market's reaction as "overdone":

> Unfortunately investors should grin and bear it, as the reaction is overdone versus a kitchen sink scenario and relief is likely.  We believe *Fortis's continued elliptical approach to explaining its subprime exposure has created unnecessary uncertainty in a market where little is being taken on trust*.  With the stock down EUR3.6bn or 8% relative to the banks in a week, this has clearly cost its shareholders' [sic] dearly. In our view this is time for clear kitchen sink thinking.  What are the bearish valuation and potential capital impacts?   *It is also time for equally clear communication by Fortis itself*.

140.    Finally, in a November 19, 2007 report entitled "The dividend question," Ton Gietman of Petercam identified the "market's main worry" as the Company's potential inability to maintain the prior year's dividend.  Like other analysts, he also questioned the transparency of Defendants' disclosures, noting that "*[c]ompared with peers the information remains poor* and the visibility of the impact of the deterioration in markets on the Q4 results are very difficult to quantify."  He added that "*[t]he company is, in our view, not very forthcoming* with information about how the tall part of the financing of the acquisition will look like."  Finally, he observed out that "[t]he Q3 net profit of EUR 797m (~10% YoY) did not exactly live up to the expectations as

raised by the company's trading statement given on September 21," pointing out that the earnings press release of that date was entitled "'excellent commercial momentum continues in Q3 2007.'"

### 5.    Late-November/December, 2007 Developments

141.    After the close of trading on Euronext Brussels and Amsterdam on November 28, 2007, Fortis issued a press release, dated November 29, 2007, announcing that a subsidiary of Ping An Insurance (Group) Company of China, Ltd. ("Ping An"), then China's second largest insurer, agreed to acquire at least a 4% stake in Fortis.  In a separate press release that Fortis issued later that day, it announced that Ping An purchased a 4.18% stake in Fortis – an investment reportedly valued at €1.8 billion, which Lippens characterized as a "strong vote of confidence" in the Company.[7]  Ping An, which became Fortis's single largest shareholder as a result of the transaction, also proposed its president as a nominee to the Company's Board.  In response to this news, the price of Fortis stock increased – by some accounts as much as 3.5% during the trading day.  Indeed, on both the Euronext Brussels and Amsterdam, the stock closed nearly €0.35 per share higher than the previous day.

142.    Thereafter, Fortis continued to make arrangements to put sufficient financing in place to fund its portion of the Acquisition.  In addition, on December 6, 2007, RBS issued a pre-close trading update and held a conference call in which it disclosed that ABN AMRO's businesses were performing in line with expectations.  However, RBS noted that it "expect[ed] to book write-downs in income on ABN AMRO's exposure to US-mortgage related assets totalling [sic] approximately £300 million in the second half."  In a December 6, 2007 analyst report entitled "Sir Fred Goodwin provides more ABN AMRO reassurance," Ivan Lathouders of Bank Degroof (ESN) examined the significance of these disclosures on Fortis.  Specifically, he noted that "[a]lthough many ABN

---

[7]    According to the 2007 Annual Report, Ping An held 4.99% of Fortis's stock as of December 31, 2007.

question[s] remain unanswered, today's RBS trading update should come as a relief.  Implicit in Fortis' share price is the assumption that there was much more bad news to come from ABN."  In response to this news, the price of Fortis stock increased.

143.    In January 2008, however, questions concerning Fortis's true financial condition loomed, and the call for additional disclosure – and balance sheet transparency – continued.  In a January 7, 2008 report entitled "Caught off guard," Albert Ploegh of ING Wholesale Banking downgraded Fortis from "buy" to "hold," noting that "liquidity is not the issue, but solvency is becoming more of a risk."  In fact, he estimated that the Company could have a "capital shortfall" of €3.2 billion on write-downs of €1.3 billion related to subprime assets, which would drop Core Tier 1 Capital to 5% (versus the target of 6%).  In addition, he cut the Company's anticipated earnings by 15%, as a result of "*increased loan loss expectations* and lower Merchant Bank earnings . . . ."  He also noted that Fortis's operating environment had become more challenging, which, contrary to Defendants' representations, was likely to have a significant impact on the Company's business:

> **Operating environment has changed for the worse**. (i) The earnings growth outlook for the Merchant bank (c.30% of standalone profits) has become without doubt more challenging; (ii) *visibility on impairments has deteriorated* given Fortis's large structured credit investment portfolio of €53bn and ongoing financial market turmoil; (iii) *the funding of ABN Amro has become more expensive* (increasing spreads) and the last leg of funding is more difficult (the securitisation market is paralysed; exit multiples on planned asset disposals have become likely less rich).

144.    In addition, he reiterated that "transparency on the balance sheet remains limited," and that "the risk of additional capital measures beyond funding of ABN Amro has dramatically increased since September 2007."  As the analyst pointed out at that time, "[t]he main risks are *a capital shortfall resulting from write-downs on subprime related assets* and substantial slowdown of top-line growth at the Merchant Bank."

145.     Then, in a January 23, 2008 report entitled "Change in valuation approach suggests there is still room for downside," analysts from Société Générale downgraded the Company from "sell" to "hold" and cut its 12-month target price.  In doing so, the analysts noted their skepticism "about the potential of the ABN acquisition, and the lack of disclosure (hence unknown risk) on the MBS/ABS portfolio and integration of ABN."  Specifically, they pointed out that their "estimates for Fortis, excluding ABN, are well below company guidance"; that "Fortis has paid too steep a price for the ABN Amro operations and we see a ROI [Return on Investment] of only 8.2% by 2010"; and that "given the limited disclosure on the ABS/MBS portfolio there is still a risk of negative surprises, despite the fact that the company has indicated it has a €5.3bn exposure to CDO sub-prime."

### 6.     The January 27, 2008 Statements

146.     When the markets were closed during the weekend on January 27, 2008, Fortis issued a press release entitled "**Fortis confirms sound capital and solvency position and unchanged dividend policy**," in which it assured the market that it was well-positioned to endure the challenging economic environment.  Claiming that it chose to make the disclosure "[i]n view of recent market speculation," Fortis made it a point to note that it had presented the information contained in the press release "to the regular Fortis Board of Directors meeting of 25 January 2008." In furtherance of its intended effect, the press release largely satisfied the market that the Company's financial condition was not in jeopardy, although questions about the transparency of Defendants' disclosures remained.

147.     Regarding its 2007 results, Fortis represented that, among other things: (i) its end-of-year solvency would "surpass regulatory requirements"; (ii) its dividend policy would remain unchanged from the prior year; (iii) all "capital and solvency requirements" would be met even under "very stringent coverage assumptions" concerning the impact of its subprime portfolio; and (iv) its "[l]oan loss provisions [were] in line with earlier guidance[.]"  Fortis disclosed the following

details with respect to each of these four points, but declined to provide additional details concerning the structured credit portfolio until the announcement of its annual results in March 2008:

▪ **Fortis Bank end-of-year solvency well above 8%.**

> *Fortis end-of-year solvency is expected to surpass regulatory requirements* and Fortis Bank core tier 1 ratio would be, even under the most stringent coverage assumptions simulated below, well above 8%.

▪ **Fortis intends to keep its dividend policy unchanged.**

> Fortis management will recommend to the Board of Directors meeting of 6 March 2008 to propose to the General Shareholders Meeting of 29 April 2008 that the cash dividend is maintained at the same level as last year, i.e. a final 2007 dividend of EUR 0.59 per share.

▪ **Capital and solvency requirements will be met, even in very stringent scenarios on the impact of the sub prime CDO portfolio.**

> *Fortis is reviewing the value of its sub prime CDO portfolio on an ongoing basis.* Different scenarios are used in this assessment. Even under very stringent coverage assumptions based on the most recent and presently available market information and data, Fortis 's [sic] capital and solvency requirements would still be met.

> *The CDO sub prime gross exposure remained unchanged compared with the disclosure at the time of the presentation of the 3rd quarter financial results early November 2007.*

> Applying the Fortis valuation model at year end would lead today to impair 40% of the Mezzanine super senior CDO tranches and 15% of the High Grade super senior CDO tranches. Those impairments would result in a Net Profit before divestments – and barring unforeseen circumstances - of around EUR 4.0 billion (i.e. EUR 5.0 billion including the EUR 1 billion of the Caifor sale). These aforementioned indications of Fortis Net Profit are excluding the positive profit contribution of ABN AMRO.

> *Since January 2008 a number of peers applied substantially higher coverage ratios.* Fortis therefore simulated the impact of provisions taken through the Profit & Loss Accounts, leading to a coverage ratio of 60% of its mezzanine super senior CDO tranches (gross exposure of EUR 0.6 billion) and 45% of the high grade super senior CDO tranches (gross exposure of EUR 4.6 billion). If these scenarios were to be applied to the closing of the accounts of 2007 – which would be subject to approval by the Board of 6 March 2008 - *the net profit of Fortis is estimated to be around EUR 3.0 billion - barring unforeseen circumstances.* This is before the impact of the divestment of the participation in the Spanish joint-venture Caifor, i.e. it

would be EUR 4.0 billion including the EUR 1 billion of the Caifor sale. These indications of Fortis Net Profit do not include the positive profit contribution of ABN AMRO.

- **Loan loss provisions in line with earlier guidance[.]**

  *Fortis confirms that the loan loss provisions of the remaining part of the portfolio* (including the asset backed credit portfolio, but excluding the impairments of the sub prime CDO portfolio) *are expected to remain within the guidance given in previous communications* (10-15bp). Fortis will provide further details on the full portfolio, including its asset backed credit portfolio of EUR 51 billion, at the announcement of the annual results on 7 March 2008.

148.   With respect to 2008, the Company represented that, among other things: (i) "Fortis does not need and is not considering" a common stock issuance or other dilutive transaction; and (ii) the integration of ABN AMRO was on track and "progressing according to plan . . . ."   Fortis disclosed the following details with respect to these two points:

- **Fortis does not need to and is not considering to issue common stock or dilutive equity linked capital instruments.**

  *Fortis is fully on track in completing its EUR 24 billion financing plan for the acquisition of selected activities of ABN AMRO.* At the end of 2007 around EUR 20 billion of capital has been secured. The remaining EUR 4 billion additional solvency will be mainly raised by divestments of non-core assets and possibly alternative financing. Divestments include, as communicated to the market, a further sale of non-core assets of acquired activities of ABN AMRO and of Fortis in the course of this year. It includes amongst others the sale of certain commercial banking activities in the Netherlands as imposed by the European Commission. Alternative financing is possible including the issue of Core Tier 1 instruments, but excluding the issue of common stock or any dilutive equity linked capital instruments, even under the stringent assumptions mentioned above.

- **Fortis focuses on the implementation of its strategic plans, in particular the integration of the ABN AMRO businesses[.]**

  *The underlying performance of Fortis' stand-alone businesses and the acquired ABN AMRO activities have demonstrated their resilient nature in the fourth quarter of 2007 and also in the first weeks of 2008.*

  *The preparation of the integration of the acquired ABN AMRO activities is progressing according to plan*, in terms of detailing separation and

integration plans, launching first customer oriented initiatives, clarifying the headquarters offices future use, building joint teams, and specifying IT platforms.

149.     Fortis closed the press release by emphasizing that it would focus on implementing "its strategic plans," including the integration of ABN AMRO:

Fortis will present its full year audited results on 7 March 2008 that will reflect the most recent views on sub prime in the markets. Fortis continues to focus on the implementation of its strategic plans, and in particular the integration of the acquired activities of ABN AMRO.

150.     The January 28, 2008 statements were false and misleading because, among other things: (i) Fortis was still at risk of experiencing substantial losses as a result of prevailing market conditions, particularly as a result of the subprime assets contained in its structured credit portfolio; (ii) Fortis's exposure to the subprime market, which Defendants claimed remained "unchanged" from their November 2007 disclosures, was far greater than Defendants had represented and had, in fact, gotten worse; (iii) Fortis could not distinguish itself from its peers in terms of the write-downs that it needed, contrary to Defendants' statements otherwise; (iv) Defendants still had reason to believe that the assets that Fortis would receive from ABN AMRO included subprime assets and that ABM AMRO would have to substantially write-down the value of certain assets, undermining the veracity of their statements and further exposing the Company to losses as a result of market conditions; (v) Fortis's capital position was drastically weakening as a result of its efforts to arrange financing to fund its portion of the Acquisition, and would have a detrimental impact on its solvency rating and its ability to issue dividends in line with prior years; (vi) Defendants knew or reasonably should have known that the Company had to write-down the value of a substantial portion of its subprime assets (as opposed to that which it claimed), including a CDO that had lost a significant portion of its value by the fourth quarter of 2007; and (vii) Defendants knew or recklessly

disregarded that Fortis was not valuing assets in the manner in which they represented it was, which had the effect of inflating the value of the assets and exposing Fortis to further losses.

151.    On January 28, 2008, the first trading day following the Company's issuance of these statements, the market signaled its acceptance of Defendants' reassurances.  In response to the press release, the per share price of Fortis's securities substantially increased in each trading market:  on the U.S. OTC market, from $19.28 (on January 25, 2008) to $21.7 – *a 12.55% increase*; on the Euronext Brussels, from €13.26 to €14.33; on the Euronext Amsterdam, from €13.21 to €14.31; and on the Luxembourg Exchange, from €13.25 to €15.00.

152.    Like the market, analysts also believed that Defendants had provided the reassurances necessary to instill confidence in Fortis's business and prospects.  In a January 28, 2008 report entitled "Trading update; No rights issue, but no margin for error," Michael van Wegen of Société Générale made the following observations, among others (while adopting a "sell" rating): (i) "Fortis reassured the market that there will be no rights issue and no dividend cut"; (ii) "Fortis indicates it will write down at least €700m on its CDO sub-prime portfolio in Q4, *but if it followed peers it would write down €1.7bn*"; (iii) "[t]he earnings guidance implies that, excluding any writedowns in Q4, *net profit would have been around €4.7bn, which is €300m ahead of our estimate*"; (iv) "[e]ven including the €1.7bn writedown, Fortis indicates the core-tier 1 ratio is well above 8%," although the analyst "estimate[d] it at between 4-4.5% after the [potential] €1.7bn writedown," which "doesn't leave much margin for error"; and (v) "Fortis indicates it does not need an equity issue, or equity linked issue."

153.    In a January 28, 2008 report entitled "A warning that should bring relief," Paul Beijsens of Theodoor Gilissen Private Bankers maintained a "buy" rating on Fortis and noted that "Fortis issued a press release over the weekend *in which it addresses the main market worries* with

regards to the company's financial position and operations . . . ."  The analyst also noted that "Fortis said [that] both [its] own business and the acquired business of ABN AMRO *have proven to be resilient in the fourth quarter*, although information on this item is limited."  In closing, the analyst pointed out that "*[t]he new given clarity should bring relief to the markets on Fortis' position and financing*. We maintain our Buy rating on the company and leave our price target unchanged at Eur 25.00."

154.    And, in a January 31, 2008 report, Ivan Lathouders of bank Degroof (ESN) gave an especially bullish take on Fortis based on Defendants' January 27, 2008 statements and his own analyses.  The following excerpts convey the highly optimistic view that he expressed in the report:

- "Between 3Q07 and 27 January Fortis had provided virtually no additional information on its structured credit portfolio, solvency or ABN AMRO.  As we are confident the market is too pessimistic in its expectation for Fortis, *we expect a positive share price impact from the publication of additional information*."

- "Related to solvency, we expect that in addition to the generous EUR 0.59 FY07 final dividend, *Fortis will continue to pay a stable or increasing dividend* (from the EUR 1.16 gross pro forma for FY06).  *As management has put its reputation on the line and repeatedly stressed that it would continue to do so there is no alternative to continuing to pay a generous dividend*."

- "We have assumed that Fortis 4Q07 MtM/impairments on its EUR 53bn structured credit portfolio will amount to EUR 2.3bn," *i.e.*, "the lower range of the scenarios announced on Sunday 27 January . . . *We therefore continue to see an upside in excess of 40% for Fortis*."

- "*Although significant risks remain*, which might lead to a continued volatile share price, *we believe this is more than reflected in today's share price*."

155.    The report also repeated much of the same information that Defendants had disclosed, accepting its truth.  In addition, the report presented the following breakdown of securities and other assets in the then-€18.2 billion Scaldis unit, which was highly exposed to CDOs, CLOs and residential mortgages:



156. Expressing his belief that Fortis's business would only improve based on Defendants' late-January 2007 disclosures, the analyst maintained a "buy" rating on the Company with target price of €22.00 per share price when the stock was trading at only €15.00 per share at the time.

### 7.    The January 31 and February 21, 2008 Statements

157. On January 31, 2008, two days after reassuring the market, Fortis issued a press release concerning the "separation and integration" process associated with the Acquisition. In the press release, Defendant Votron characterized as a "key milestone" the Company's receipt of permission from DNB for a "demerger" of two ABN AMRO entities, which he suggested was "a major step forward." He also indicated that the integration process "on track." The press release provided, in pertinent part, as follows:

**Fortis welcomes permission from DNB for demerger of ABN AMRO Asset Management**

**First milestone in separation and integration process**

Fortis welcomes the permission from the Dutch central bank (DNB) concerning the proposed demerger of ABN AMRO Asset Management (AAAM) from ABN AMRO Bank. This demerger is expected to be completed at the end of Q1.

*'We're on track', explains Fortis CEO Jean-Paul Votron. 'This is a major step forward and a key milestone in the integration process of the ABN AMRO activities that will join us. The subsequent combining of the two entities will see the formation of a world-class asset manager with an impressive solutions offering and a truly global footprint.'*

- 68 -

Richard Wohanka, nominated CEO of the combined asset management entity said: '*I am delighted that the DNB has given its consent. This is the successful culmination of several months of diligent hard work and close cooperation between the two asset managers and the Dutch authorities. The formal separation of AAAM from the ABN AMRO group can now commence\*, after which Fortis Investments can officially start the rapid and seamless integration of its business with that of AAAM*.'

The combination of the two asset managers would create a top tier asset manager benefiting from a global geographic footprint (over 30 countries worldwide, over 2,000 employees, including 600 investment specialists in 40 investment centres) and enhanced offering to institutional clients and third-party distributors. The combined solutions offering is expected to reach top quartile position across many asset classes and achieve scale in core growth products.

\*subject to consultation with the Works Council

158.    On February 21, 2008, Fortis issued another press release, this time announcing that the Company had completed a "non-dilutive" capital raising transaction that was "in line" with its January 27, 2008 announcement.  In the press release, the Company emphasized the benefits that the transaction would have on its solvency, providing, in pertinent part, as follows:

**Fortis takes advantage of a market opportunity and strengthens solvency with non-dilutive Core Tier 1 Capital**

Fortis launched on Monday 18 February 2008 a Core\* Tier-1 capital transaction ("NITSH" or "Non-Innovative Tier-1 Hybrid Securities"). The transaction is non-dilutive, in line with Fortis's announcement of 27 January 2008.

Fortis successfully placed an amount of USD 750 million, carrying a cash coupon of 8.25% at the tight end of the marketing range, after marketing the transaction to institutional intermediaries in Asia and Europe, who will subsequently place the securities with their individual high net worth and retail clients.

This instrument is a non equity-linked, perpetual and subordinated debt, callable as of 2013 and without incentive to redeem. The securities are qualified as "non-innovative Tier-1", not subject to a 15% regulatory limit. In the Belgian regulatory environment, this transaction benefits from a pioneer regulatory treatment and sets a precedent of this type.

In current turbulent markets, capital raising opportunities are limited and capital is a scarce resource. ***The Asian Retail market currently offers an attractive investor base for issuers to raise solvency. Fortis has decided to act quickly and on a preemptive basis to take full advantage of this opportunity, as the availability and liquidity of this market has in the past proved to be limited. This innovative step in***

- 69 -

*the Asian Retail market allows Fortis to strengthen its capital ratios at a tax deductible cost while efficiently diversifying its investor base.*

*\*The securities are qualified as "non-innovative Tier-1" capital, meaning falling outside the Tier-1 capital regulatory limit of 15% for innovative capital instruments.*

159.    The January 31 and February 21, 2008 statements were false and misleading because, among other things: (i) the integration of ABN AMRO was not "on track," as costs associated with the integration were increasing and Fortis was beginning to feel to the effects of overleveraging itself in order to fund its portion of the Acquisition; (ii) Fortis's solvency was taking a hit as a result of its funding obligations in connection with the Acquisition, which was substantially likely to prevent the Company from ever becoming "a world-class asset manager with an impressive solutions offering and a truly global footprint"; and (iii) Fortis's foray into the Asian market could not sufficiently strengthen its capital ratios in a sufficient manner to ensure that its solvency was insulated from the costs associated with the Acquisition.

### 8.    The February 28, 2008 Statements

160.    Signaling to the market that it was streamlining its operations to more readily capitalize on the ABN AMRO assets that it had acquired, Fortis issued a press release on February 27, 2008 in which it announced that Santander had agreed to acquire the Brazilian asset management operations of ABN AMRO that Fortis had purchased.  The transaction, valued at approximately €209 million, was slated to close during the second quarter of 2008.  According to the press release, Fortis would retain "the Latin American (ex-Brazil) institutional sales and some equity investment teams related to funds distributed through ABN/Fortis channels."  Fortis also reiterated that it had "received an agreement from the Dutch Regulatory authorities to move forward with the integration of ABN AMRO's asset management with Fortis Investments."

161.    Without having even completed the integration of the ABN AMRO assets, and having just agreed to sell-off the Brazilian asset management operations of ABN AMRO, Fortis then issued

a press release on February 28, 2008 before the market opened, entitled "**Fortis-acquired ABN AMRO activities deliver strong performance in 2007**," in which it touted the positive impact that the ABN AMRO assets it retained had on its 2007 full-year financial results.  The press release provided, in pertinent part, as follows:

### *Pro forma 2007 results*

- **Underlying net profit of acquired businesses up 17% to EUR 1,355 million**

- **Strong commercial performance delivers resilient net interest income and growth in net commissions and fees**

ABN AMRO today reports its results for full-year 2007. Fortis has decided to inform the market of the pro forma non-consolidated financial results of the ABN AMRO activities it has acquired.

On 7 March 2008, when Fortis discloses its full-year 2007 results, it will publish the net contribution of the acquired ABN AMRO activities after the impact of purchase accounting. Fortis will also publish the total impact of the acquisition on its results, including financing costs and integration costs.

Excluding the impact of the sale of Bouwfonds in 2006 and 2007, the EUR 83 million in realised capital gains on the sale of the Asset Management activities in 2006, and the integration costs taken at Asset Management activities (EUR 39 million after tax), total **underlying net profit** of the acquired businesses (Retail and Commercial/Corporate activities Netherlands, Private Client activities, Asset Management activities) **increased 17% from EUR 1,158 million to EUR 1,355 million**.

The 2007 net profit of the acquired ABN AMRO activities amounted to EUR 1,400 million. This is 29% lower than the comparable figure for 2006, which included the results from and the realised gains on the sale of Bouwfonds and the realised gains on the sale of Asset Management activities.

162.     Commenting on these results, Votron, Fortis's CEO, once again represented that the integration was "on track" and that the Acquisition itself provided Fortis with a "strong base" from which to weather the challenging economic climate:

*"Despite the volatile market conditions at the end of 2007 and uncertainty during the period of the bidding process itself, our ABN AMRO colleagues delivered an extremely robust financial performance in 2007," commented **Jean-Paul Votron**, CEO of Fortis. "ABN AMRO maintained strong customer momentum during this*

*period, with minimal client attrition and higher customer satisfaction levels reported. **This performance validates our strong conviction that the combination of Fortis and ABN AMRO represents a compelling proposition for both our employees and our clients, and it is clear from these results that we have a strong base from which to grow in the future**. **We are fully on track with the integration of ABN AMRO's activities** and expect the asset management integration process to be completed over the coming weeks, followed by private banking by the end of the year and retail banking and commercial/corporate activities by the end of 2009.*"

163.    In the press release, Fortis assured the market that "uncertainty" surrounding ABN AMRO had subsided as a result of the Acquisition, which purportedly led to the Company's favorable financial results:

> The strong underlying commercial performance led to resilient net interest income and net commissions and fees. Net interest income was flat year-on-year at EUR 3,328 million, but showed robust growth in the fourth quarter. ***The increase was fuelled in part by the growth of market share in deposits achieved at Retail and Commercial/Corporate activities Netherlands in the fourth quarter, as corporate uncertainty around ABN AMRO subsided***. Net commissions and fees advanced 9% to EUR 2,339 million in 2007. ***All acquired businesses contributed to this growth***.

164.    In the press release, Fortis also identified what it characterized as "differences" between its operations and those of ABN AMRO's, as well as its analyses of the financial impact that the acquired assets had on its full-year 2007 financial results.  Once again, Fortis assured the market that "corporate uncertainty" with respect to ABN AMRO had subsided.

165.    Specifically, with respect to its retail and commercial/corporate activities in the Netherlands, Fortis disclosed, in pertinent part, the following:

***Retail and Commercial/Corporate activities Netherlands***

> There are three main differences between the scope of BU Netherlands at ABN AMRO and that of the Retail and Commercial/Corporate activities acquired by Fortis. Fortis excludes the following activities:
> - Global Clients and former Wholesale Clients Netherlands activities
> - Global Markets businesses that formed part of BU Netherlands
> - Interbank/DMC

**Analysis**

- **Underlying net profit up 13% to EUR 854 million in 2007, reflecting a resilient commercial performance driving income and commissions**
- **Savings volumes grow in the fourth quarter, as ABN AMRO recovered market share lost earlier due to corporate uncertainty during the bidding period**
- **Retail customer satisfaction rates improve in the fourth quarter**

166.     With respect to its private client activities, Fortis disclosed, in pertinent part, the

following:

**Private Client activities**

> There are two main differences between the scope of BU Private Clients at ABN AMRO and that of the Private Clients activities acquired by Fortis.  At Fortis:
> - International Diamonds & Jewellry [sic] Group (ID&JG) is included
> - The proceeds of the sale of the Latin American Private banking operations in Miami (net EUR 72 million) are booked in Shared Assets.

**Analysis**

- **Net profit rose 21% despite smaller scope resulting from strategic divestments**
- **Net commissions and fees up 11%, driven by resilient commercial activity**
- **Funds under management down 3% to EUR 138 billion, as net inflow of EUR 2.3 billion in 2007 was offset by financial markets developments and strategic divestments. Private Clients managed to retain and grow its client base despite corporate uncertainty during the bidding period**

167.     Referring to the bidding process associated with the Acquisition, Fortis indicated that

"[n]otwithstanding difficult market conditions and the corporate uncertainty during the bidding

period, the **client base** of Private Clients (excluding divestments) was maintained and, in fact,

increased in 2007 by 1.5% compared to 2006."

168.     Finally, with respect to its asset management activities, Fortis disclosed, in pertinent

part, the following:

Asset Management activities

> - There are only minor differences between the scope of BU Asset management at ABN AMRO and that of the Asset Management activities acquired by Fortis.

- 73 -

**Analysis**

- **Underlying net profit up 28% to EUR 194 million, as 2007 is impacted by restructuring costs related to the merger with Fortis Investments, and 2006 results included gains on divestments**
- **Assets under management increased slightly as market appreciation offset outflow due to corporate uncertainty during the bidding period and focus on profitability**
- **DNB grants permission for demerger of ABN AMRO Asset Management. Management and investment teams of combined entity have been selected**
- **Fortis to sell ABN AMRO's asset management activities in Brazil to Santander**

169. According to Fortis, "Total expenses increased 13% to EUR 652 million in 2007. This can be explained by the EUR 50 million in costs related to the integration of Asset Management activities into Fortis Investments." Nevertheless, Fortis positively described the integration of ABN AMRO, indicating that it had already started the "seamless" process:

> At the end of January 2008, Fortis received permission from the Dutch central bank (DNB) concerning the proposed demerger of ABN AMRO Asset Management (AAAM) from ABN AMRO bank. *This demerger should be completed by 1 April 2008. Fortis has already started the seamless integration of AAAM with Fortis Investments.*
>
> *The combination of the two asset managers creates a top tier asset manager* with a global geographic footprint, i.e. present in more than 30 countries worldwide, with upwards of 40 investment centres and more than 2,000 employees. The combined entity will provide an enhanced offering to institutional clients and third-party distributors alike.

170. The February 27, 2008 statements were false and misleading because, among other things: (i) the integration of ABN AMRO was not "on track," as costs associated with the integration were increasing and Fortis was beginning to feel to the effects of overleveraging itself in order to fund its portion of the Acquisition; (ii) Fortis's solvency was taking a hit as a result of its funding obligations in connection with the Acquisition, which was substantially likely to prevent the Company from ever becoming "a world-class asset manager with an impressive solutions offering and a truly global footprint"; and (iii) Defendants sought only to further reassure the market that

- 74 -

Fortis's financial results, as well as the integration of ABN AMRO, were consistent with their representations, but they had knowingly or recklessly misrepresented the true condition of both.

171.    This time, the market did not exhibit any substantial movement, although the price of Fortis's securities steadily remained artificially inflated – as it had throughout February 2008. Nevertheless, Defendants' unexpected announcement had its intended effect and once again calmed analysts, who universally viewed the news positively.  In a February 28, 2008 "flash note" entitled "ABN AMRO FY07 underlying quality better than expected," Ivan Lathouders of Bank Degroof (ESN) once again had a bullish take on the Company, indicating that "Fortis published ***better than expected*** FY07 for the activities it will be acquiring form ABN AMRO."  Specifically, "FY07 underlying net profit increased 17% to EUR 1,355m, well ahead of the EUR 1,288m we were expecting."  As a result of this news, the analyst noted that he would increase estimated concerning ABN AMRO's activities after the anticipated announcement of Fortis's full-year 2007 financial results on March 7, 2008.  In concluding his report, the analyst noted that he was "***positively surprised*** *by relatively strong FY07 from ABN AMRO activities,* ***both in terms of absolute number and in terms of quality***."

172.    In a February 29, 2008 report entitled "ABN AMRO operations performing in line with estimates," analysts from Société Générale also positively regarded Defendants' statements (while leaving estimates unchanged).  In contrast to Bank Degroof, however, Société Générale noted that the "main issues remain."  Nevertheless, Defendants' representations significantly reassured the analysts, which they expressed by noting that "we are glad the company is providing disclosure on the performance at this stage, as ***we feared investors would remain in the dark*** about the performance of the ABN AMRO assets for almost a year."

### 9. The March 7, 2008 Statements

173.     On March 5, 2008, Fortis announced that it had signed a memorandum of understanding with VINCI, a construction group, "with a view to combining their respective activities in the public car park industry."  According to Fortis, "[t]he transaction w[ould] have a positive impact on Fortis's solvency ratio."

174.     Two days later, on March 7, 2008, Fortis released its Consolidated Quarterly Financial Report for the fourth quarter of 2007, in which the Company represented that "[t]here have been no material events after the balance sheet date that would require adjustment to the Consolidated Interim Financial Statements at 31 December 2007."  On that date, Fortis also issued a press release announcing its full-year financial results for 2007.  The press release, entitled "**Fortis's full-year net profit at EUR 4.0 billion on continued strong commercial activity in banking and insurance**," touted the Company's "prudent approach to impairments" and conservative approach to accounting for subprime-related assets, as well as the fact that the "transition and integration process" associated with ABN AMRO remained "on track."  The press release, whose byline read "**Proposed final cash dividend of EUR 0.59 brings total dividend to EUR 1.176 (EUR 1.171 in 2006)**," contained the following highlights:

- **Fortis delivers a full-year 2007 net profit before the divestment of CaiFor of EUR 3.0 billion.** This is based on a prudent approach to impairments, using stringent assumptions on super senior CDO's with subprime exposure. The impact on net profit of these impairments amounts to EUR 1.5 billion.

- **Underlying net profit of acquired ABN AMRO activities up 17% to EUR 1,355 millon** [sic]**.** The net contribution of these activities to Fortis's results amounted to EUR 179 million for the 76 days we consolidated. The transition and integration process is fully on track, assumptions regarding synergies and profit contribution have been confirmed

    - **Banking**

        - Full-year net profit contribution at EUR 1.8 billion, down 44% due to subprime impairments

- Higher net interest income and commissions and fees resilient drivers of 10% total revenue growth
- Funds under management up 9% to EUR 208 billion, net inflows of EUR 13.9 billion in 2007
- Solid underlying loan growth of 16% in 2007, reflecting strong commercial performance
- Credit loss ratio at 5 basis points, excluding subprime impairments
- Half of the 12% increase in expenses was related to investments in growth

▪ **Insurance**

- Full-year net profit before divestments reaches EUR 1.6 billion, up 12% despite impact of Windstorm Kyrill, UK floods and capital markets turmoil, driven by solid business performance and high capital gains
- Life gross inflow up 9% to EUR 13.2 billion, Non-Life gross written premiums up 9% to EUR 5.5 billion
- Value Added by New Business 6% higher, 8% increase in Embedded Value

▪ **Fourth-quarter net profit** of EUR 0.4 billion, compared with net profit of EUR 0.8 billion for third-quarter 2007 and EUR 0.8 billion for fourth-quarter 2006

- **Banking net loss** of EUR 0.9 billion in fourth quarter, due to subprime impairments. Net interest income advances, RWCs down slightly on third quarter
- **Insurance net profit** before divestments in fourth quarter reaches EUR 0.5 billion, supported by capital gains offsetting impact of credit market turmoil and additional liabilities related to unit-linked policies in the Netherlands. The divestment of CaiFor contributed EUR 0.9 billion to fourth-quarter net profit

175.    In addition, the Company downplayed the significance of *€2.7 billion in subprime-related impairments*, which resulted in full-year net profit "*down 44% from the previous year*," instead emphasizing its "prudent approach" and use of "stringent assumptions" in valuing the assets:

**Net profit Banking**

*Full-year net profit clocked in at EUR 1,768 million, down 44% on the previous year*. *Fortis applied a prudent approach to impairments, using stringent assumptions on the super senior CDO subprime exposure*. The impact on net profit of these impairments amounted to EUR 1.5 billion (EUR 2.4 billion pre-tax).

***Total subprime related impairments amounted to EUR 2.7 billion*** (EUR 1.7 billion after tax). Excluding these, net profit in 2007 would have been EUR 3.5 billion, up 11% compared with 2006. ***This result reflects a strong underlying performance on vigorous commercial activity throughout the year***.

Solid income growth more than offset the increase in expenses, the latter being mainly driven by investments in growth and an 8% rise in the number of FTEs. Excluding the impact of the US CDO subprime portfolio, the credit loss ratio stood at 5 basis points.

***The fourth quarter saw a net loss of EUR 881 million, due entirely to subprime-related impairments***. Disregarding these impairments, net profit stood at EUR 0.8 billion, 51% higher than the same period last year.

176.     Fortis also downplayed the subprime exposure of its structured credit investment portfolio, which, by the end of 2007, was purportedly valued at approximately €48 billion – down from more than €53 billion earlier – as a result of the write-downs:

### Structured credit portfolio

Fortis's total structured credit portfolio net of write-downs amounted to EUR 48 billion at the end of 2007. The portfolio can be divided into three major segments:

- US subprime CDO portfolio EUR 2.9 billion
- Credit spread portfolio EUR 42.2 billion
- Insurance ABS portfolio EUR 3.1 billion

At the Bank, ***an impairment of EUR 2.4 billion*** (after tax EUR 1.5 billion) ***was taken on the super senior CDO portfolio with subprime exposure in the fourth quarter of 2007***. Additionally, an impairment of EUR 0.2 billion was recorded in 2007 on the below super senior tranches and some warehouse positions related to the origination activity. Finally, an impairment of EUR 0.1 billion was booked in the credit spread portfolio, bringing total subprime impairments taken at the Bank to EUR 2.7 billion in 2007 (after tax EUR 1.7 billion).

The total impact of the credit market turmoil on Insurance amounted to EUR 0.3 billion (after tax EUR 0.2 billion), approximately half of which was due to impairments and half to changes in fair value through the P&L.

177.     Specifically, the Company reiterated that it had employed a "prudent approach" and used "stringent assumptions" to determine its subprime exposure, and noted that it still turned a profit on its "U.S. subprime portfolio" (the existence of which Defendants had practically denied previously):

- 78 -

*US subprime CDO portfolio*

Fortis has reviewed the value of its US subprime super senior CDO portfolio with a gross exposure of EUR 5.3 billion. ***Fortis applied a prudent approach to impairments, using stringent assumptions on the super senior CDO subprime exposure***. This resulted in impairments of 43% for the High Grade super senior CDO tranches and 57% for Mezzanine super senior CDO tranches. ***The impact on net profit of these impairments amounted to EUR 1.5 billion (EUR 2.4 billion pre-tax)***.

As was foreseen, ***an impairment of EUR 0.2 billion was taken in the fourth quarter*** on below super senior tranches and some warehouse positions related to the origination activity. The only net exposure left (after impairments) related to subprime CDOs are the AAA High Grade and Mezzanine super senior tranches.

178.    The Company also positively described its "credit spread portfolio," largely comprised of securitized assets, as "conservative," "well-diversified" and of the "highest quality":

*Credit Spread Portfolio*

Fortis Bank manages a portfolio of structured credits aimed at generating long-term stable spread income. ***The conservative portfolio focuses on the highest quality of assets and is well diversified*** over a large number of securities with an average size of EUR 20 – 25 million.

Over 93% of the portfolio is AA or better, 84% of which is AAA. The vast majority of securities in the portfolio are first-order securitisations such as RMBS, ABS and CLOs. Less than 6% of the portfolio consists of CDOs.

Besides its exposure to subprime CDO tranches, Fortis has a limited exposure to subprime RMBS. At the end of 2007 gross exposure amounted to EUR 0.6 billion. The portfolio consists predominantly of AAA super senior tranches (76%), and the remainder are AA. ***Given current credit enhancements, even with cumulative losses of 30%, no impairments on these tranches are expected to be necessary***.

Total impairments on the credit spread portfolio amounted to EUR 0.1 billion in 2007. Due to further widening of the credit spread, the negative revaluation of the structured credit portfolio recorded under 'available for sale' increased from EUR 0.7 billion at the end of the third quarter to EUR 0.9 billion at year-end 2007. These negative revaluations do not have an impact on the P&L or on core equity.

179.    The Company also had highly positive things to say about Scaldis, its commercial paper and securitization unit (considered part of the credit spread portfolio), noting that the unit (somehow) remained virtually immune from the effects of the "global commercial paper market":

- 79 -

### Scaldis

Fortis manages one conduit, Scaldis, which was established in 1999 and has current outstandings of around EUR 18 billion. Scaldis is part of the credit spread portfolio described above. Scaldis is a hybrid ABCP programme with 70% AAA securities and 30% multi-seller receivables, and *it enjoys the highest possible ST ratings (P1/F1+/A1+). Despite the developments in the global commercial paper market, the programme has been able to finance itself externally for the majority of the portfolio*. Today 100% of funding comes from third party commercial paper investors.

180.     In addition, the Company disclosed that its "insurance portfolio," which it also described as "well-diversified" and of "high quality," had approximately €200 million in U.S. subprime exposure and had been materially impacted by the "credit market turmoil" to the tune of €336 million:

### Insurance portfolio

Fortis Insurance's total net exposure to structured credits amounts to EUR 3.1 billion. The portfolio provides Insurance with fixed and relatively high financial income while contributing to the diversification of Insurance's investment book. *A large majority of the portfolio is composed of high quality and well diversified securities, in terms of collateral type and geography. US subprime exposure is limited to EUR 0.2 billion, mostly high quality and older vintages*, as the exposure to 2006 and 2007 vintages is less than EUR 10 million.

Impairments of EUR 147 million were taken on various debt instruments at Insurance in 2007. Taking into account changes in fair value through the P&L, *the total impact of credit market turmoil on Insurance for the full year amounted to EUR 336 million before tax*.

181.     The Company disclosed additional information concerning its "change in provisions for impairments" (*i.e.*, write-downs), reiterating that a €2.4 billion write-down was necessary during the fourth quarter of 2007:

**Change in provisions for impairments** reached EUR 2.8 billion in 2007 mainly due to the impairments on the US sub-prime related investments (EUR 2.7 billion). *Fortis applied a prudent approach to impairments, using stringent assumptions on the super senior CDO portfolio with subprime exposure*. An impairment of EUR 2.4 billion (after tax EUR 1.5 billion) was taken on this exposure in the fourth quarter of 2007. Additionally, an impairment of EUR 0.2 billion was recorded in 2007 on the below super senior tranches and some warehouse positions related to the origination

activity. Finally, an impairment of EUR 0.1 billion was booked in the credit spread portfolio, bringing *total subprime impairments taken to EUR 2.7 billion in 2007* (after tax EUR 1.7 billion).

*Taking these impairments into account, the remaining exposure on US subprime CDOs stood at EUR 2.9 billion at the end of 2007, EUR 2.6 billion of which in High Grade super senior tranches and EUR 0.3 billion in Mezzanine super senior tranches*. A reclass of impairments and net interest income negatively impacted the impairments by EUR 25 million due to further alignment with IFRS. This negative change was partly offset by the release of an IBNR provision of EUR 179 million due to the revision of the parameters of calculation. As far as the loan book is concerned, *specific provisions remained very limited.*

182.    Thus, even in light of the Company's "prudent" and "conservative" approach,

*subprime-related impairments comprised 96.4% of all impairments taken during 2007* (*i.e.*, €2.7

billion of €2.8 billion in total write-downs).

183.    The Company referred investors to an Investor Presentation available at its website, at

www.fortis.com, for "[a] detailed overview of the structured credit portfolio."

184.    Fortis described the other aspects of its business and operations in a similarly glowing

fashion, pointing out, for example, that its liquidity position remained strong and that the risks

associated with its U.S. corporate lending activities remained under control:

**Liquidity**

Since the global liquidity crisis set in last year, *Fortis has been strictly managing its strong liquidity position and taken appropriate measures to maintain it. Its robust and diversified funding structure has proven its merit*. Fortis benefits from a diversified funding base with more than half of funding coming from customer deposits. As a bancassurer, Fortis is able to utilise its large liquid asset base to attract collateralised funding at attractive rates.

*       *       *

**US corporate lending**

US corporate outstandings amounted to EUR 10 billion at the end of 2007, around 60% of which are included in the Energy, Commodities & Transportation (ECT) portfolio. *Risk mitigating factors are the high level of collateral, long-standing relations with these clients and relatively short-term and self-liquidating nature of commodities financing at ECT*.

185.    The Company also represented that its solvency remained extremely strong during the fourth quarter of 2007, even in connection with the planned integration of ABN AMRO's assets, which admittedly "strongly impacted" solvency.

186.    Commenting on Fortis's full-year 2007 financial performance, Defendant Votron showered praise on the Company's financial results while admitting that the turmoil in the credit markets had an adverse affect on the Company, and suggesting that the worse had come to pass:

> "This past year has been an extraordinary one for Fortis. Most observers will of course associate 2007 with the consortium acquisition of ABN AMRO, a move that allows us to accelerate our strategy. Yet, as CEO, I am also particularly pleased that we continued to implement our growth plans in 2007 despite difficult market conditions. **Fortis, though, was not immune to the impact of the turmoil in global credit markets, and, as highlighted in January, our financial results carry the burden of impairments on our subprime CDO portfolio**. But the continued focus on the fundamentals of our businesses as well as selective divestments allow us to **confirm our confidence in our solvency and liquidity position**.
>
> Fortis has successfully focused on delivering tangible value for its customers, as evidenced by a strong commercial performance in 2007. My thanks to the 65,000 employees around the world who delivered these results despite the unstable environment. Focusing on the customer helped us to increase client-driven revenues, to keep net interest income robust and to achieve strong growth momentum in commissions, fees and insurance premiums.
>
> **The compelling strategic logic of our acquisition of the selected ABN AMRO businesses has become even more relevant during this period**. Not only are these activities delivering a better-than-expected 17% rise in underlying profits, they are providing additional distribution power, increasing our retail funding capacity and, last but not least, providing us with a large and very predictable earnings stream and lowering the overall risk profile of our company.
>
> **As expected, we are making good progress with our plans for the integration of ABN AMRO. Clients have already begun to experience the benefit of a strengthened product capability**. In January, for instance, we launched the first ABN AMRO investment product into the Fortis network. Fortis is now in a position to demerge ABN AMRO's asset management activities and subsequently integrate this business with Fortis Investments. With respect to the funding of the ABN AMRO transaction, we have slightly adjusted the targeted financing mix. Divestitures and outside participation in the capital of some of our businesses will form a substantial part of the completion of the financing and strengthening of our capital position. This is one of my key priorities for 2008. In addition to the announcements made in the past few weeks, we have been engaged in exclusive negotiations on another

*transaction that will further strengthen our solvency substantially. This envisaged transaction is fully in line with our already communicated strategy and vision regarding the development of our businesses and our markets.*

*Although I am pleased with the progress we are making, there is certainly no room for complacency. We expect the markets to remain challenging for the foreseeable future and, as a result, we will intensify our efforts to control costs, in line with our commitment to the operating leverage target, and focus on risk management. **With respect to the subprime market, we have taken appropriate steps to curtail our CDO activities and have also taken the decision to apply a very stringent valuation model to super senior CDO's with subprime exposure, leading to relatively high coverage ratios but reducing our net profit before divestment to EUR 3.0 billion**.*

***Our underlying profit remains solid and our solvency strong**. As a result, it is the Board's intention to propose to the General Shareholders' meeting a full-year dividend of EUR 1.18 per share (final 2007 dividend of EUR 0.59), despite the volatile environment. For 2008, our objective and commitment is clear, regardless of external factors weighing on the financial sector: we will build on our current business momentum and will remain focused on delivering a strong performance for our customers and our shareholders, while successfully integrating ABN AMRO."*

187.    Following the issuance of the press release, Defendants held a conference call to discuss the Company's financial results. Defendants Votron, Mittler and Dierckx participated in the call and each gave presentations, while De Boeck and three other Fortis representatives were present.

188.    During his presentation, Defendant Votron was finally forced to acknowledge the significant negative impact that the subprime crisis had on Fortis. At the same time, however, he attempted to reassure the market that the Company – and he, personally – had the losses under control. For example, he indicated that he would chair a newly formed "Executive Risk and Capital Committee," in which capacity he would "constantly" "assess and approve all major risk exposure." He also indicated that Fortis ceased its "CDO originations activities in the U.S." Specifically, Defendant Votron stated, in pertinent part, as follows:

***The sub prime crisis negatively impacted us but at the same time we have also taken decisive actions** and I will highlight what these actions are.*

\*      \*      \*

Now let me talk to about the US [sub]prime and as I said, Philip later on will be documenting that with a number of details. ***Fortis 2007 financial results have been negatively impacted by the US [sub]prime prices***. Despite the recognized high quantity of the underlying assets in our super senior subsidiary prime CDO portfolio we have decided to apply stringent assumptions to our impairments in line with what was announced at the end of January 27.

We have assumed the total cumulative loss to be at 30% which is a high number compared to other numbers that have been around. We have put the value of all underlying CDOs at zero and we have assumed immediate impairment of all of super senior CDOs as soon as they quote below par. This result is a higher coverage of the risk and the early assumptions we took but we explained that January 1 and the delta between the two assumptions equals to about EUR1 billion.

***This creates a protection in case of worsening of the environment in 2008 and we elected to go for a prudent approach by having a stringent evaluation of the impact***. But as I said Philip will elaborate on that.

I also said we took a number of measures going forward. A few these measures -- ***we stopped our CDO originations activities in the US. We further strengthened the central monitoring function within our risk management organization reporting*** also (inaudible) can tell you a few words about that later on. ***And we are also creating an executive risk and capital committee which I will personally chair. This committee will assess and approve all major risk exposure. It will constantly assess the risk appetite of the book and all major capital related issues. In a nutshell, we believe we are recognizing the importance of the CDO impact but we're also taking measures to address it***.

*       *       *

***We have applied stringent assumptions in evaluating our sub prime CDO impairments protecting us against a potential further deterioration in 2008***. And we want to keep on having our attention now really going to support the business and the growth of our business. That's why ***we also elected to take a stringent assumption for the valuing of sub prime CDO impairments***.

189.    Separately, Defendant Votron indicated that he would "personally oversee" the ABN AMRO integration and represented, once again, that it was "on track."  Specifically, he stated, in pertinent part, as follows:

The agenda of myself, what are my key priorities for 2008. I will make sure we continue to relentlessly focus on serving our customers and growing our business where we know we have the expertise to do it. ***I will oversee personally also the successful integration of the ABN Amro business and I can tell you this is going really very well***. We can certainly take questions about that later.

- 84 -

I'm also committed to further improving our cost efficiency both in the strict application of our [gated] funding models and when we talk about costs you'll see that there are other measures (technical difficulty) **we will make sure to maintain a very sound solvency position** with Fortis and Gilbert will tell you about that.

*     *     *

I'm also pleased to report our estimated synergies which we amounted to EUR1.3 billion broken down between revenue and costs, cost being UER1.1 billion, revenue EUR0.2 that **these costs synergies are on track** and that the integration cost which was evaluated at EUR1.5 billion can be confirmed.

**In terms of progress with the ABN Amro integration we are on track**. We expect the approval from [DNB] on our transition plans in the coming days but I can tell you that we have good news on that subject. The merger of asset management will happen April 1. Around 1000 FTEs are involved with the integration.

190.     He also made highly positive statements concerning the Company's solvency, and, as with his representations concerning the management of further risks and losses, indicated that Fortis had in place plans to insulate it from any solvency issues (which he characterized as an "important part of [his] CEO agenda"):

**Our capital position is sound at Fortis. I insist it is sound and fully in line with the plans drawn up for the acquisition of ABN Amro**. With respect to the financing of the ABN Amro transaction we have decided to slightly adjust the target financing mix reflecting the change in the environment of the recent six months. Divestitures and (inaudible) participation in the capital of some of our businesses will form a substantial part of the completion of this financial plan.

As announced this morning we are engaged also in exclusive negotiations on another transaction that will further substantially strengthen our solvency. This envisaged transaction is fully in line with our communicated strategy and vision regarding the development of our businesses and the development of our markets. **We stay strictly in line with what we said before**.

The combined positive impact on solvency of the recently announced initiatives and the transaction currently negotiated is estimated to be around EUR3.2 billion as the impact. **We will maintain our policy of a stable growing dividend distribution. We always stick to that and we showed it this year as well. We also remain very comfortable with our ability to maintain our solvency and liquidity position going forward thanks to the five levers which we will be able to selectively use as appropriate** (inaudible) the retention of part of our recurrent earnings, divestments of noncore assets and the creation of strategic joint ventures, the issuance of non

- 85 -

dilutive capital instruments, the control of our risk-weighted commitment development and the usage of capital optimization technique.

*       *       *

*We're very confident in our ability to maintain our solvency and liquidity position going forward. This is an important part of my CEO agenda*. This is something Gilbert and I do in tandem and Gilbert will tell you in detail about it.

191.    In concluding his presentation and opening remarks, Defendant Votron referred to Fortis as "a machine with a very well oiled engine," and noted that its "businesses are going full speed and are delivering results" despite the "challenging and volatile" economic environment.

192.    Defendant Mittler, who concentrated on Fortis's insurance operations, also portrayed the Company's financial results in a highly positive light during his presentation.  Specifically, he claimed that the results were "fully in line with what we said on January 27 – EUR4 billion of net profit," including "EUR1.8 billion after taxes of impairment linked to the US subprime crisis of which EUR1.5 billion always net of taxes relates to the US subprime super senior portfolio of our Company."  He also indicated that the Company's solvency was "strong today" and consistently above-target, noting that Fortis insurance's total solvency during 2007 was 235% (as opposed to a target of 225%).

193.    Defendant Dierckx, who concentrated his presentation on Fortis's banking operations, indicated that it was his "objective to show to you that we are holding quality positions yielding an attractive return."  In furtherance of this objective, he attempted to positively portray the Company's substantial subprime losses and resulting 44% decrease in net profit by pointing out that Fortis had finally taken write-downs:

> This slide provides you an overview of the four main components of our banking results. As mentioned the bank's full year net profit clocked in at EUR1.8 billion down 44% compared to the previous year. ***This was essentially the consequence of our decision to take a very stringent approach on our originated super senior subsidiary prime CDOs***. But importantly if we exclude the impact of the sub prime, the net profit in '07 would have been up 11% to EUR3.5 billion.

- 86 -

194.    Commending the "sound quality of the loan book and of all our assets," he, too, was nevertheless forced to finally acknowledge the significant impact that the subprime crisis had on Fortis's financial results:

> ***The result of the merchant and private bank clearly bears the mark of the earlier mentioned credit markets turmoil***. The EUR540 million net profit is the result of severe impairments on our US sub prime CDO portfolio. Excluding these even merchant and private bank would have increased its net results with 5% compared to a stellar '06.

195.    Dierckx also provided additional detail on the composition of the structured credit investment portfolio and the events that resulted in the write-downs, but tempered this information with comments about how Defendants had managed the risk associated with the portfolio (which he continued to describe as "high quality"):

> I think there was already said a lot about the impairments on the CDOs. Basically what happened was that in January we thought that in accordance with our model we should take a EUR900 million impairment. And based on the figures of the end of January we had to take EUR50 million more as a result of the evolution of the expected loss.

> ***We performed stress tests and as Jean-Paul mentioned***, if we take a cumulative loss of 30% for the vintages '06 and '07 which no one has done, if we take a full impairment on the CDO buckets and if we take indeed the impairment even if the value of the underlying is still above 80% we come to this new figure of EUR2.4 billion. That leaves us with a coverage ratio of 45% divided between the super senior [mezzanine] or 57% and 43 for the super senior high grades. I think you will have to admit that it is a very conservative approach.

> Let me now look to the second part of the presentation where we are going to talk about our investment portfolio. As you know, Fortis has a total asset base of EUR871 billion. 24% of that or EUR206 billion is invested in what we call our investment portfolio. You can see that 8% is in equities, 2% real estate and 90% for the debt securities. And out of that portfolio we have EUR48 billion in structure credits or in asset-backed securities.

> Let's now try to understand more what is in this asset-backed securities and I am sure that some of you have already spent time looking at this. ***I think that we are going to give you a full disclosure and I hope we can convince you that we have been building this portfolio over a period of 10 years with zero losses over the last 10 years. You have to admit that now certain assets are more risky than others so I'm***

- 87 -

*going to spend more time on them. But overall this portfolio is of a very good quality*.

In the EUR48 billion, we have three buckets. The first bucket is the EUR2.9 billion of (inaudible) CDOs. We have discussed that at length. This is evidently after the impairment. ***Then we have the ABS portfolio of the insurance and finally we have the EUR42 billion credit spread portfolio which is managed by a highly experienced team as you can see in view of the quality it has***.

The next slide gives you a lot of details on our CDO portfolio. I'm not going to go into detail but you can see that we mentioned the attachment point, that we mentioned the vintages. You see the coverage. ***I think one element is that we had the super senior position and when there will be defaults that is a strong position because it will help us to protect better our own interests***.

The rest of the credit spread portfolio can be broken down in different ways. The first way is to look at it with EUR6 billion invested in the asset pool of (inaudible) which are valued at five, EUR3 billion in saving assets which are marked to market and EUR33 billion of investments classified as available for sale. It's also important to mention that of these EUR33 billion, [70]% is still in marked to market or a level one while the rest was valued on adjusted price.

196.    Moreover, in an attempt to deflect attention away from some of Fortis's poorer

performing assets, he claimed that the market had not valued the assets at their "intrinsic value" and

went so far as to offer specific examples of why:

You will certainly ask the question on the negative evaluation on this last part of the portfolio. As you can see out of the forest it is EUR900 million or a negative evaluation of 3%. And it is also certain that the ratings and the markets have not been very favorable so that this value has gone down in the first two months of the year.

However -- and I think it's really important (inaudible) we feel and I think the industry feels that ***the current market pricing generally does not reflect the intrinsic underlying economic value of the investment***. I think the spread widening has been to a large extent purely technical and not fundamental. ***I think the synthetic markets have been pushing the spread's [sic] widest on technicality slides the absence of an active market***.

This and other funds that have to liquidate yesterday, there was another example of this with Carlisle -- high inventory on the books of investment banks, [industries] that do not always represent intrinsic value of certain assets. Let me give you two striking examples.

***The brokers quotes on the AAA Dutch rated RMBSs are now (inaudible) 95%; simply and completely ignoring the fundamentals of the underlying markets and***

*securities*. You know probably that in these markets the 90-day delinquencies are at [03.0] when we have a credit enhancement of 5.9%. *So basically this is really out of line with what you can expect as an impairment (inaudible). So these assets should be valued closest to par*.

And this is not only true for the Dutch RMBSs. I could give you plenty of examples. Maybe a second one is the UK prime RMBS as with two years remaining average life where they quote at 96% now and the delinquencies are at 0.7 with a credit enhancement of 11.5%. So [it's really a credit market] absence of bias while driving the sales prices.

197.     He continued his presentation by explaining reasons why the portfolio remained

"sound," further muddling the Company's disclosures and concealing the dire state that it was

actually in:

> *Let's now look somewhat more closely at the portfolio and some of the reasons why we believe it is extremely sound*. First of all -- and this becomes technical -- we have first all the securitization for 94% meaning that only 6% represents second order securitization or CDOs. *I think there is a fundamental difference in judging a first order securitization and a second order securitization*.
>
> *Secondly, 84% of this portfolio is AAA and 94 is at least AA. What is probably more important is we have the most senior positions and that we have also the first cash flows*. I will come back on that because that's another important feature of the strength of this portfolio.
>
> *I think this portfolio is also the consequence of a lot of due diligence. We're not going to rely in this portfolio on the rating agencies and all the decisions have been taken with the approval of the credit department*. Finally I would like to mention that it's an extremely (inaudible) portfolio with more than 2000 lines and average ticket sizes of EUR15 million.
>
> The next two slides are I think for your information and try to explain why the CDO is and what an RMBS is. Only one word of explanation -- we have a lot of first cash flows meaning that the repayments go very quickly because all repayments go first to this first cash flow is and you should look also at the tables when we give information. *This is one of the very strong mitigating factors and defensive factors in our portfolio*.
>
> Let's now look at the different components of the portfolio, first of all the US RMBS portfolio for an amount of EUR11.8 million. 95 AAA, 99 AA and plus. EUR4.5 billion in US prime and first-year fixed, EUR0.7 billion in agency guaranteed by the US government, 2.1 in negative amortization with credit enhancements of 45 to 50%. *So meaning in laymen's terms you can suffer a loss of 45 to 50% on this portfolio.*

- 89 -

*In addition, very high repayment speed, super senior levels and low debt level to income*.

Finally, the EUR0.4 billion in HELOCs is in deals '05 and before most senior positions 100% AAA-rated and there you'll say, yes, but that's a consequence of the [monoliners]. *You should know that even if you exclude the impact and the guarantee of the [monoliners] they are still all above investment grade. And in addition to being fully conservative we have taken on this one a EUR60 million impairment which we think covers more than the rate we actually have on this portfolio*.

198.    But Dierckx did not stop there.  He continued to hammer home the notion that the Company was stable and its portfolio was insulated from further losses, ironically claiming that some of Fortis's peers attempted to mislead investors by using "loaded" terms and definitions to describe their own assets.  Moreover, Dierckx attacked what he apparently perceived to be criticisms of Fortis's assets and valuation methodologies, and repeatedly emphasized that Fortis had "stress tested" the assets time and time again to ensure that worst case scenarios were taken into account.  Specifically, he stated, in pertinent part, as follows:

I think it is probably better to focus on three categories in this portfolio. First of all I would like to talk to you a little bit about definitions because *what we have tried to do is to give you all of the information available and I think when you compare this with some of our peers -- I'm not going to name them -- but you will see that they use sometimes loaded definitions or less conservative definitions*.

First of all we have the Alt-A. Alt-A is 98% in AAA, short cash flow positions of 88% exclusively on first lien loans with five to seven-year reset periods and having a short average life of 2.2 years. We also know that this total performance of Alt-A ahs always been much better than that of mid and sub prime and loss severity in Alt-A is about 10 to 15% lower than sub prime.

If we look then at the mid prime and sub prime positions, they have a similar profile -- only first lien loans, a clear majority of vintages of (inaudible), 90% in short cash flows and all resulting in credit enhancements of 30 to 45%. *During the best ones you can sustain a loss of 45%*.

And then you'll ask -- some people ask yes, but if you compare this to the ABX indexes what do you see in terms of pricing? *This comparison is simply not relevant because our mid and sub prime exposures are first cash flow and the ABX index is based on long cash flows. So again, a lot of technicalities but I hope I can convince*

- 90 -

*you to that this makes a lot of difference in judging the value of these are expanding*.

Let's continue with the sub and mid prime. What have we done? We basically said well, if we look at the current delinquencies and you see that for each and any of the RMBSs we have done that. So this is not a (inaudible) view, this is a view line for line. First RMBS -- that's on average there is a 24% current delinquency. If you take the assumption of a loss of 50%, so we are going to sell these houses and you recuperate 50% which is not very high, then you see that the estimated pipeline loss gives us a three times cover compared to the value of these sub prime and mid prime exposures.

*So we can even go down three times what actually is now the real figure. And then we make the next stress test*. We say okay, for the CDOs we have taken a 30% cumulative loss. I mentioned that in the beginning of my presentation. *We see that if we take that extreme stress test, all of our our RMBSs still are above a coverage of 120%. So it could even go down further*.

The next question you'll ask if you have read this file is yes, but here you talk about the AAA. You have EUR400 million of AAs. That's true. In the AAs, 50% are related to vintages of '05 with credit enhancement subordination of 65%. *Here we can have a loss of 65% meaning that basically all the loans are foreclosed -- well, everything is possible. I don't think that's a very realistic scenario*.

199.    Dierckx remained in a defensive posture while discussing the other assets that comprised Fortis's portfolio, and his focus remained dispelling the notion that Fortis's assets were risky in nature and subject to further substantial losses.  In fact, he expressly represented that further write-downs were unnecessary, claiming that Defendants had conducted a line-by-line "stress test" of the portfolio:

For the '06 tranches we have a credit announcement of 27%. If we take the assumption of 30% loss the stringent, assumption we'll have a loss of 3% on EUR200 million, EUR6 million. We took an impairment of EUR78 million. *I think again we have been extremely conservative in the valuation of this asset class*.

Lately there was also a lot of discussion on the Alt-A. When you look at the press it's about Alt-A, Alt-A will be the second sub prime. *We have performed the same stress tests* and you can see it if you take the current delinquency pipeline, 9.8% of delinquencies (inaudible) LGD and we have seen that in the past and this is also what (inaudible) is mentioning is much lower, 35%. Then we have an estimated pipeline loss of 3.4% so our coverage is just under 5%.

If you take the assumption for Standard & Poor's (inaudible) this will still further deteriorate and you accept a loss of 4.5% then we still cover 3.6 times the potential loss. Now you could say yes, but with averages you can show everything. A*gain I want to mention to you that we have stress tested each line of this portfolio and nowhere is there for the time being a reason to come to an impairment. So again I think this is a safe portfolio and for what it's worth there are no downgrades in this portfolio*.

200.    He also commented on the extent of Fortis's exposure to the U.S. subprime and credit market, as manifested in CDOs and other similar assets.  Once again, he downplayed the riskiness of the assets, claiming that Defendants had performed extensive tests to ensure that write-downs were unnecessary and ratings downgrades were not imminent:

The last category we should mention is the US multisector CDO, that's a CDO in which you have not -- have asset classes -- totally different asset classes going from insurance claims, both Alt-A to (inaudible) payment leases and so on; so very broad asset class. This is a CDO which is wrapped by the monoliners and I will come back on that. It is wrapped by MBIE for 66%, and backed for 24% and assured in guarantee for 10%. *So none of the ones who have had a downgrade. But even more importantly, we have done tests of these portfolios and the underlying value and you see that all of them have investment-grade and even 55% of the assets are still AAA without the guarantee*.

Commercial real estate exposures -- but since time is going on I'm not going to dwell too much on it. I think you can see again the credit enhancement levels. You can see the super senior levels. And also here you can see that in '07 we had 30 upgrades and one downgrade. *So quite a stable and quite a performing portfolio*.

Finally, EUR12.1 billion of consumer related exposure. First of all the student loans EUR4.2 billion, *81 guaranteed by US government. Let's not dwell too much on it. The remainder have a high level of subordination of our credit enhancement*, 15 to 17% compared to current delinquencies of 6 to 7%.

And then US credit cards. *Here again we are exclusively on the most senior positions with top-quality issues and high credit support*. 18% credit enhancement levels follows the current 5.2 charge-off levels more than three times. So again the coverage ratio of more than three times.

201.    In concluding his presentation, Dierckx once again emphasized the close degree to which Defendants monitored the portfolio and their belief that it was "sound" and would continue to be:  "I hope that with this disclosure we have at least shown to you that *this is a sound portfolio,*

*that we look at it line for line, that we carefully monitor it and that this is also a portfolio which*

*has a very good [package] over the last 10 years and we hope it will continue to* have a good

(inaudible)."

202.    During the following question-and-answer session, Defendants largely reinforced the

message that the ABN AMRO integration was on track and proceeding according to plan.  In fact,

Defendant Votron confirmed that he personally kept in close contact with ratings agencies

concerning Fortis's business and operations, including the integration, and downplayed the fact that

Standard & Poor's and Moody's each had issued a "negative outlook" press release:

> I'll take the rating agencies one. ***I have always been very close to all rating agencies. I think this is the policy of this company. Each time we do something we meet them and also if we don't do things we try to keep them as informed as possible. So everything that was disclosed today and normally even a little bit more is known by our three rating agencies and all of our regulators***.

> So I was not surprised by the comments and the text of the press release of Standard & Poor's a few weeks ago and Moody's this week. ***This is not bad news by the way. They did not downgrade at Fortis. They have put us on negative outlook***. That means that on a regular basis they want to follow the plan that I disclosed this morning to you. And we will do that.

> In fact what they are telling us and they by the way also have put other Belgian and non Belgian institutions on that list of negative outlook the message they're giving us is a number of points. First of all you have nice flexibility in your financing but we would like to know when and if those plans will be closed and realized.

> Secondly we reviewed the quality of the portfolios that we highlighted today and we have a certain degree of comfort with those portfolios. ***We had also a long session with those rating agencies on the evolution of the integration of ABN Amro in order to show them that this is not something very difficult or complex***. But we did it before a few times and it's not one big integration. It is a number of smaller projects and I'm quite happy with the comments they made in the press release.

203.    Defendants also indicated, both during their presentations and the following question

session, that the Company was in the process of engaging in a transaction valued at €2 billion, on

which they refused to provide additional detail.

204.    The March 7, 2008 statements were false and misleading because, among other things: (i) Defendants' "stress tests" and extensive "due diligence" should have alerted them to the fact that the Company's losses were not contained and its portfolio was not "sound" or of "high quality"; (ii) Fortis was at risk of experiencing further substantial losses as a result of prevailing market conditions, particularly as a result of the subprime assets contained in its structured credit portfolio; (iii) Fortis's exposure to the subprime market was far greater than Defendants had represented; (iv) the Company had to take further write-downs to account for the precipitous decline in the value of its assets, including the fact that CDOs of pre-2006 vintages were deteriorating in value; (v) Fortis's solvency and capital position were not as favorable as Defendants had portrayed, but were instead being impacted by the Company's efforts to arrange financing for the Acquisition; (vi) Defendants had reason to believe that the assets that Fortis would receive from ABN AMRO included subprime assets and that ABN AMRO would have to substantially write-down the value of certain assets, undermining the veracity of their statements and further exposing the Company to losses as a result of market conditions; (vii) the integration of ABN AMRO was not "on track" as a result of Fortis's increasingly weakening financial condition, the full extent of which Defendants continued to conceal; (viii) Defendants knew or recklessly disregarded that Fortis was not valuing assets in the manner in which they represented it was, which had the effect of inflating the value of the assets and exposing Fortis to further losses; and (ix) the "negative outlook" that certain ratings agencies placed on Fortis was not simply an inconsequential matter, but was having, and would continue to have, an adverse impact on the Company's business.

205.    In response to Defendants' extensive (and seemingly satisfactory) disclosures, the market price of Fortis's securities, which had remained relatively steady during the prior weeks, increased.  For example, on March 7, 2008 (the date of the disclosures), the per share price of the

securities increased: on the U.S. OTC market, from $21.75 (on March 6, 2008) to $22.59; on the Euronext Brussels, from €14.29 to €14.74; on the Euronext Amsterdam, from €14.30 to €14.77; and on the Luxembourg Exchange, from €14.30 to €14.82.  The price continued to climb for the next several days, when, on March 12, 2008, it reached $23.55 per share on the OTC market and at or about €15.28 per share on the Luxembourg Exchange and the Euronext Brussels and Amsterdam.[8]

206.    In addition, analysts once again extensively examined the results – and appeared to be reassured by them.  In a March 10, 2008 report entitled "Firmly on the road to redemption," Farquhar Murray of Fox-Pitt expressed his belief that the "issue" related to the Company's subprime exposure "is now finally behind [it] and indeed *the risk has swung to potential recoveries* in the years to come."  According to him, "**[t]he EUR2.7bn pre-tax purge, the lengthy ABS portfolio confessional and the sudden arrival of EUR2bn of capital should atone for the sins of the 3Q07 results and put Fortis firmly on the road to redemption**."

207.    In addition, he noted that Fortis's 30% cumulative loss assumption with respect to the subprime portfolio was "conservative" and "well above current expectations of around 17%," such as that expressed by Standard & Poor's.  The following table, contained in the report, demonstrates his comparison of how Fortis stacked up against Société Générale and UBS, which also had taken substantial write-downs:

---

[8]    As Ton Gietman of Petercam indicated in his March 12, 2008 report, a Belgian newspaper had printed an article reporting "that Fortis would raise EUR 2bn through the sale of half of Fortis Investments to Ping An."  This news, which was referenced during the March 7, 2008 conference call without disclosure of Ping An's involvement, could have contributed to the second stock price increase.

| ABS CDO exposures | Par value | Current value | As % of par | Collateral RMBS | CDO | Attachment point | <=2005 | Vintage 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|
| **Fortis (EURmn)** | | | | | | | | | |
| High grade | 4,561 | 2,600 | 57% | 73% | 27% | 19% | 20% | 72% | 8% |
| Mezzanine | 698 | 300 | 43% | 94% | 6% | 42% | 23% | 57% | 20% |
| **Total** | **5,259** | **2,900** | **55%** | **75%** | **25%** | **20%** | **20%** | **71%** | **9%** |
| | | | | | | | | | |
| **Société Générale (EURmn)** | | | | | | | | | |
| High grade | 1,736 | 1,116 | 64% | 53% | n.d | 15% | 38% | 38% | 23% |
| Mezzanine 1 | 1,401 | 955 | 68% | 84% | n.d | 31% | 63% | 37% | 1% |
| Mezzanine 2 | 1,717 | 1,554 | 91% | 73% | n.d | 32% | 85% | 8% | 7% |
| **Total** | **4,854** | **3,625** | **75%** | **n.d** | **n.d** | **n.d** | **73%** | **24%** | **4%** |
| | | | | | | | | | |
| **UBS (US$mn)** | | | | | | | | | |
| High grade | 3,889 | 2,800 | 72% | n.a | n.a | n.a | n.a | n.a | n.a |
| Mezzanine 1 – 12% attach. | 2,778 | 2,000 | 72% | n.a | n.a | n.a | n.a | n.a | n.a |
| Mezzanine 2 | 15,660 | 8,300 | 53% | n.a | n.a | n.a | n.a | n.a | n.a |
| **Total** | **22,327** | **13,100** | **58%** | **n.a** | **n.a** | **n.a** | **n.a** | **n.a** | **n.a** |

208.    He also noted that he "saw little to raise eyebrows within the extensive detail" that Defendants gave on the credit spread portfolio.  Nevertheless, he noted that "ING's portfolios are performing better with higher loss coverage despite lower attachment points."

209.    In a March 11, 2008 report entitled "Economic Newsflow Remains Key Driver," three Bear Stearns analysts confirmed that Fortis's disclosure signaled that "there were no significant new areas of concern . . . ."  In his March 12, 2008 report, entitled "And now the earnings," Ton Gietman of Petercam agreed that Defendants had quelled the most prevalent concerns, but indicated that their disclosure should have come sooner:

> All attention in the Q4 presentation was on i) the solvency of the group and the ii) disclosure about the CDO write-downs. The latter was so extensive (and late) that there was hardly time to provide a proper analysis of the underlying results of Fortis in 2007 and in the final quarter more specifically. In this respect, the group was not very forthcoming with additional information.

210.    Other analysts also expressed relief that Defendants had finally made what appeared at the time to be adequate disclosure concerning the Company's losses.

### 10.    The March 31, 2008 Statements

211.    On March 31, 2008, Fortis published its 2007 Annual Report, entitled "*Solid foundation, exciting perspectives*," which largely repeated the representations Defendants made in the March 7, 2008 press release and conference call and incorporated the earlier financial

disclosures.[9]  Also on March 31, 2008, Fortis issued a press release announcing the publication of the Annual Report and indicating that a copy was available at its website, at www.fortis.com or www.reports.fortis/2007.  On the same date, Fortis also published its 2007 Corporate Sustainability Report, which repeated certain of the statements made in the Annual Report and elsewhere.

212.    In the Annual Report, Defendants Votron and Lippens authored and signed a message to shareholders from the Company's Board, wherein they touted the "remarkable year, both strategically and operationally," that Fortis purportedly had during 2007.  The Annual Report also included an interview with Defendant Votron, who answered numerous questions regarding the Company's financial performance and the Acquisition.

213.    Specifically, he once again acknowledged that Fortis was not immune from the impact of turmoil in the financial markets, but downplayed its significance, stating, in pertinent part, as follows:

> *Like other financial institutions, we were hit last year by the global credit crunch and extreme weather-related claims*. Our financial results carry the burden of impairment on our subprime CDO portfolio. Given the adverse market conditions, *we pursued a prudent approach* and took total subprime-related impairments of EUR 2.7 billion at Banking. *But our underlying profit remains solid and our solvency strong*.
>
> *      *      *
>
> We were not the only company to feel the turbulence that struck global equity markets last year. But our performance management process, built around a series of long-term strategic priorities and financial targets, and the continued focus on our strategy *give us the tools to deliver a strong performance*.

---

[9]      The Annual Report is comprised of the Annual Review and the Financial Statements, which are separate documents that expressly incorporate each other by reference.

214.    He also once again represented that he would personally oversee the Company's operations during 2008, including its efforts to maintain solvency and effectuate the integration of ABN AMRO:

> *For 2008, I will have four priorities*. One, I will make sure that we continue to focus relentlessly on serving our customers, profitably growing our franchise and further building on our business momentum. Two, *I will oversee the successful integration of the acquired ABN AMRO businesses*, which will also necessitate timely execution of the EU remedies. Three, I am committed to further improving our cost efficiency, including the strict application of our gated funding mechanisms for growth investments. Finally, *my fourth priority will be to maintain our sound solvency position*.

215.    Unlike in Fortis's previous disclosures, however, the Annual Report detailed the risk management responsibilities of the Board and Senior Management, as reflected in the following chart (taken from the Annual Report but modified to only reflect their duties):

| Board of Directors | Senior Management | |
| --- | --- | --- |
| **Risk and Capital Committee** <br> Helps the Board in understanding the risks Fortis runs, in overseeing that they are appropriately managed and in ensuring the adequacy of our capital. | **Executive Committee** <br> Sets policy, rules and limits, and ensures that they are implemented; takes steps to report, monitor, control and manage risks. | **Central Risk Management** <br> Ensures that Fortis maintains consistently high standards of risk management and raises executive management's awareness and understanding of risks being taken; encourages optimisation of the risk/return ratio and measures group-wide economic capital. |
| **Audit Committee** <br> Reviews the quality and effectiveness of procedures and structures, accounting valuation, capital assessment procedures, and internal control system. | **Risk Committee** <br> Ensures the understanding of key risks; oversees consistency in approach across the company (bank, insurance and businesses); ensures that global issues are taken into account. | |

216.    In fact, Fortis described risk management as one of its "core competencies," as it explained the integral function that risk management played in its operations:

> As a financial services provider, one of the most critical aspects of our operations is managing and controlling risk. Sound risk management is, in fact, a key ingredient of our strategy of sustainable profitable growth – and therefore *one of our core competences*. We rely upon a strong risk management framework *to ensure that we achieve an appropriate balance between risk and return* and to secure and preserve the trust and confidence of customers, shareholders, regulators, rating agencies and other stakeholders. The risk management framework resides at all levels within Fortis.

217.    In addition to the reasons set forth above as to why the March 7, 2008 statements were false and misleading, the March 31, 2008 statements were also false and misleading because, among other things: (i) Defendants knew or should have known that the Company could not weather the financial crisis by overextending itself in arranging financing for the Acquisition, or by continuing to manage assets that were exposed to the subprime market; (ii) Defendants had not adhered to the risk management policies that they publicly disclosed and professed to have followed; and (iii) risk management was not one of Fortis's core competencies, as reflected by Defendants' intentional disregard or reckless ignorance of their risk monitoring and management function, which they claimed to have discharged.

218.    In response to the publication of the Annual Report, the trading price of Fortis's securities once again increased and began a steady ascent.  For example, the per share price of the securities increased: on the U.S. OTC market, from $24.90 on March 28, 2008 to $25.25 on March 31, 2008 (and $26.05 on April 1, 2008); and on the Luxembourg Exchange and the Euronext Brussels and Amsterdam, from an average of €15.93 on March 31, 2008 to an average of €16.47 on April 1, 2008.

### 11.    April 2008 Developments

219.    On April 2, 2008, Fortis issued a press release announcing that Ping An had agreed to acquire a 50% equity stake in Fortis Investments, the global asset management arm of Fortis, for €2.15 billion in cash.  The announcement of the transaction served to confirm earlier press and analyst reports that Fortis and Ping An were in discussions concerning a further, multibillion dollar investment in the Company by Ping An.  The transaction was expected to close during the second or third quarter of 2008.

### 12.    The May 13, 2008 Statements

220.    On May 13, 2008, Fortis issued a press release announcing its financial results for the first quarter of 2008.  The press release, entitled "**Fortis first quarter net profit of EUR 808 million driven by resilient operational performance**," proclaimed that the Company's income growth was "supported by strict cost management . . . [d]espite challenging markets . . . ."

221.    With respect to its banking operations, the Company indicated that *Fortis had to take a further €366 million pre-tax write-down* (€231 million after-tax) on its structured credit portfolio during the first quarter.  Nevertheless, the Company represented that the credit quality of its loan portfolio was "strong" and that the integration of ABN AMRO was still "on track."  The press release provided, in pertinent part, as follows:

- ▪ Sustained organic operational growth, especially in banking, and strict cost management result in a first quarter net profit of EUR 808 million, including EUR 380 million net of tax impact of the credit market turmoil.

- ▪ **Banking**
  -Ined First quarter net profit of EUR 721 million, *including EUR 231 million of after-tax impairments on structured credit portfolio*
  - Income growth of 17% year-on-year driven by higher income from treasury and financial markets as well as *strong underlying growth* in net interest income in all banking businesses
  - Strict cost containment resulted in a 2% increase in expenses and an improvement of the efficiency ratio
  - *Credit loss ratio of 12 basis points,* excluding impairments on the structured credit portfolio, *reflecting continued strong credit quality of loan portfolio*
  - Asset Management and Private Banking saw a net inflow of EUR 2.6 billion in the first quarter
  - Good underlying pro forma net profit of acquired ABN AMRO activities of EUR 319 million
  - *Well on track with the integration of ABN AMRO*, Asset Management transferred as per 1 April 2008

222.    The Company also disclosed that the structured credit portfolio, after write-downs, was valued at €43.3 billion as of the end of the first quarter – a €4.9 billion decline from the value reported at the end of 2007, which Fortis claimed was "fully explained by repayments, changes in

exchange rates, some selective sales and additional write downs[.]"  Moreover, the Company indicated that €2.3 billion in exposure remained in the U.S. subprime CDO portfolio, also noting that the credit spread and insurance ABS portfolios were valued at €38.5 billion and €2.5 billion, respectively.

223.    In addition, Fortis provided additional detail concerning its write-downs and the impairment in value of its subprime-related assets, many of which were Defendants had previously claimed were insulated from the effects of the credit market turmoil because of their high quality, financial soundness or pre-2006 vintage:

> *A further deterioration in credit market conditions in March 2008 led to various downgrades of investment securities within the structured credit portfolio*. This led to additional impairments on the investment portfolios of both Banking and Insurance.
>
> Banking incurred impairments totalling [sic] EUR 366 million (after tax EUR 231 million). *Two thirds of these impairments were taken on the super senior CDO portfolio with subprime exposure. Deterioration in the quality of the vintages before 2006 was the primary reason for the additional impairments*.
>
> An additional impairment of EUR 32 million was taken on *super senior mezzanine CDOs with subprime exposure*, increasing coverage as a percentage of the notional amount from 57% to 63%. An additional impairment of EUR 212 million was booked with respect to *super senior high grade CDOs with subprime exposure*, leading to a coverage ratio of 48% compared to 43% at the end of 2007. In addition, EUR 79 million of impairments were taken on warehouse positions related to the *CDO origination activity*.
>
> The remaining EUR 43 million of impairments were booked primarily on HELOCs wrapped by downgraded monolines and to a lesser extent on subprime and Alt-A securities.
>
> *The total impact of the credit market turmoil on Insurance amounted to EUR 209 million (after tax EUR 149 million)*, of which the vast majority was due to changes in fair value through the P&L with the remainder due to impairments.
>
> *The strong deterioration in credit markets pushed down the valuation of instruments that were fundamentally sound from a credit point of view*. During the first quarter of 2008 the unrealised loss of the structured credit portfolio recorded under 'available for sale' (AFS) increased by EUR 1.6 billion to EUR 2.5 billion. This unrealised loss does not have an impact on our P&L and core equity.

- 101 -

224.    The Company further represented that "group solvency remains sound," disclosing, in pertinent part, the following details:

> The group core equity stood EUR 5.5 billion above target at the end of the first quarter of 2008, compared with EUR 6.2 billion at the end 2007, whereby the target is computed on the basis of Basel I risk-weighted commitments.
>
> During the first quarter of 2008, Fortis's core equity decreased marginally from EUR 26.1 billion to EUR 26.0 billion. Retained net profit of EUR 0.8 billion and the issue of EUR 0.5 billion of non-innovative tier 1 hybrid securities (NITSH) were offset by the EUR 1.2 billion negative impact of the equity market on Fortis's AFS equity portfolio and EUR 0.1 billion due to other elements predominantly related to translation differences deducted from core equity. Of the EUR 1.2 billion impact of equity markets on core equity, EUR 0.2 billion was related to the realization of capital gains on equity.
>
> Rising bank risk-weighted commitments (predominantly related to market risks), computed under Basel I, drove up group core equity target to EUR 20.5 billion at the end of the first quarter of 2008, 3% above the EUR 19.9 billion target core equity at the end of 2007.
>
> ***Group leverage stood at 18.6% at the end of the first quarter of 2008, but is expected to be back on target by the end of the year***.

225.    With respect to its insurance operations, the Company reported net profit of €219 million, including €149 million "of after tax impact [from] the credit market turmoil" (€209 million pre-tax).  In addition, the Company reported that "[n]et profit doubled compared to the fourth quarter which was heavily impacted by the write-downs on the structured credit portfolio," and that it experienced "[f]urther growth in revenues quarter-on-quarter while costs were significantly lower as a result of a strict management, especially visible in non-staff related expenses[.]"

226.    Commenting on the results, Defendant Votron took a more somber tone than he had in the past, acknowledging that the "increased volatility of capital markets in the first quarter resulted in additional write-downs on our structured credit portfolio."  He also noted that the Company's capital ratios took a hit during the first quarter as a result of "the downturn in the equity markets."  Notwithstanding these concessions, however, Votron represented that Defendants had

successfully contained the effects of the credit market turmoil as a result of the "stringent view" they

had taken as of March 7, 2008:

> *These continue to be highly challenging times, as reflected by the further deterioration of financial markets in the second half of March 2008. While it is clear that the US economy is suffering, it is still uncertain how the crisis will impact other economies, which in turn could affect commercial activity. We believe that the environment will continue to be challenging for the foreseeable future.*
>
> ***The increased volatility of capital markets in the first quarter resulted in additional write-downs on our structured credit portfolio***. *The net of tax impact of the credit market turmoil recorded in the first quarter was limited to EUR 380 million **thanks to the stringent view taken at the time of our full-year results publication**.*
>
> ***To address the impact of the changes in the environment, we already took various measures during the first quarter***. *Strict cost management, especially in non-staff related expenses, in combination with income growth at both the insurance and the banking operations resulted in a **resilient operational performance** illustrated by a net profit including the impact of the credit turmoil of EUR 808 million. **Our first-quarter results also reflect the benefits of our strategy of having a significant presence in the Benelux countries**, a region with a very strong credit history and relatively low volatility in earnings.*

227. Votron also represented that Ping An's investment enabled the Company to accelerate

its growth plans; that the integration of ABN AMRO was "proceeding according to plan"; and that,

although the Company's capital ratios were adversely impacted during the first quarter, Fortis

remained "on track" to meet its "stated capital objectives for 2009":

> *At 1 April 2008, the asset management activities of ABN AMRO were transferred to Fortis, and **the operational integration is proceeding according to plan**. We also announced a number of key appointments in recent weeks to facilitate the future integration of the retail, commercial & corporate and private banking activities. **Customers too are beginning to experience the benefit of the combined group**, with several joint investment products already successfully launched in the market. In respect of the announced sale of certain Dutch activities under the agreed EC remedies, **we are making good headway**.*
>
> *The formation of Fortis Ping An Investments represents an important strategic development for the company, giving us greater access to the Asian markets, specifically China, and a significantly broader distribution platform for our products. The partnership will allow both parties to leverage each other's expertise, **putting us in a position to accelerate our plans for the asset management business**.*

*Fortis is delighted, too, to welcome to its Board Louis Cheung, the CEO of Ping An, who will be an enormous asset in further understanding this huge market.*

***Our capital ratios were affected in the first quarter by the downturn in the equity markets***. *However, retained profit and the launch of non-dilutive instruments compensated for this development.* ***Core capital remains well above our target***. *This surplus in core equity will decrease when the acquired ABN AMRO activities are transferred to Fortis during the course of 2008 and 2009, and consolidated for the first time.* ***Nevertheless, we remain on track to meet our stated capital objectives for 2009, through the retention of future profits, selective asset sales and the issuance of non-dilutive instruments as previously indicated***. *The first-time publication of Fortis Bank's capital requirements under Basel II illustrates* ***the moderate risk profile of our franchise*** *and provides scope for future capital relief.*

228.    In closing, Votron stated that "the environment remains challenging, but we will continue to take whatever steps are necessary to navigate successfully through the current crisis," and reaffirmed the Company's devotion to successfully integrate ABN AMRO and develop the Ping An partnership.

229.    Following the issuance of the press release, Fortis held a conference call, conducted by Defendants Mittler and Dierckx, to discuss the first quarter financial results.  In his opening remarks, Defendant Mittler, describing the financial results as "highly resilient," once again downplayed the significance of the Company's substantial write-downs and lauded the purportedly prophylactic efforts the Defendants made the previous quarter, stating, in pertinent part:

We all know that these are challenging times for the financial industry. Global financial markets have further deteriorated in the second half of March 2008 and the West economy is still suffering. It's [sic] remains unclear for all of us how this crisis will impact the global economy, also potentially affecting commercial activities of the banking and insurance industry.

***However, we report today a set of highly resilient results***. ***Our reported profit of EUR808m should indeed be adjusted for some exceptional elements in order to fairly assess the performance over the first quarter of 2008***. Our profit was negatively impacted by EUR380m additional write-downs on our structured credit portfolio while its recorded EUR151m gain on credit hedge in merchant bank. So net sum of those two -- is an impact of EUR230m after taxes on our total profit.

***If we exclude these elements, and also the financing cost of ABN Amro, our standalone profit stands above EUR1.1b, in line with last year's results for Q1. I***

*think this demonstrates the resilience of Fortis activity and strong operational developments*.

Now in view of a further dislocation in structured credit markets end of March, we could have a debate to see if there is or not somewhat better situation today. But nevertheless, and also like other banks did, we have taken end of Q1, so end of March, additional impairments on super senior sub-prime CDOs.

*These impairments were limited to EUR244m pre tax thanks to the prudent approach that we took at the end of 2008 on that portfolio*. This leads to a coverage ratio at the end of March 2008 of 48% on the high grade super senior CDOs and 63% the on mezzanine super senior CDOs.

*Now despite the successive waves of downgrades by rating agencies our credit spread portfolio still contains AAA rated securities for 82%. And if you add the AA rated securities you even reach 93%*. We should also remember you that all of those CDOs are fully paying interest and principles.

Besides these impairments it is essential to focus on the operational performance of our Company. *Strict cost management in combination with income growth at both the insurance and banking operations resulted in a resilient operational performance*. Our first quarter results reflect the benefit of our strategy of having a significant presence in the Benelux countries with a very strong credit history and a relatively low volatility in earnings.

230.     He also gave assurances that he still believed that the disruption in the credit markets through the end of March devalued certain assets that, he contended, remained "fundamentally sound from a credit point of view":

*The strong devaluation of credit markets* through the end of March 2008, mainly as a result of poor liquidity, *pushed down the valuation of instruments that are fundamentally sound from a credit point of view*. We'll not elaborate on this too much as we provide in our presentation the level of valuation for the sub segments of our credit spread portfolio. It is however important to note that *our coverage ratios on the most sensitive areas are still comfortable despite a large increase in expected delinquencies*.

The high level of credit enhancement still shows a coverage of 2.3 times the expected losses for our sub-prime and mid-prime portfolio, while it stands at 3.1 times for the alt-A exposures. *Despite the successive swathes of downgrades by rating agencies our credit spread portfolio still contains AAA rated securities for 82% and if you add, as I said earlier I think, the AA you even reach 93%*.

231.    Defendant Mittler gave similar assurances with respect to the Company's solvency and capital position, stating that "*[o]ur capital ratio remains stable over the first quarter*, retained profit and the launch of non-dilutive instruments compensated for the equity markets downturn. Our banking Core Tier 1 ratio reached 8.5% *indicating a very sound solvency position*." He added that the Company "*remain[s] firmly on track to meet at that time our solvency targets* through the retention of future profits, selective sales of non- core assets or joint ventures, set up capital relief transactions, controlled growth of capital requirements and the issuance of non dilutive instruments." In furtherance of stabilizing the Company's solvency, Mittler referenced the press release and pointed out that Fortis intended to complete, "in the short-term," an "additional non-dilutive non-innovative Tier 1 capital [raise] in the European markets depending on market circumstances."

232.    In addition, during the question-and-answer segment of the call, Mittler represented that the Company was "on track" to realize synergies from the integration of ABN AMRO during 2008, while acknowledging that the integration itself would not be completed for years:

> Now this is the legal part of our integration. ***This doesn't mean that we wait until those days in order to start benefiting from the acquisition in terms of realizing synergies***. And the full scope of our synergies were included in the budget of both the Fortis related businesses and the ABN acquired businesses. And that's the reason why we could and we will show you that on May 27 -- 22. ***We could already state that we are fully on track on synergies expected to be realized in 2008, even if for some businesses the legal integration will only happen in 2009***.

233.    Nevertheless, in addressing whether the morning press release was "relatively negative" in tone, Mittler claimed that he was "not part of that very optimistic crowd" of Fortis's peers who purportedly believed that the "wors[t] is behind us" – no doubt another attempt to appear "prudent." In contrast, he delivered his closing remarks in a decidedly optimistic tone, once again emphasizing the resilience of the Company's operations (a word that he used five times during the call) and the "very proactive stance" he claimed the Defendants took in managing those operations:

First, our first quarter 2008 results demonstrate the **_resilient operational performance_** of Fortis, under highly challenging market conditions.

Secondly, the same goes for the acquired businesses from ABN Amro. With the Dutch retail and corporate activities, the private banking and asset management **_all showing their ability to generate also resilient earnings_**.

**_And finally, and this is very important for me, the solvency of Fortis is very strong. We have a sound capital base. We manage that capital base on very flexible and agile plans, and we take a very proactive stance._**

234.   The May 13, 2008 statements were false and misleading because, among other things: (i) Fortis's financial results were not resilient under the volatile market conditions or the product of Defendants' "prudent" management, but reflected Defendants' knowing or reckless failure to write-down the value of Fortis's impaired assets in a timely or responsible manner; (ii) Defendants failed to insulate the Company from further losses by appropriately minimizing its subprime exposure, which still remained in the billions of dollars as of March 31, 2008; (iii) Defendants knew or should have known that the Company could not weather the financial crisis by overextending itself in arranging financing for the Acquisition, or by continuing to manage assets that were exposed to the subprime market; (iv) the assets that Defendants characterized as financial sound were, in fact, not, particularly in the context of the prevailing market turmoil; (v) Fortis's solvency and capital base was not sound; and (vi) the integration of ABN AMRO was not "on track," nor would synergies be realized as quickly as Defendants had represented, because the Company's operations were continuing to deteriorate as expenses associated with the integration increased.

235.   In addition, these statements demonstrate that certain of Defendants' previous statements were false and misleading.  For example, Defendants admitted that they were aware as of March 2008 that market conditions required further write-downs, yet they caused the Company to disclose its fourth quarter and year-end 2007 financial results without any indication that such write-downs were then necessary.

236.    In response to Defendants' false and misleading May 13, 2008 statements, the trading price of Fortis's securities remained artificially inflated, reflecting the market's acceptance of Defendants' continuing reassurances.

### 13.    The May 22 and 23, 2008 Statements

237.    On May 22, 2008, Fortis held its annual Investor Day in Brussels, dedicated to the ABN AMRO integration.  In a press release issued in connection with Investor Day, entitled "**Fortis reports strong progress in the integration of ABN AMRO**," the Company "reconfirmed" the timetable on which the integration was to take place and reiterated that the process was "on track."  The Company also confirmed that it would benefit from €1.3 billion in synergies by the end of 2010 from the integration "as previously announced" – *with 26% of those synergies realizable in 2008* – based, in part, on "its extensive experience of acquiring and integrating companies."  In the press release, the Company detailed the synergies as follows:

Synergies and integration costs detailed and confirmed

Total synergies of EUR 1.3 billion, to be realised by the end of 2010, and related integration costs of EUR 1.5 billion, are confirmed today. ***The synergies are in line with the update given in September 2007.*** Total cost synergies are expected to be EUR 1.1 billion, or 83% of total synergies, and the revenue synergies targeted are EUR 0.2 billion, or 17% of total synergies. ***As for the timing, 26% of the synergies are expected to be realized in 2008, 55% in 2009 and 100% in 2010***. Based upon the latest assessment, additional synergies may be realised as from 2011 onwards.

238.    Commenting on the integration, Defendant Votron applauded the "high quality businesses" that Fortis acquired in the Acquisition:

*"We are just seven months into the process and have already made excellent progress on all fronts. **We have hit each of the key milestones for this process, and even at this very early stage our customers are beginning to see the first benefits**," confirms Fortis CEO Jean-Paul Votron. "**We acquired high quality businesses with a recurrent and predictable earnings stream**. These businesses fit our strategic profile, allowing us to build on existing strengths. We are growing in markets that enjoy attractive economic and commercial fundamentals. **Customers are already experiencing the benefits of this transaction**, for instance in the joint rollout of new investment products. The intention to take full control of ABN AMRO's insurance*

- 108 -

*activities, as announced on 20 May 2008, fits Fortis's ambition to fully leverage its bancassurance skills to the ABN AMRO client base."*

239.    Votron also claimed that the Acquisition was effectively insuring the Company's longevity as a going concern:

> "***This acquisition is transforming Fortis into one of Europe's most dynamic and sustainable financial services brands***,' concludes Jean-Paul Votron. 'We are creating long-term value for our shareholders, career prospects for our staff, and a leading competitor in the markets we operate in. We're committed to further solidifying our leadership position in the Benelux, and internationally."*

240.    Then, on May 23, 2008, Fortis issued a press release announcing that it had successfully placed €625 million through a non-dilutive Core Tier 1 capital transaction that was "not subject to a 15% regulatory limit."  In the press release, the Company represented that "this new transaction **demonstrates the ability of Fortis to benefit from market opportunities to further strengthen its capital ratios**, in line with its capital management policy."  Moreover, in commenting on the transaction, Defendant Mittler claimed that "[w]e have reached our stated benchmark target, further solidifying Fortis's capital position."

241.    The May 22 and 23, 2008 statements were false and misleading because, among other things: (i) under the market conditions then facing the Company, Fortis could not realize the substantial synergies Defendants represented it could, on the timetable they represented it could; (ii) the Acquisition could not save the Company from the adverse effects of its mismanaged structured credit portfolio and other impaired assets; (iii) Fortis's solvency and capital position was not strong; and (iv) Defendants were aware that the Company had overextended itself in arranging funding for the Acquisition, which was adversely impacting the integration process.

242.    Although the trading price of Fortis's securities slipped slightly on these announcements, the price remained artificially inflated.

### 14.   The June 26, 2008 Statements

243.   On June 26, 2008, Fortis issued a press release, access to which it purported to restrict, in which it announced that it was accelerating the execution of its "solvency plan."  While "confirm[ing] that its current solvency is strong and that the commercial momentum of its businesses remains resilient," Fortis claimed that it was nevertheless accelerating its solvency plan "based on the expected outcome in the coming weeks of the imposed sale of some of the Dutch commercial banking activities under the European Commission (EC) remedies ruling, the planned acquisition of the remaining 51% stake in the Dutch insurance joint venture with Delta Lloyd . . . ."  Specifically, Fortis disclosed that it was close to finalizing the sale of parts of ABN AMRO in the Netherlands pursuant to the EC's directive, but that "[t]he expected sale price could be approximately EUR 300 million *below* the net asset value."  The Company also noted that it "anticipate[d] a continued challenging market environment as well as taking a prudent stance on required capital in the current environment."

244.   To effectuate the acceleration and preserve solvency, Fortis indicated that it would "take additional measures, some of which w[ould] have an immediate impact."  It specified the following two measures in the press release:

- *an equity raising of approximately EUR 1.5 billion by means of an accelerated bookbuilding offering*, starting today. This increase is well within the mandate given by shareholders to the Board to issue new shares

- *the decision not to pay an interim 2008 dividend. This will preserve solvency as the interim dividend was expected to impact second quarter solvency by EUR 1.3 billion*. A proposal to pay the full-year 2008 dividend in shares will be made to the Annual General Meetings of Shareholders in March 2009.

245.   As disclosed in the press release, the shares issued under the first measure would be entitled to receive the full-year 2008 dividend.  With respect to the second measure, however, Fortis indicated that "[a]t the time of the full-year 2008 results disclosure *in March 2009, a dividend*

*proposal for full-year 2008, payable in shares, will be considered*."  Moreover, Fortis claimed, without explanation, that "exceptional circumstances" required the measures and added that the suspension of dividend would "strengthen the capital base":

> *Current exceptional circumstances necessitate these exceptional measures*. The Board of Directors of Fortis has decided that *under the current circumstances it is more prudent to strengthen the capital base and not pay an interim dividend*. Fortis intends to resume its practice of paying dividend in cash, probably as early as the interim 2009 dividend.

246.    Fortis also disclosed the terms of an "updated solvency plan," which the Company expected to provide "more than EUR 8 billion of additional solvency in total in the short to medium term."  According to the Company, the plan would "broadly offset the future impact on solvency of the EC remedies and the intended acquisition of the Dutch insurance joint venture," as well as "enable Fortis to keep the core Tier 1 ratio well above 6% by year-end 2009 (under Basel I)."  The additional measures that the Company intended to implement in connection with the updated plan included the following:

- a capital relief programme and a sale and lease-back transaction of real estate, for around EUR 1.5 billion

- the issuance of non-dilutive capital instruments up to EUR 2 billion

- additional disposals of mature non-core assets, which are expected to lead to a total solvency uplift of around EUR 2 billion

247.    Despite the seemingly serious nature of the announcement, Defendant Votron claimed in the press release that Fortis's solvency was strong and downplayed the significance of the measures while, in typical fashion, patting himself on the back for taking a "prudent" approach:

> *"While our solvency today is strong, the announced measures prepare us for the road ahead, which we believe is a prudent approach to take in the current environment,"* explains Fortis CEO Jean-Paul Votron. *"The acquisition of the ABN AMRO activities reinforces Fortis's long-term growth potential and the stability of its earnings profile. Fortis and ABN AMRO continue to demonstrate resilient commercial momentum. As previously stated, we believe that 2008 will be a difficult year for our industry and we do not expect an improvement in the economic*

- 111 -

> *environment soon. The measures announced today will help Fortis navigate through the current challenging market circumstances and enable us to fully focus on the promising future."*

248.    Seemingly in line with Defendant Votron's comments, the Company also disclosed

that its operational performance during the second quarter of 2008 remained "resilient" and in line

with, if not above, the previous quarter:

> *Despite difficult market circumstances, the underlying commercial performance of the banking and insurance activities continues to be resilient and is expected to be in line with or slightly up on the previous quarter*. Lower capital gains are anticipated to be offset by lower *impairments on the structured credit portfolio*. The first quarter benefited from a large revaluation gain on the credit portfolio hedge, which will not recur in the second quarter. *The impact of equity markets on solvency is estimated to amount to EUR 400 million. Mitigating measures are being deployed, leading to a reduction in sensitivity to a change in equity markets*. The second quarter 2008 results will be published on 4 August 2008.

249.    Following the issuance of the press release, Fortis held a conference call, conducted

by Defendants Votron, Mittler and Dierckx, at which the Company's announcement was discussed.

In his opening comments, Votron – who said that he "insisted we go through this plan" – reassured

the market that the integration was "well on track" and reiterated that the Company's solvency and

capital position were more than adequate, but claimed that the new solvency plan was aimed at

ensuring that Fortis remained that way in the future:

> *The businesses we are integrating from the acquisition are boosting a number of our core competencies*, and these are retail, commercial banking, private banking and asset management and merchant banking, in a part of the world where we happen to be comfortably at home, I would say, which is the Benelux.

> *            *            *

> This is all done, one would agree, against difficult market circumstances which we all have been experiencing. *And this is why also we elected at Fortis to focus about the things we can control, which is our tremendous skills in terms of integration and in terms of sizing* -- right-sizing companies, bringing them together, that's the history of the Company, and building a model which then delivers high efficiency.

> We are right in the middle of doing that with ABN AMRO. *Things are well on track and we don't want to be distracted by that*. It happens that if you look at the pressure

of the last months, and particularly I would say the pressure of the last weeks, I think it's particularly important to head into this direction with a very strong solvency. ***My prime objective is leading this Company to make sure we have a strong solvency. Therefore, we have taken a number of measures to address it, but let me first of all stress that the core solvency today is a very strong solvency***, happens to be a core Tier 1 amounting to 8.5%, which is well above the target of 6%.

*     *     *

. . . ***The integration is going very well***. Asset Management has been done. Private Bank will be done by the end of the year and then we will move forward with the rest of the businesses.

We have defined a EUR1.3b of synergies with this plan. ***I confirm that we will deliver, as I've said, the EUR1.3b of synergies***. In 2008 and 2009, the cost of the operation, and I remind you the cost being EUR1.5b, to reach these synergies is something which impacts '08/'09, but as from 2010 we'll go for full profit impact on these assets.

250.     He further represented that the acceleration of the solvency plan was predominately brought about by three developments: (i) the EU remedies, which required Fortis to divest itself of certain ABN AMRO assets in the Netherlands that it acquired – as Votron confirmed, likely €300 million ***below*** the net asset value of the assets; (ii) the "opportunity" to acquire a 51% interest in Delta Lloyd, which he admitted "was not part of the original plan of acquisition of ABN AMRO; and (iii) the "current market environment," which he claimed required a "very strong solvency plan" to navigate.  Nevertheless, he indicated that Company's second quarter was "doing better than the first quarter":

Just to highlight a couple of more things. I'm sure you will be asking me if Q2 is going well. What did we say on Q1? ***If you look at the pure commercial momentum of this Company, I think that we are really driving with all cylinders, really going well of a very good automobile***. We see that the first quarter has good commercial momentum. I can tell you that the second quarter, and if I exclude here all the impacts of the capital gains or impairments, ***the second quarter commercial momentum of the Company is even doing slightly better than the first quarter. So we feel pretty good about the commercial momentum of our Company***.

251.     Later in the call, Votron again repeated that the integration was "going well" and that "business momentum is sold":

One wish I have would be to accelerate integration as much as we can in all sectors, because *it is going well, the morale is good, people are doing a good job. We don't have attrition of clients. The business momentum is solid*. So I'd rather accept with my colleagues to take a little shave on the deal with a party, but go for speed of execution of our major plan. And this is why -- I would hope, by the way, to be able to clarify that in the next few days or weeks.

252.    During the question-and-answer session, Defendant Mittler positively described the Company's cancellation of the dividend in response to an analyst's question about whether its plans to issue dividends in stock, as opposed to cash, would be highly dilutive to earnings per share. Specifically, Mittler indicated that with a stock-based dividend, "solvency criteria is not a criteria anymore" for the Board to determine whether, and in what amount, to award a dividend for full-year 2008. As he further explained: "And so that means that at the moment we will decide and the Board will propose to the AGM in March next year the dividend of this year they will not have to take care of the solvency impact." Later during the session, Mittler attempted to provide further assurances about the Company's dividend policy, noting that "Fortis has always been a paying dividend company" and "ha[s] a policy of paying a dividend that is at least equal [to the previous year] if not growing."

253.    Defendant Dierckx positively described the Company's plans to securitize assets while acknowledging that the market was not conducive to those plans, stating, in pertinent part:

Maybe you should understand what this transaction is about. I think we are indeed preparing the real securitization and we are offloading the market, but for the time being these are transactions which remain on our balance sheet. *So we create, in fact, the securities and when we feel that the market conditions start to improve, which by the way is slightly the case, then we are ready in fact to offload into the market*.

254.    He further explained that the Company would securitize and sell certain of the *ABN AMRO assets* that it had only recently acquired:

Yes. And we mentioned also -- when I said you should also take into account that when we are talking about Fortis here it is the enlarged Fortis, so it's Fortis plus ABN AMRO. *We will work on the assets in the balance sheet of all acquired*

- 114 -

*activities of ABN AMRO*. They are also very well equipped in order to securitize and to offload a number of assets, as they did in the past and as we did in the past also.

255.    Defendant Mittler concurred with Dierckx, stating that "[w]e were always in the market of securitization" and representing that "in the last couple of weeks we saw more than 10 transactions in that market, *so that means that the markets see openings and we are ready to move as soon as possible, as Filip said, in that market*."

256.    With respect to the potential effect on solvency that the structured credit portfolio and potential write-downs could have, Defendants Votron and Dierckx both indicated – as they had in previous calls – that they had "stress tested" the portfolio and satisfied themselves that the extent of the impairments were reasonably known and under control:

**Jean-Paul Votron – *Fortis – CEO***

Let me -- that's an excellent question, by the way. *What we have done is we looked at all our assumptions in a stress test scenario with the knowledge of what we have today. We stress tested and we stress tested the equity portfolio. We stress tested the structured credit portfolio, everything*. The stress test is the assumption we take when we talk about straining the solvency as we go forward. So in the buildup of approximately EUR8b of solvency, we have taken into account a stress test scenario.

*      *      *

**Filip Dierckx – *Fortis – Head of Merchant Banking***

Okay. I think, first of all, if you look at the structured credit portfolio, I think that -- if you look at the credit portfolio, I think, as already mentioned by Jean-Paul and Gilbert, *we think that in the second quarter the impairments, the write-downs, will collectively be low*. And we continue, in fact, with what we have done over the last quarters, *is to have a stringent approach, so compared to our economic models take a more stringent approach*. That's basically, I think, what we have now.

*What we have done also is we have stressed the scenarios even further* and we come, and I'm not going to pin down on certain numbers, but we come at situations where you could face additional impairments. *We don't believe it now, but that's basically the buffer we have been building in the structured credit portfolio*. I think, as far as the equity exposure is concerned, Lex [Kloosterman, Fortis's Head of Private Banking, Asset Management] has mentioned very clearly that we have taken, both in insurance and in the bank, additional measures to decrease our sensitivity. So

- 115 -

there we have less of additional buffers, because simply our sensitivity is going down.

257.    In his closing comments, Defendant Votron first emphasized his belief, based upon its business model and the markets in which it operated, that Fortis had "an undisputed, solid, recurrent commercial business."  He then indicated that Defendants' prime responsibility" was to address the market's concerns about the Company's solvency, which he claimed they had satisfactorily done:

> *So I think our prime responsibility, and that's what I want to express here, clearly, is to go through the concerns which are expressed by the markets, sometimes around Fortis and about its solvency. And I was happy that we got a chance to clarify that our solvency today* is very strong at 8.5%, but that we happen to be in this situation where we acquired a business and had to integrate it. And where that integration is taking place, by the end of next year, creates a stress scenario vis-a-vis the solvency of today. *And this is why we want to respond to that question and that concern of the market by taking the right measures in order to address it in a look-through base*.

258.    Also on June 26, 2008, Fortis issued a press release, access to which was purportedly restricted, in which it announced that it had completed its accelerated bookbuilding offering "after receiving substantial demand from institutional investors."  In connection with the offering, the Company placed 150 million new shares at a price of €10.00 per share – well below the trading price at that time.  The Company indicated that it would file to have the shares listed on the Luxembourg Exchange and the Euronext Brussels and Amsterdam.

259.    The June 26, 2008 statements were false and misleading because, among other things: (i) the Company's solvency and capital position were not "strong" but were in danger of declining further, and Defendants were on notice of the danger earlier in the quarter (if not even before); (ii) the solvency measures that Defendants proposed were not intended to deal with *potential* future conditions, but were necessary *at that time* to ensure that the Company was adequately solvent; (iii) Fortis was not resilient, as Defendants had consistently represented, but was instead suffering the adverse impact of carrying assets that were continuing to decline in value, as evidenced by previous

and then-current write-downs and the continued disruption in the credit markets; (iv) Defendants' so-called "stress tests" should have alerted them to the fact that certain of the Company's assets required further and larger write-downs sooner; (v) the stock-based divided that Defendants proposed would, in fact, result in the substantial dilution of shareholders; and (vi) the integration of ABN AMRO was not "on track" but was suffering from the Company's deteriorating condition and the continued disruption in the credit markets.

260.    In response to Defendants' statements, the price of Fortis's securities declined, as the 150 million new shares diluted the market and shareholders began digesting the dividend postponement and the revised solvency plans.  For example, on June 26, 2008, the trading price of Fortis's securities declined on the U.S. OTC market from $19.60 per share the previous trading day to $16.25 per share that day; on the Euronext Brussels, from €12.65 to €10.26 per share; on the Euronext Amsterdam, from €12.65 to €10.20 per share; and on the Luxembourg Exchange, from €12.51 to €11.29 per share.

261.    Analysts were also taken off-guard by Defendants' announcement.  In a June 26, 2008 "flash note" entitled "Solvency plan: biting the bullet," Ivan Lathouders of Bank Degroof (ESN), who noted that he was "unpleasantly surprised" by the announcement, expressed concern that "[t]he solvency plan Fortis announced this morning was more drastic than expected."  In fact, he pointed out that "*[e]lements like the rights issue and the scrapping of the FY08 interim dividend are contrary to all previous management statement[s]*."  "Measures of this scale," he reported, "clearly indicate that management is not very confident on Fortis' ability to generate organic solvency in the near term."  As a result, he cut his price target for Fortis's securities by €2 per share – the amount that he estimated the measures would cost shareholders – from €21 to €19.  The stock at that time was trading at €12.65.

262.     In a June 26, 2008 report entitled "Measures announced to address capital problem," Duncan Russell of JPMorgan also expressed concern about the proposed measures, and pointed out that "[t]he increased share count, issue of perpetual and further disposals translates into ***EPS dilution in the range of 15%*** . . . ."  In a June 27, 2008 report entitled "Not out of the woods completely," Farquhar Murray of Fox-Pitt observed that "[w]hile this was probably the peak in terms of bad news flow and we are seeing signs of capitulation, the lack of detail on the earnings miss leaves a degree of uncertainty, which will only be resolved fully with the 2Q08 results, due on 4 August."

263.     In a June 27, 2008 report entitled "Gambled and lost," Ton Gietman of Petercam observed that Defendant "Votron continues to believe that the acquisition was an excellent move," which "no longer seems tenable.  He also characterized the Company's claim that "commercial momentum continued to be resilient" as "difficult to believe . . . ."

### 15.     The July 2008 Statements

264.     On July 2, 2008, the company issued a press release announcing that it had entered into an agreement to sell to Deutsche Bank a portion of the ABN AMRO businesses that it had acquired in connection with the Acquisition.  Specifically, in exchange for €709 million in cash from Deutsche Bank, Fortis agreed to sell a slate of businesses based in the Netherlands, including:

> two corporate client units that provide a range of financial services to large corporate clients; 13 commercial advisory branches that serve medium-sized clients; parts of the well-known Rotterdam-based bank Hollandsche Bank Unie N.V.; and the factoring services company IFN Finance B.V., the Dutch part of ABN AMRO's factoring unit IFN Group Finance.

265.     According to the press release, the sales were "aimed at addressing the EC's concerns regarding concentration in the Dutch banking market resulting from Fortis' acquisition of certain ABN AMRO assets."  The Company also disclosed that "[t]he businesses concerned produced pro forma full year 2007 pre-tax profits of approximately EUR 140 million," and confirmed that "[t]he sale price represents a discount of approximately EUR 300 million to the businesses' net asset value,

as previously communicated by Fortis in its statement of 26 June 2008." However, the Company disclosed for the first time that the "terms and conditions" of the sale required ABN AMRO to provide "initial credit risk coverage" for approximately €10 billion of risk-weighted assets, the capital for which would be "released over time." The transaction was subject to DNB's approval, as well as other regulatory approvals.

266.    In the press release, Defendant Votron made highly positive statements portraying the transaction as a "key milestone" and "essential step" in furtherance of integrating ABN AMRO:

> Jean-Paul Votron, Chief Executive Officer of Fortis Group, said: *"We have reached a key milestone. The sale of these parts of ABN AMRO Business Unit Netherlands (BU NL) is an essential step in the completion of Fortis's acquisition of certain ABN AMRO assets. We will now be able to proceed with the integration of the acquired activities on schedule and to start realizing the synergies identified as a result of this acquisition."*

267.    Then, on July 9, 2008, Fortis announced that it had sold International Asset Management Limited ("IAM"), a London-based fund-of-hedge-funds manager, to IAM's management team. As disclosed in the press release, the Company had acquired IAM in connection with the Acquisition. Although the Company did not reveal the sale price, it noted that "[t]he transaction will not have a material impact on the Fortis net profit per share" but would provide "[s]ome solvency relief . . . ."

268.    The very next day, the Company issued a press release announcing that the Board would convene on July 11, 2008 to "discuss in particular the public reaction – in Belgium and The Netherlands – on the announcement made on 26 June." Nothing further was disclosed in the press release.

269.    The market did not have to wait long to discover the results of the Board's meeting. On July 11, 2008, the Company issued a press release announcing that Defendant Verwilst, then Fortis's deputy CEO and executive member of the Board, would replace Defendant Votron as CEO

until a suitable replacement could be found through an executive search process.  In the press release, the Company attempted to portray the firing diplomatically, claiming that the Board and Votron had "decided, by mutual agreement and in the interest of the [Fortis] Group, to terminate [his] mandate . . . ."  However, the import of the Board's decision was clear:  Votron was ousted from the Company.

270.    Then, on July 15, 2008, the Company issued a short press release addressing what it characterized as "exceptional market speculation."  In the press release, the Company represented that the Board reconfirmed the adequacy of the solvency measures that Fortis disclosed on June 26, 2008.  In addition, the Company confirmed the receipt of a "request for information" from the Dutch market regulator.  The press release provided, in full, as follows:

**Fortis Statement on market speculation**

In response to exceptional market speculation, Fortis feels it necessary to issue the following statement.

On Friday 11 July, the Fortis Board discussed and re-confirmed the adequacy of the measures as disclosed on 26 June and did not envisage any additional capital increase.

The Board further requested, unanimously, that Count Maurice Lippens continues to serve as Chairman of the Board.

The Dutch market regulator AFM (Autoriteit Financiële Markten) has today sent to Fortis a request for information in the frame of decisions disclosed on 26 June and 11 July 2008. Fortis will obviously cooperate with the authorities and respond to this request for information.

In addition, Fortis reaffirms its earlier statements made on 26 June about its operational performance for the second quarter of 2008. Details on these results will be published on 4 August 2008.

271.    Thus, Defendants continued to affirm the false and misleading statements that they made on July 26, 2008 and at other times, and embellished the reasons for Votron's departure.  In

addition, they failed to recant their earlier statements, even after Votron's termination.  Accordingly, these statements remained alive and part of the total mix of information in the market.

272.    On July 17, 2008, Fortis issued a press release once again directed to addressing market concerns.  In the press release, the Company disclosed that it met with a Dutch institutional shareholder association, Vereniging van Effectenbezitters ("VEB"), in response to questions that VEB raised in three letters dated June 27, July 1 and July 10, 2008, to which Fortis also responded in writing.  The Company also disclosed that it had responded to similar letters dated July 3 and 10, 2008 from Deminor, a Belgian shareholder advisor, and Test Achats, a consumer rights organization (collectively, "Deminor").  In addition, the Company confirmed that the Board would consider VEB's July 1, 2008 letter "request for further open discussion by organising a General Meeting of Shareholders" – a request that Deminor also made, in its July 10, 2008 letter.  Attached to the press release were the two letters dated July 17, 2008 that Defendants Verwilst and Lippens issued on Fortis's behalf in response to VEB and Deminor.  Although the response letters largely repeated the disclosures that Defendants made on June 26, 2008 (and at other times), Defendants purported to answer specific questions from VEB and Deminor.

273.    For example, VEB requested disclosure of the facts upon which "Votron base[d] his statement that the balance sheet was in good shape at the end of April 2008 and that it would not need to be strengthened[.]"  In response, Defendants indicated that "[t]he decision to accelerate the execution of the solvency plan was based on a combination of factors which manifested themselves *mainly in the month of June*."  VEB also asked why Fortis "fail[ed] to discuss the amendment to its dividend policy at the AGM of 29 April 2008," to which Defendants responded that "*[a]t the end of April, there were no plans to possibly amend the dividend policy*" and that those plans developed "mainly in June."  Defendants did not provide additional detail concerning whether Fortis

"expect[ed] any new (significant) write-downs or losses on its loan portfolio," or whether the Board "ha[d] information before 26 June 2008 concerning the financial position of Fortis which it did not make public" and which contradicted its public disclosures.

274.    Deminor asked whether the Company was aware, as of May 15, 2008, of the facts upon which it purported to justify the acceleration of the new solvency plan; Defendants denied having any suck knowledge at that time.  Deminor also asked whether the Company was planning on implementing any mechanism designed to reduce shareholder dilution, to which Defendants responded that no such mechanism would be proposed, even in light of the accelerated book offering.  In addition, Deminor requested Fortis to disclose any measures aimed at "restor[ing] the credibility of management," to which Defendants replied that Fortis had replaced Votron with Verwilst.  Defendants also gave the same canned answer they gave to VEB concerning whether any additional write-downs were necessary, largely ignoring Deminor's question about whether KPMG "expressed a view recently on whether sufficient asset write-downs have been performed – particularly with regard to the structured credit portfolio, the fair value of which was estimated at EUR 43.3 billion at the end of March 2008 and the equity investments (fair value of EUR 13.1 billion)[.]"  With respect to the "need to guarantee EUR 10 billion in loans from ABN AMRO" in connection with Fortis's sale of Netherlands assets to Deutsche Bank, Defendants simply reposnded that "[t]he request for this guarantee emerged during the negotiation process with the buyer. However, this guarantee is of limited duration."

275.    Accordingly, Defendants continued to affirm the false and misleading statements that they made on July 26, 2008 and at other times, and persisted in embellishing the reasons for Votron's departure.  In addition, they failed to recant their earlier statements.  Accordingly, these statements remained alive and part of the total mix of information in the market.

276. Also on July 17, 2008, Fortis issued a press release announcing that Standard & Poor's had lowered Fortis's ratings by one notch, downgrading Fortis Bank "from AA- with negative credit watch to A+ with a stable outlook." The Company also noted that Fitch and Moody's both rated Fortis Bank "in the AA category." The press release contained the following chart:

| Rating 17/07/08 | S&P | Moody's | Fitch |
|---|---|---|---|
| Fortis Group | A | A1 | AA- |
| Fortis Bank | A+ | Aa3 | AA- |
| Fortis Insurance | A+ | A1 | AA |

277. In addition, Fortis represented that its "capital position remains strong. In this respect, the execution of the financial plan further supports its solidity and enables Fortis to focus on servicing its clients as well as the integration of ABN AMRO." Neither of these statements was true.

### 16.    The August 1 and 4, 2008 Statements

278. On August 1, 2008, Fortis issued a press release entitled "**Fortis announces further initiatives to improve dialogue with shareholders**," in which it assured shareholders that the Board would address their concerns in newly-formed informational meetings during the second half of August 2008. The press release provided, in pertinent part, as follows:

> As announced earlier, Fortis recognises the need to further intensify the dialogue with its shareholders. *CEO Herman Verwilst has stated repeatedly that one of his priorities is restoring confidence in the company and reconnecting with all shareholders*. On 19 July a special website was launched to adddress [sic] questions of shareholders and customers. So far, more than 40,000 people have visited the Fortis website and 2,500 questions have been asked. Over time this site will be further developed and further filled with information of interest to our shareholders.
>
> In its meeting of today, the Board of Directors discussed several proposals to intensify the dialogue with the investor community. *The Board came to the conclusion that information meetings with shareholders are a very efficient and expedient way to achieve this. Such events are an excellent opportunity to give information, answer questions, and exchange views*. The meetings will be held in the second half of August 2008 in both Belgium and the Netherlands. The exact times and locations will be announced shortly.

Fortis is currently exploring additional ways to improve the dialogue with shareholders. New initiatives in this respect will be announced in due course.

279.   Also on August 1, 2008, Fortis issued a press release announcing changes in the reporting structure of its executives, which only served to strengthen Defendants' stranglehold on the Company.  The press release provided, in full, as follows:

> Fortis CFO, CRO and General Counsel to report to CEO Gilbert Mittler appointed special advisor to the CEO As from today, the Fortis Chief Financial Officer, Lars Machenil, the Chief Risk Officer, Fred Bos, and the General Counsel, Jeannine Quaetaert, *will report directly to the Fortis CEO Herman Verwilst. This further strengthens the authority of these key control functions*.
>
> *Gilbert Mittler, formerly at Group Executive Committee level responsible for these departments, will from now on fully devote his time to the role of special advisor to the CEO, working alongside Herman Verwilst to implement the strategic priorities for Fortis*.
>
> 'Gilbert has played for over 20 years a first hand role in the growth of this company,' says Fortis CEO Herman Verwilst. 'Therefore this new assignment is a recognition of his extensive experience and commitment. I'm therefore happy that Gilbert, whom I have known for a long time, has accepted to take up this important new function.'

280.   On August 4, 2008, the Company issued a press release announcing its financial results for the first half of 2008.  This time, Fortis was forced to disclose that its banking and insurance operations collectively sustained €591 million (net of tax) in impairments during the first half of 2008 alone.  In addition, the Company expressly defined the phrase "*impact of the credit market turmoil*" to mean "[t]he combined effect of the impact on the structured credit portfolio and the revaluations of the hedging portfolio . . . ."

281.   Once again, the Company's structured credit portfolio took the brunt of the impairments from the credit market turmoil, although Defendants attempted to temper this fact by claiming that the losses were partially offset by other operating results:

> *A further deterioration in credit market conditions in 2008 led to various downgrades of investment securities within the structured credit portfolio*. This led to additional impairments on the investment portfolios of both Banking and Insurance. *The total net of tax impact in the first six months amounted to EUR 722*

*million*. The total net of tax impact was partly mitigated by a positive revaluation gain on the credit hedge portfolio in the first half of 2008 of EUR 132 million, bringing the total net of tax impact of the credit market turmoil to EUR 591 million. *In the first half of 2007 the net of tax impact of the credit market turmoil was limited to a negative revaluation of the credit hedge of EUR 27 million*.

*The total after tax impact of the additional impairments on the structured credit portfolio in the second quarter amounted to EUR 342 million compared to EUR 380 million in the first quarter 2008. The total net of tax impact of the credit market turmoil, including the revaluation on the credit hedge portfolio, amounted to EUR 229 million in the first quarter and EUR 362 million in the second quarter*.

During the second quarter of 2008 the unrealised loss of the structured credit portfolio recorded under 'available for sale' (AFS) increased by EUR 0.2 billion to EUR 2.7 billion. These unrealised gains/losses do not have an impact on either the P&L or on core equity.

282.    In addition, Fortis detailed the substantial write-downs that it recorded with respect to each of the banking and insurance operations, as follows:

**Banking**

Banking incurred EUR 845 million (EUR 540 million net of tax) impairments in the first half of 2008 of which EUR 479 million (EUR 309 million net of tax) in the second quarter. *The majority of these impairments were taken on the super senior CDO portfolio with subprime exposure*. A deterioration in the quality of the underlying assets led to additional impairments.

The impairments of EUR 479 million in the second quarter consist of:

- *An impairment of EUR 340 million on super senior high grade CDOs with subprime exposure*, increasing coverage as a percentage of the notional amount from 48% at the end of the first quarter to 57%
- An impairment of EUR 58 million with respect to *super senior mezzanine CDOs with subprime exposure*, leading to a coverage ratio of 74%, compared to 63% at the end of the first quarter
- An impairment of EUR 14 million on *warehouse positions*, leading to a coverage ratio 74% compared with 70% at the end of the first quarter
- An impairment of EUR 67 million primarily on *downgraded sub- and midprime and Alt-A securities*

The total net of tax impact of the credit turmoil (including the revaluations on the credit hedge portfolio) in Banking was EUR 409 million in the first half of 2008. The total net of tax impact of the credit turmoil in the second quarter was EUR 329 million compared to EUR 80 million in the first quarter.

*         *         *

**Insurance**

The total impact of the credit market turmoil on Insurance amounted to EUR 256 million net of shadow accounting (after tax EUR 182 million) in the first half of 2008, of which *the vast majority was due to changes in fair value through the P&L with the remainder due to impairments*. The total impact of the credit market turmoil on Insurance amounted to EUR 47 million net of shadow accounting (after tax EUR 33 million) in the second quarter.

283.     Fortis also disclosed the value of the three portfolios that comprise the structured credit portfolio:  the U.S. subprime portfolio was valued at €1.9 billion, while the credit spread and insurance ABS portfolios were valued at €37.6 billion and €2.2 billion, respectively.  Moreover, "[t]he **change in provisions for impairments** reached EUR 981 million in the first half of 2008, of which EUR 842 million related to structured credit exposure (total impact of EUR 538 million on net profit) and EUR 139 million related largely to the loan book."

284.     In addition, Fortis disclosed information which suggested that its solvency position was weakening.  For example, the Company indicated that applying the "look-through method" to determine solvency resulted in "core equity levels below target at both Fortis Group and Bank levels" – an issue that Fortis nevertheless attempted to downplay by noting that its capital plan, coupled with the full integration of ABN AMRO, would restore equity to target levels.

285.     Regarding the integration of ABN AMRO, Fortis disclosed that the total impact of its sale of certain assets to Deutsche Bank *could amount to €900 million in the negative*, mainly consisting of:

- ▪ *A discount of EUR 300 million* compared to the net asset value of the divested activities

- ▪ *The write-down of the intangible assets related to the divested activities, as recognised by Fortis on the acquisition date. The expected impact of the write-down of these intangibles will be around 10% of the total intangibles recognised for the ABN AMRO acquired businesses (EUR 2.9 billion)*

▪ ***A charge related to the recognition of the liabilities of the credit risk coverage*** provided on the divested loan portfolio (***initially for around EUR 10 billion*** of risk-weighted assets, decreasing over time)

286.    In addition, Fortis warned that the "fair value" of investment in RFS Holdings might not be recoverable in the future, "taking into account the change in general economic conditions and more specifically the on-going financial market turmoil."  According to the press release, Fortis performed an examination of such fair value as of June 30, 2008 and would do so again at year-end. Fortis also indicated that it would consider whether it could still attain the synergies and other benefits from ABN AMRO's operations that it claimed it would, which it cautioned could suffer from impairments:

> However, Fortis's ability to reach the goals set for the acquired ABN AMRO activities in terms of budgets, outlooks and synergies is subject to changes in general economic conditions and more specifically in financial market conditions in the quarters and years ahead. Furthermore, the level and timing of the implementation of integration plans can also impact budgets and forecasts. ***Fortis will reassess before year-end, and in line with IFRS requirements, whether it will be necessary to recognize an impairment loss on its investment in RFS Holdings B.V.*** The assessment will be based on the yearly budgeting process that takes place in the second half of the year. ***This process will also include a detailed review of the long-term targets and budgets of the acquired ABN AMRO activities and the related expected synergies and integration costs***.

287.    Commenting on the results, Defendant Verwilst represented that the Company's capital position remained "strong" and that its businesses "performed satisfactory" even as its financial results admittedly continued to reflect the impact of the credit crisis:

> ***In the first half of 2008 our businesses, including the acquired ABN AMRO activities, performed satisfactory in turbulent market conditions***. *Most of the commercial activities were still able to grow underlying revenues. At the same time, costs were well controlled. But we observe that the environment is becoming more difficult on different fronts.*
>
> ***Fortis continued to be impacted by the credit market turmoil. However, the capital position of Fortis remains sound***. *Our core equity of EUR 24.6 billion was EUR 4.0 billion above the target level on 30 June. The accelerated capital plan announced on 26 June is being executed step by step. **Divestment of non core Fortis and ABN AMRO assets, the EC remedies and the creation of joint ventures are part of this***

> ***plan to further strengthen our capital ratios****. The resulting capital gains and losses of these exceptional events are expected to have a substantial impact on reported results. This will lead to increased volatility of the reported results in the second half of 2008. Execution of the capital plan will enable us to absorb the full consolidation of the ABN AMRO activities planned for end of 2009, and develop our business further.*
>
> *The priorities for me and the senior management team are straightforward:*
> - Diligent and full execution of the capital plan of 26 June, including the announced divestments
> - Disciplined and focused implementation of our present strategy, including the swift integration of the ABN AMRO businesses
> - Sustain commercial momentum and step-up the cost-saving efforts
>
> *I consider it crucial to strengthen the communication with our stakeholders and will update the market in full transparency on progress made.*

288.    Following the issuance of the press release, Fortis held a conference call, conducted by Defendants Verwilst and Dierckx and attended by other executives, to discuss the first-half 2008 results.   In his opening comments, Verwilst was forced to acknowledge the impact that the "continuing market turmoil" had on the Company, but attempted to reassure the market that the new solvency plan did not arise as a result of unforeseen or undisclosed financial problems:

> ***Let me emphasize very strongly that this was not the reaction to a newly discovered major financial problem as you will see today***. This was a proactive choice to further strengthen the capital base of the Company and to support its future growth and development. ***The financial position of Fortis is sound***. We will come to the detailed figures in a minute.

289.    Apart from repeating the disclosures contained in the press release, Verwilst acknowledged that the Company's operations, though performing "satisfactorily," were in danger:

> Fortis reported a net profit of EUR1.6 billion over the first six months of the year. Year-on-year this compares with a record net profit of EUR2.8 billion in 2007. ***The underlying business, ladies and gentlemen, is performing satisfactorily.*** We have an engine with many cylinders. ***The engine is not firing today on all cylinders, but the risk of the engine stalling is in existence***. We have a very diversified platform, and we are operating in a credit stable region with a high savings rate. Moreover, the ABN acquisition will increase our earnings power over time.

290.    Nevertheless, Verwilst downplayed the degree to which the Company's operations were in danger as a result of then-current market conditions, taking the party line that the challenging economic environment merely exposed the resiliency of the business, even in light of impairments. He also continued to represent – as his predecessor, Votron, had – that the integration of ANB AMRO remained "on track."  On these points, Verwilst stated, in pertinent part, as follows:

> Looking at some of the specifics, we see that both banking and insurance were impacted by the market environment in the first half year, albeit to a different magnitude for the various elements, and that is what the slide illustrates.
>
> Those elements include first the impact of the credit market turmoil. Second, higher impairments on the loan portfolio related to the business cycle evolution. Third, overall lower capital gains in 2008, but also a higher taxation due to lower capital gains on equity investments and a different composition of trading results.
>
> Compared to last year, the results of 2008 were also impacted by the negative contribution of the ABN AMRO activities, that is if you take into account the financing and integration costs, as well as the cost of the shared assets.
>
> ***Although down overall and despite a difficult market, the underlying revenue lines evolution is satisfactorily, while our cost containment measures resulted in limited cost growth***.
>
> ***In what I would like to call difficult to adverse market conditions, Fortis gave proof of a resilient commercial performance***, and let me give you just a few elements to illustrate this.
>
> ***With EUR215 billion of customer deposits, we were slightly above the year-end results of 2007***. The underlying growth of the loans amounted to 7% on year-end and 14% compared to the same period last year. The main drivers for this growth were commercial loans and mortgages.
>
> Thirdly, market conditions obviously had a negative impact on our total funds under management. The net outflow was limited EUR2.5 billion, mainly in asset management, while private banking posted a net inflow of EUR1.8 billion in the first half. ***The significant increase of our funds under management as a whole are explained by the transfer of EUR88.7 billion of the ABN AMRO asset management activities in the second quarter***.
>
> ***Finally, our insurance activities also showed a solid performance***. Gross inflow remained stable in life, and premiums were up in nonlife. And our continued product innovation and investments in new markets, especially in Asia, contributed largely to this growth at attractive margins.

On May 22 we updated you on the transition and integration of the acquired ABN AMRO activities. ***Fortis continues to prepare the implementation of its transition and integration plans and remains on track***.

291.    Lee Machenil ("Machenil"), Fortis's CFO, affirmed Verwilst's statements and added that the Company's "capital position at the end of June is solid, and diligent execution of the capital plan as announced on June 26 will enable the full consolidation of ABN AMRO activities and ensure future financial flexibility." He also represented that "in the event Fortis would need to take an impairment on goodwill [relative to RFS Holdings], it will have no effect on the look through solvency."

292.    During the question-and-answer session, Machenil claimed that the Company was not worried about the ratings downgrades it sustained in July 2008, and that Scaldis was still performing well:

> As far as some structured product is concerned, yes, there might be an impact. ***I think this is going to the quite measurable, so we are not too worried about that***. You should also not forget that we in the structured credit portfolio have still an important part in Scaldis, which has continued to be financed for the time being without any difficulty. I think we still have that vehicle which is fully financed through the market. I know there are conditions of the guarantee and the credit enhancement which is done by Fortis Bank, but ***for the time[]being I don't think we foresee a major impact in the coming months***.

293.    Later during the session, Verwilst also represented that Fortis was not concerned with the downgrades, noting that "I think we had already communicated that in the past that we believe that the additional funding costs may be around 100 to EUR150 million gross" but that such costs were "not a consequence of the downgrading of Standard & Poor's, but more as a consequence of the deteriorating economic situation and the higher funding costs overall for financials."

294.    Separately, Machenil confirmed his understanding that in connection with the asset sale to Deutsche Bank, Fortis not only had to take a €300 million hit on the net asset value of the assets, but also obligated itself to keep the risk-weighted commitments and "pick up the

impairments." He further noted that Fortis's agreement with the other Consortium members obligated them to ensure that each other maintained a capital ratio in excess of 4.95%. In connection with that obligation, Fortis set aside €0.25 billion for the purpose of capital support in the event that its obligation came due to one of the other Consortium members.

295.     In response to an analyst's question, Defendant Dierckx maintained that Fortis was taking a "prudent" approach with respect to the structured credit portfolio, even though it failed to disclose in its June 26, 2008 statements that the impairments would be anywhere near as substantial as they were:

**Manus Costello** – *Merrill Lynch* – *Analyst*

I have a couple of questions, please. The first is on the structured credit portfolio where *the marks that you have taken were substantially in excess of the level that you implied they would be at on the 26 of June* when you put your press release out with the equity raising. So I wondered *what caused the shift in excess of that guidance? And I wondered if you think there will be more marks in Q3*, especially given some new benchmarks being set in the market by Merrill Lynch amongst others?

*          *          *

**Filip Dierckx** – *Fortis* – *Head* – *Merchant Banking*

Indeed, we have been saying that there was one interesting play in the market sold at relatively low price. And now, first of all, I think you have to look also -- if that would be the benchmark, then I think you have to look also at the composition of what was sold. I think the Merrill Lynch portfolio was a portfolio which was much more geared to mezzanine than to hybrids. So I don't think that it would be correct to assume that the 22% becomes the new benchmark for our portfolio.

The second thing is I can also imagine that when you sell that and when you sell to that kind of buyer, that he is looking for a certain return. *So basically I believe that the 22 is probably what you do in case of a firesale but not looking at the real benchmark*.

What I see is that at Fortis we have not -- now overall a coverage ratio of just over 60%, and yes, you see that some parties are well below that coverage ratio. Some are above. *So I think that at the end of June, certainly we are taking quite a prudent stance*.

And maybe a last remark on that, we have always explained also what our model led to us computation. ***There is still more than 10% different between what the model leads to and the valuation we take. So we are 10%, more than 10% more conservative. So yes, I think that certainly at the end of June we have taken a very prudent approach***.

296.    Machenil further represented that Fortis would continue to manage the structured credit portfolio despite the substantial losses that it continued to sustain, as evidenced by the following exchange:

**Ryan Palecek – *Kempen & Co. – Analyst***

. . . I wonder if you could give us an update in terms of the destiny of -- the final destiny of the structured credit portfolio ***as it appears to be an overhang now for several quarters now and as we see the revaluation reserves continue to grow in the negative direction***.

**Lars Machenil – *Fortis – CFO***

***[A]s far as . . . the structured credit portfolio is concerned, I think on the one hand I still firmly believe that if you look at a good asset allocation in a bank insurer, that it makes sense to have an asset-backed securities portfolio***. Now it is quite clear that for the time[]being taking into account the capital constraints and so on, even if I believe that when you look at some of the returns you can have in, for example, the European RMBSs, that it could be interesting to reinvest. It is clearly that Fortis is not going to do that.

***So for the time[]being, clearly we are in a mode of repayments***, and as we have mentioned in the presentation, these repayments are around EUR350 million a month. ***So this portfolio steadily goes down. What we will decide in the future once this market has come down, you will be the first to know***.

297.    The August 4, 2008 statements were false and misleading because, among other things: (i) Fortis's financial position was not "sound" but was instead in danger as a result of continued turbulence in the markets and a failure to execute an adequate capital and solvency plan; (ii) Defendants had not engaged in the "prudent" management of the structured credit portfolio, but rather had failed to appropriately value and timely write-down the portfolio's assets; (iii) Defendants knew or reasonably should have known as early as June 26, 2008 that the value of the structured credit portfolio required write-downs that were far larger than Defendants had represented at the

- 132 -

time; (iv) Defendants failed to disclose that Standard & Poor's downgrades were rendering Fortis's cost of capital prohibitively expensive, contrary to their denials; (v) Defendants failed to disclose the true reasons for accelerating the new solvency plan and other solvency measures; and (vi) Defendants failed to disclose the true reasons for Defendant Votron's departure, as well as the fact that he was terminated.

### 17.    The September 2008 Statements

298.    On August 21, 2008, Fortis issued a press release announcing that it had entered into an agreement to sell the 49% stake in ABN AMRO TEDA Fund Management Co., Ltd. that it had acquired in connection with the Acquisition.  According to the press release, Fortis would receive €165 million in connection with the sale, which Fortis represented was necessary as a result of regulatory requirements.  In the press release, the Company also disclosed that the transaction was "expected to provide solvency relief of approximately half of the cash consideration."

299.    Then, on September 16, 2008, Fortis issued a short press release, entitled "**Fortis statement on market speculation**," in which it once again purported to respond to market speculation.  The press release provided, in full, as follows:

> Fortis notes that speculation regarding its share price is being exacerbated by emails spreading misinformation regarding a possible imminent rights issue. Fortis categorically denies this rumour.

> Fortis confirms that there are no new elements to announce.

300.    On September 25, 2008, Fortis issued a one-line press release that was purportedly once again directed at addressing market rumors.  The press release provided, in full, as follows: "Fortis firmly denies rumours currently in the market and confirms its earlier statements."

301.    Thus, in essence, Fortis *twice* disclosed that it had no news to disclose.  In actuality, however, the press releases appear to have been aimed at deflecting attention from Fortis – or the Defendants, whose fraudulent conduct decimated the Company – to market rumors in an effort to

explain away the volatility in the Company's share price.  Nevertheless, Defendants' confirmation of their earlier statements kept their false and misleading statements alive and part of the total mix of information in the market.

302.   Fortis's gratuitous announcements continued with its issuance of a press release on September 26, 2008, in which it purported to "clarify" its "commercial and financial situation."  As it had in the past, Fortis once again proclaimed that its banking operations were "solid," its liquidity was sufficient, its solvency was "solid and above the regulatory minimum," and the ABN AMRO integration was "on track."  The press release provided, in full, as follows:

**Fortis clarifies commercial and financial situation**

In response to continued market rumours and questions, Fortis provides an update on its financial situation.

- **Fortis customer deposit flows**: *Above all we underline the solid position of the bank*. In a challenging environment of market turmoil, of negative coverage on Fortis triggering many questions from our customers, of very sharp competitive environment, customer moves have remained limited. Compared to January 1st 2008, these moves represent less than 3% of its total Benelux retail and private banking customers assets excluding market impact. This is thanks to longstanding customer loyalty, an increased effort of the Fortis staff to provide the appropriate information and answers to the questions of customers and the positive result of continuous targeted commercial efforts, such as the e-savings account in Belgium launched in July.

- **Fortis liquidity**: *Fortis currently disposes of a diversified funding base of more than EUR 300 billion* (from institutional investors, retail and private deposits, Central banks and corporates) allowing to fully fund operations. *In addition Fortis has a collateral buffer*.

- **Fortis solvency** *is solid and well above the regulatory minimum*. Fortis' capital plan which will support the consolidation at the end 2009 of all acquired ABNAMRO businesses, is being further developed.

*As at 30-6-2008, Fortis core capital stands at EUR 4 billion above its target.*

*The future need for additional capital will actually only be in 12- 18 months as we start to fold in the largest part of the ABN AMRO business*. In support of this and taking into account the current difficult market circumstances for issuing non-dilutive financial instruments, *It [sic] has been decided to implement a wider range of*

- 134 -

*activities of assets to be divested/sold*. So far more than 10 files have been earmarked both in Bank and Insurance. These activities to be divested are located as well in- and outside Benelux. The total estimates are between EUR 5 and 10 billion. So far on every file concrete interest of potential buyers is indicated and confidentiality agreements have been signed. *No capital increase is being envisaged*.

- **ABN AMRO integration** *is moving on track*, awaiting approval of the DNB on the integration plan and the closing of the EC-remedies. Preparations are made to fully integrate the ABN AMRO Private Banking activities outside of the Netherlands in Q4 2008 and beginning 2009 subject to approval.
  - Expected key dates are as follows:
    - EU remedies                          3 Oct 2008
    - PB outside NL fold-in                 6 Oct 2008
    - Retail fold-in                        1 Oct 2009
    - Merchant & Private Banking            1 May 2010

303.    Following the issuance of the press release, Fortis held a conference call in which Defendants Verwilst and Dierckx participated.  Taking a defensive position, Verwilst opened the call by claiming that Fortis's stock price did not reflect its true value and stating that "I think it is sufficient to read all the analyst reports to see that valuation for instance based on sum of the parts type of analysis [to] get to amounts that are significantly different than the market cap implied by the present stock price."

304.    In contrast, Machenil, Fortis's CFO, refused to provide additional detail on the "collateral buffer" that Fortis disclosed in the earlier press release.  Instead, he claimed that the buffer was determined through "stress tests."  He also refused to respond to an analyst's question about whether Fortis was "in talks with other financial institutions regarding a merger," either with respect to itself or ABN AMRO.  Instead, he claimed that the Company was still intent on executing its plans:  "*At this stage, Fortis has a strategy. Fortis has a plan to strengthen its capital. Fortis is going to integrate the parts that we bought of ABN AMRO. So the whole thing is perfectly clear. We are working hard every day to execute it.*"

305.    The very same day, Fortis issued a separate press release announcing the Board's unanimous nomination of Defendant Dierckx as CEO, as well as his assumption of CEO

responsibilities until approval at a general shareholder meeting.  In the press release, Defendant Lippens indicated that Dierckx would focus on implementing the capital plan, integrating ABN AMRO and restoring "trust and confidence" in the Company.  Defendant Verwilst was slated to remain a non-executive director.

306.    The September 26, 2008 statements were false and misleading because, among other things: (i) Fortis's Bank was not in a "solid position," but was suffering from the incomplete integration of ABN AMRO and the Company's overextension of capital to finance the Acquisition and augment solvency and liquidity as a result of the disruption in the credit markets; (ii) Fortis's liquidity was also being adversely affected by a scarcity of capital and higher credit costs resulting from ratings downgrades; (iii) Fortis's solvency was not "solid" but was in dire need of a lifeline in order to ensure that the Company remained within target levels; (iv) the divestiture of assets was necessary to shore up solvency at the time the statements were made, not within 12 to 18 months; (v) the integration of ABN AMRO was not "on track," but was instead suffering from all of the aforementioned undisclosed facts; and (vi) the Company could not effectuate its new solvency plan, integrate ABN AMRO or properly run its business and operations without a substantial outside investment, which Defendants knew or should have known was necessary at the time they made their statements.

### 18.    The Benelux Governments' €11.2 billion Bailout of Fortis

307.    On September 29, 2008, just three days after Defendants had reassured the market that the Company's business and financial position were solid and the integration remained "on track," Fortis issued a press release announcing that it had secured a multibillion government bailout. Specifically, the Benelux Governments agreed to invest €11.2 billion in Fortis in exchange for "significant representation" on the Board.

- 136 -

308.    As part of the transaction, Fortis agreed to sell its stake in RFS Holdings, which included all of the ABN AMRO assets it had acquired except for the Asset Management business (which had already been transferred to it during the second quarter of 2008).  As Fortis disclosed, a sale of its stake in RFS Holdings for any amount below €24 billion would result in an impairment, while a sale below €12 billion would "negatively impact core equity."  What Defendants did not disclose, however, was that Fortis's divestiture of its interest in RFS Holdings – and, by extension, ABN AMRO – was reportedly a mandatory condition of the bailout transaction that the Benelux Governments expressly demanded.

309.    In addition, Fortis disclosed that it would record €5 billion in impairments during the third quarter of 2008, "related to, among others, the deferred tax assets, goodwill on the separately managed asset managers *and the structured credit portfolio*."  The Company further detailed the nature and extent of substantial additional write-downs, as follows:

> *Within the CDO origination portfolio, the high grade assets are anticipated to be written down to 25% and the mezzanine and warehouse positions to 10%. On average 78% of the total CDO origination portfolio is written down*. The remaining net exposure on the CDO origination portfolio is expected to amount to EUR 1.1 billion, subject to approval of the external auditors. In addition to the impairments on the CDO origination portfolio, *further impairments are expected to be taken on the remainder of the structured credit portfolio*.

> In addition, Fortis will impair EUR 1.2 billion of US deferred tax assets.

310.    Further, the Company further disclosed that Defendant Lippens had resigned from the Board and that "[t]he new Chairman w[ould] be recruited from outside the company in consultation with the Belgian government."

311.    Commenting on the announcement, Defendant Dierckx maintained a highly positive tone that, once again, downplayed the significance of the events, which were much more serious than his statements suggested:

*'[sic]The actions taken by the Belgian, Luxembourg and Dutch governments are a* **sign of confidence** *in Fortis and of* **comfort to customers and all other stakeholders** *alike,' reacts Fortis CEO elect Filip Dierckx.* **'These actions ensure the financial strength and stability of our company going forward.'**

312.    Following the issuance of the press release, Fortis held a conference call that Defendant Dierckx and Machenil conducted.  In his opening remarks, Dierckx confirmed that the Company had decided to sell the ABN AMRO assets, noting that "***we think it's imprudent to further integrate ABN AMRO***, and so we will sell ABN AMRO."  Later, during the question-and-answer session, he admitted that some of the management decisions that preceded the Company's epic fall were bad or wrongly timed decisions.  In fact, under further questioning, ***he even conceded that the Acquisition was one of those decisions***.

313.    With these disclosures, the full extent of Fortis's precarious financial position was finally becoming clear.  Nevertheless, Defendants' efforts to obscure the truth rendered certain of their September 29, 2008 statements false and misleading.  For example, the Benelux Governments' investment would not ensure Fortis's "financial strength and stability," because the Company had enormous internal control and other deficiencies that Defendants exploited in perpetrating their fraud.  Moreover, the investment was not a "sign of confidence" but rather a bailout aimed at protecting the Belgian economy from losses associated with the global economic crisis.  In addition, contrary to Defendants' suggestions, the Benelux Governments expressly required Fortis to divest itself of the ABN AMRO assets as a condition precedent to their multibillion dollar capital contribution.  Further, Defendants knew or reasonably should have known the amount of the further impairments required for the structured credit portfolio, because of their intimate knowledge of its composition.

314.    Also on September 29, 2008, the *Financial Times* published an article entitled "Fortis's woes lie with ABN Amro deal," that took a critical view of Defendants' pursuit of ABN

AMRO at all (or any) costs.  The article reported that Fortis's troubles could be "traced directly to its decision, in the spring of 2007, to participate in the break-up bid for ABN Amro, its larger Dutch rival."  It also noted that for Defendants Votron and Lippens, "the opportunity to take control of ABN Amro was just too tempting to pass up."  Indeed, as the article detailed, "[f]or much of the previous decade, [Fortis] had been looking for ways to boost its size and escape its crowded and low-growth market"; the Acquisition presented this opportunity.

315.     However, as the article explained, financing the Acquisition "left Fortis on an unsure financial footing just at the time when the storm in the financial markets was destabilizing banks across the Western world."  Moreover, "the prospect of Fortis absorbing ABN Amro's assets at the same time as it was grappling with a large portfolio of assets backed by US mortgages undermined investors' confidence in Fortis."  Further, "[a] high-profile U-turn in June destroyed the credibility of its management team."  The following graphic, adapted from the article, provides an overview of key events that took place during a substantial portion of the Class Period:



### 19.   Fortis's Exit from the Banking Industry

316.    On September 30, 2008, Fortis issued a press release announcing that its partnership with Ping An with respect to Fortis Investments would not proceed as a result of the turmoil in the financial markets.  Specifically, the Company disclosed that "[i]n order to provide clarity to the market and in the context of the current severe market disruption and the ongoing uncertainty in the global capital markets, Fortis announces that it expects not to be able to complete the asset management partnership with Ping An."

317.    On the same date, Fortis issued a separate press release, entitled "**Fortis statement on DNB decision for EC Remedies sale**," announcing that the DNB would not approve the Company's asset sale to Deutsche Bank "until further notice, following further review."  According to the press release, "DNB referred to the exceptional circumstances on international financial markets, the uncertainty with regard to the future shareholder in ABN AMRO Bank and the implications of this uncertainty for all parties involved."

318.    Then, on October 3, 2008, Fortis issued a press release, entitled "**Fortis statement on transaction with Government of the Netherlands**," announcing that the Government of the Netherlands had acquired "Fortis Bank Nederland (Holding) N.V., including the participation in RFS Holdings, that represents the acquired ABN AMRO activities, Fortis Verzekeringen Nederland N.V., and Fortis Corporate Insurance N.V. for a total consideration of EUR 16.8 billion."  According to the press release, the transaction was to replace "the previously announced investment of EUR 4 billion in Fortis Bank Nederland Holding N.V."  The Company disclosed that the DNB had approved the new transaction.  Trading in Fortis's securities on the Euronext Brussels and Amsterdam and the Luxembourg Exchange was temporarily suspended on the news.

319.    Fortis's exit from the banking industry continued with the Belgian Government's acquisition of the remaining share (50% + one share) of Fortis Bank SA/NV, which the Company announced on October 6, 2008 with the issuance of a press release.  In the press release, entitled "**Fortis confirms sale of Banking and Belgian Insurance activities**," Fortis disclosed that the Belgian Government had "reached an agreement with BNP Paribas on the subsequent transfer of a majority interest in Fortis Bank SA/NV," and, further, that BNP would "acquire 100% of Fortis Insurance Belgium" in exchange for €5.73 billion in cash.  In connection with these transactions, Fortis also agreed to transfer a portfolio of structured products, valued at €10.4 billion, to a separately managed entity owned by Fortis (66%), the Belgian Government (24%) and BNP (10%).  This time, Defendant Dierckx somberly commented on the news:

> *'As a result of this transaction, the Fortis Group is exiting the banking business and the Belgian insurance business,' comments Fortis CEO Filip Dierckx. 'Given the extremely difficult market environment, the integration of Fortis Bank and Fortis Insurance Belgium into a truly leading European financial company is in the best interest of all stakeholders.'*

320.    In a press release issued on October 14, 2008, the last day of the Class Period, Fortis announced its "non-audited pro-forma figures representing the expected impact of the recent transactions on Fortis using the last published accounts (half year 2008 results) as a basis."  The press release, entitled "**Information on the new structure of Fortis SA/NV and Fortis N.V.**," indicated that Fortis had undergone a "complete metamorphosis" and would consist of its insurance operations, a stake in a structured credit portfolio entity, and the financial assets and liabilities of different financing vehicles.  Fortis also explained that the financial crisis required "immediate resolute action," an express acknowledgment of urgency that Defendants had previously refused to make when discussing the Company's operations and capital needs.  Specifically, Fortis disclosed, in pertinent part, as follows:

Fortis, like many financial institutions, has been confronted with a systemic financial crisis of ever-growing, unparalleled proportions. Faced with this situation of mounting crisis and the need for immediate resolute action, and given the role and responsibilities of the governments, Fortis had to safeguard the interest of all stakeholders by ensuring that the operations of its large Banking and Insurance units would continue to function. In the prevailing market conditions this could only be realised by agreeing to sell these to available strong parties.

321.    In addition, unlike in its other public disclosures, Fortis accompanied the disclosures in the October 14, 2008 press release with a cautionary disclaimer which purported to warn that "forward-looking statements involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements."

322.    The trading price of Fortis's securities plummeted in response to the October 14, 2008 announcements.  Indeed, on that day, the closing price on the U.S. OTC market was $1.30 per share, down from $2.00 the previous day; €1.21 per share on the Euronext Brussels and Amsterdam, down from €5.41 on October 3, 2008 (the date on which trading was suspended); and €2.00 on the Luxembourg Exchange, down from €5.25 on October 3, 2008.

323.    In an October 28, 2008 news article entitled "Fortis N.V. Chiefs Face Inquiry Over Market Statements," *Reuters* reported that "Belgian public prosecutors launched a formal investigation into whether current or former chiefs of Fortis N.V. misled financial markets," and that a lawsuit was brought in an Amsterdam commercial court alleging mismanagement at the Company. Then, on October 29, 2008, Fortis issued a press release in response to an article published in *Le Soir* which concerned "how Fortis communicated on its sub-prime exposure in September 2007."  In the press release, Fortis took a defensive tone and denied that it had withheld information concerning the nature or extent of its subprime assets.  It also claimed that it would "cooperate fully with any enquiry in this respect, but w[ould], in the interest of any investigation, refrain from further comment."  Moreover, confirming that Defendants were well aware of Fortis's dire state of affairs

during the Class Period, the Company further represented that decisions about writing-down assets "have always been approved through the required decision making process." On that date, Fortis's securities respectively traded below $1.00/€1.00 per share in each market.

324.    Thereafter, Fortis was unable to obtain shareholder approval of the proposed sale of Fortis Bank to BNP as well as the other transactions involving the Dutch and Belgian Governments. In the interim, on March 31, 2009, Fortis reported a €28 billion loss for 2008, €27.4 billion of which was attributable to discontinued operations as a result of the sale of its banking operations. Then, at a revote that took place on April 28, 2009, shareholders finally approved each of the transactions, after they won a court bid to require the vote and secured a sweetened deal that enabled Fortis to retain its Belgian insurance business (which was originally earmarked for sale to BNP). In May 2009, the transactions closed and BNP acquired a 75% interest in Fortis Bank.

325.    The markets for Fortis securities were open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged herein, Fortis's securities traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class (defined below) purchased or otherwise acquired Fortis securities in reliance upon the integrity of the market price of Fortis's securities and market information relating to Fortis, and have been damaged thereby.

326.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Fortis securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

327.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Fortis's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Fortis and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

328.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

329.    For example, as detailed herein, the Individual Defendants engaged in discrete risk management functions during the course of their employment at, or involvement with, the Company.  These functions were described at length in the 2007 Annual Report, as well as in other materials.  According to the 2007 Annual Report, the Risk and Capital Committee also assisted the Board in monitoring and managing the Company's risks in at least the following three ways: (i) "in understanding Fortis's exposure to risks inherent to banking and insurance activities"; (ii) "in

- 144 -

overseeing the proper management of these risks"; and (iii) "in ensuring the adequacy of Fortis's

capital relative to these risks and to those inherent in its overall operations."  In turn, the Risk and

Capital Committee was "assisted by certain Fortis support functions, including Fortis Central Risk

Management and the CFO Office."  According to the 2007 Annual Report, the Risk and Capital

Committee met on nine occasions during 2007, and "[t]he meetings were attended by the CEO, the

Deputy CEO, the Chief Financial Officer and the Chief Risk Officer."  The matters addressed at

those meetings, which where reported to the Board "after each meeting," included, among others:

- "Fortis's financing requirements and strategy," as well as its solvency, capital allocation and new capital model;

- "Fortis's risk appetite considerations and Fortis's risk profile," with the assistance of "[a] newly developed quarterly risk dashboard [that] provided the Committee with a detailed overview of the risks to which Fortis is exposed in areas such as credit risk and liquidity risk and of the way these risks are measured and managed";

- "The credit risk framework and Fortis's exposure to specific sectors, such as private equity, hedge funds and subprime lending";

- "Fortis's position with regard to Basel II and Solvency II";

- "Fortis's risk structure and risk governance, including the organisational structure of the risk management function and its main procedures, in particular the revised Group Risk Policy";

- The risk management and control system, the monitoring of which "was based on reports by management (management control statements and their follow-ups)";

- "[T]he outcome of the 2007 risk management focal point audit . . . performed by Fortis Audit Services"; and

- "The dividend policy and the 2006 dividend."

330.    In addition, "the CEO, the CEOs of the Bank and of Insurance, the General Auditor

and the external auditors" met with the Company's Audit Committee, both during each of its five

meetings throughout 2007 and separately, in closed sessions.  The Audit Committee considered

many of the same matters that the Risk and Capital Committee considered – including risk

management and control issues – but also discussed the Company's financial results and disclosures. Also, like the Risk and Capital Committee, the Audit Committee reported to the Board on the matters that it addressed "after each meeting."

331.   Moreover, Fortis's Brussels headquarters was intimately involved in managing the Company's New York operations, some of which were responsible for originating CDOs and other assets with U.S. subprime exposure.  For example, according to CW4, Fortis's Belgian headquarters had to approve the New York office's annual plan, which established the framework under which the New York office operated for the following year.  In addition, as detailed herein, CW4's team prepared biweekly reports to senior-level management in New York and Brussels which set forth its assessments and findings regarding Fortis's CDO portfolio.  These reports, which were initially prepared in an Excel format, were prepared by a Risk Manager who CW4 supervised.  The reports were then distributed via email to three superiors, one of whom was based in New York and two of whom were based in Brussels.  Prior to being submitted to the head office in Brussels, the reports were converted into Adobe Acrobat files, which were approximately 15 pages long.  Because senior management in Brussels was "most comfortable" when working with the Risk Management team in Brussels as opposed to New York, the reports were internally reviewed by Brussels personnel before being finalized.  CW4 believed that the Individual Defendants participated in this process.

332.   Further, according to CW4, then-CEO of Merchant Banking, Defendant Dierckx, was intimately involved in reviewing the biweekly and weekly reports from the New York office, and thus was "very aware" that subprime assets were an important topic, especially in 2007.  CW4 explained that the reports contained complete information regarding Fortis' sub-prime exposure in the U.S., as they pertained to CDO transactions and investments of the New York office.  In addition, CW4 knew of Dierckx's involvement and awareness because he often requested additional

reports, and whenever he did so, it was "always" with some sense of urgency.  According to CW4, New York's Front Office was also asked on regular occasions by Dierckx for virtually the same data that was contained in the reports, and CW4 frequently discussed such requests with the Front Office to ensure that the information contained in the reports matched the information provided by the Front Office.

333.    In addition, when Fortis adopted new valuation methodologies to value assets that were marked-to-market (changes that CW4 described as "drastic" ones), numerous internal discussions took place within Fortis's Risk Management organization, both in New York and Brussels.  Discussions also took place with various consultants and auditors – including KPMG, which had to "agree" with Fortis' new valuation methodology and be assured that it was satisfying various criteria established to mark the assets to market.  CW4 emphasized that changes in the asset valuation models were of high importance and required special approvals in order to ensure that they would not inadvertently impact other assets and areas of the Company's business.

334.    For example, in the fall of 2007, Fortis's Central Risk Committee – an "independent" group based in Brussels – sent representatives to the New York office to discuss and review the valuation models utilized there.  According to CW4, the Committee's representatives prepared a lengthy and detailed report, which CW4 believed was submitted to the highest-level officers of the Company.  The Office of the Accounting Chief in Brussels also undertook a review of the valuation models for the subprime assets in the fall of 2007, independent from the Central Risk Committee's review, in which it conducted discussions with New York personnel by telephone.

335.    Further, as set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Fortis, their control over, and/or receipt and/or modification of Fortis's allegedly materially misleading misstatements and/or their associations with

the Company, which made them privy to confidential proprietary information concerning Fortis, participated in the fraudulent scheme alleged herein.

336.   For example, Defendants had an intimate knowledge of all matters pertaining to the Acquisition, a highly significant transaction for Fortis and the other members of the Consortium and the largest banking transaction of its kind.  For example, during the November 8, 2007 third quarter earnings conference call, Defendant Mittler described the enormous effort that Fortis was undertaking – at the highest levels of the Company – in connection with the integration of ABN AMRO:

> First of all, we are progressing as expected. ***The teams are in place. When I speak about teams, that's what we call TSGs, transition steering groups. We have a representative of each of the consortium member*** and a dedicated person from ABN on more than 20 different subjects working very hard, but having had an excellent contact and having an excellent contact with the counterpart, in fact, ABN AMRO, who was, by the way, very well-prepared for the questions we all raised.
>
> ***In parallel to that, we have plenty of one-on-one meetings and also plenary sessions in order to explain to people and, more important, to try to get to know each other*** and see who could, as I always said, how we could benefit from the talent pool of ABN AMRO. We have to deliver for December 10, around December -- let's say middle of December, the transition plan to the DNB. So we are working very hard in order to be able to do that, and this means that we are in line.

337.   Moreover, Defendants themselves took part in material aspects of the integration process and claimed that ABN AMRO's assets were performing much better than they actually were.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

338.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Fortis securities and operated as a fraud or deceit on Class Period purchasers of such securities by failing to disclose the problems with the Company's business and operations.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Fortis securities fell precipitously as the prior artificial inflation came out.  As a result of their purchases of

Fortis securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

339.    As a direct result of Defendants' disclosures, the price of Fortis securities fell precipitously.  These drops removed the inflation from the price of Fortis securities, causing real economic loss to investors who had purchased Fortis securities during the Class Period.

340.    The decline in the price of Fortis securities after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Fortis securities negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Fortis securities and the subsequent significant decline in the value of such securities when Defendants' misrepresentations and other fraudulent conduct were revealed.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

341.    At all relevant times, the market for Fortis securities was an efficient market for the following reasons, among others:

(a)     Fortis securities met the requirements for listing, and were listed and actively traded on, among others, the U.S. OTC market, the Euronext Brussels and Amsterdam, and the Luxembourg Exchange, all of which were efficient markets;

(b)     Fortis regularly and publicly disclosed its financial information, including on a quarterly and annual basis, and periodically made filings with the SEC as part of the Consortium in connection with the Acquisition;

- 149 -

(c)      Fortis regularly communicated with public investors via established market communication mechanisms, including press releases on the global circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Fortis was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force, customers of their respective brokerage firms, and investors.  As reflected on the Company's website, these analysts included, among others:  ABN AMRO; AEK; Bank Degroof; Cazenove; Citigroup; Dresdner Kleinwort; Fox-Pitt; Goldman Sachs; ING Financial Markets; JP Morgan; KBC Securities; Keefe, Bruyette & Woods; Kempen; Landsbanki Kepler; Natixis Securities; Oddo Securities; Petercam; Rabo Securities; SNS Securities; Société Générale; Theodoor Gilissen; and WestLB.  Each of these reports was publicly available and entered the public marketplace.

342.    As a result of the foregoing, the market for Fortis securities promptly processed current information regarding Fortis from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Fortis securities during the Class Period suffered similar injury through their purchase of Fortis such securities at artificially inflated prices and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

343.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe

harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fortis, who knew that those statements were false when made.

## XVI.    CLASS ACTION ALLEGATIONS

344.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities of Fortis between September 17, 2007 and October 14, 2008, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

345.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fortis's ADSs publicly traded on the OTC market, as evidenced by ADRs, and Fortis's other securities traded on the Euronext Brussels and Amsterdam and the Luxembourg Exchange.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of geographically dispersed members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Fortis or its transfer agent, or through similar means, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

346.    Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' wrongful conduct.

347.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

348.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  These questions include, among other things:

(a)    Whether the federal securities laws were violated by Defendants' conduct;

(b)    Whether Defendants misrepresented or omitted material facts about Fortis's business and operations;

(c)    Whether the price of Fortis's securities were artificially inflated during the Class Period; and

(d)    Whether, and to what extent, the members of the Class have sustained damages.

349.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable and Defendants' conduct similarly affected all Class members.  Moreover, because the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for them to redress, on an individual basis, the wrongs done to them.  Further, there will be no difficulty in managing this action as a class action.

## XVII.  CLAIMS FOR RELIEF

### A.    COUNT I:  Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

350.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

351.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

352.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

353.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fortis securities.  Lead Plaintiffs and the Class would not have purchased Fortis securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

354.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class have suffered damages in connection with their purchases of Fortis securities during the Class Period.

**B.      COUNT II:  Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

355.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

356.    The Individual Defendants acted as controlling persons of Fortis within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By reason of their positions as officers

- 153 -

and/or directors of Fortis, and their ownership of Fortis stock, the Individual Defendants had the power and authority to cause Fortis to engage in the wrongful conduct complained of herein.

357.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, costs and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

DATED: May 18, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
JOSEPH RUSSELLO

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

KOSKIE MINSKY LLP
MICHAEL MAZZUCA
20 Queen Street West
Suite 900, Box 52
Toronto, Ontario
M5H 3R3
Telephone: 416/977-8353
416/977-3316 (fax)

*Addition Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Samuel H. Rudman, hereby certify that, on May 18, 2009, I caused a true and

correct copy of the attached:

> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
> FEDERAL SECURITIES LAW

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to

all counsel listed on the attached service list.

Samuel H. Rudman

FORTIS (LEAD)
Service List - 5/18/2009   (08-0241)
Page 1 of  1

### Counsel For Defendant(s)

Michael S. Feldberg
David C. Esseks
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY  10020
  212/610-6300
  212/610-6399 (Fax)

James R. Warnot, Jr.
Paul M. Alfieri
Linklaters LLP
1345 Avenue of the Americas
New York, NY  10105
  212/903-9000
  212/903-9100 (Fax)

### Counsel For Plaintiff(s)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Michael  Mazzuca
Koskie Minsky LLP
20 Queen Street West, Suite 900, Box 52
Tornonto, Ontario M5H 3R3,
  416/977-8353
  416/977-3316 (Fax)