UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

CHRISTOPHER COPELAND, on             :
behalf of himself and all
others similarly situated,           :

                    Plaintiff,       :

          - against -                :                    **OPINION**

FORTIS, FORTIS BANK S.A./N.V.,       :                    08 Civ. 9060 (DC)
FORTIS NV, HERMAN VERWILST,
JEAN-PAUL VOTRON, MAURICE            :
LIPPENS, GILBERT MITTLER,
and FILIP DIERCKX,                   :

                    Defendants.      :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**          COUGHLIN STOIA GELLER
                          RUDMAN & ROBBINS LLP
                               By:  Samuel H. Rudman, Esq.
                          58 South Service Road, Suite 200
                          Melville, New York  11747

                                    - and -

                          KOSKIE MINSKY LLP
                               By:  Michael Mazzuca, Esq.
                          20 Queen Street West
                          Suite 900, Box 52
                          Toronto, Ontario  M5H 3R3
                               Attorneys for Lead Plaintiffs

                          LINKLATERS LLP
                               By:  James R. Warnot, Jr., Esq.
                                    Paul M. Alfieri, Esq.
                                    Ruth E. Harlow, Esq.
                          1345 Avenue of the Americas
                          New York, New York  10105
                               Attorneys for Defendants

**CHIN, District Judge**

          In this securities class action, lead plaintiffs

Labourers' Pension Fund of Central and Eastern Canada (the

"Pension Fund") and Employees' Retirement System of the

Government of the Virgin Islands (the "Retirement System") sue defendants Fortis, Fortis Bank S.A./N.V., Fortis NV, Herman Verwilst, Jean-Paul Votron, Maurice Lippens, Gilbert Mittler, and Filip Diercxs for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. Lead plaintiffs sue on behalf of themselves and all other persons or entities, except for defendants, who purchased Fortis securities between September 17, 2007 and October 14, 2008.

Defendants move to dismiss the amended complaint (the "complaint") pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the complaint is dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Therefore, I do not address defendants' motion under Rule 12(b)(6).

## BACKGROUND

The facts alleged in the complaint are assumed to be true for purposes of this motion.

Fortis is an international provider of banking and insurance services. (Am. Compl. ¶ 21). Fortis has two parent companies: Fortis SA/NV, incorporated in Belgium, and Fortis N.V., incorporated in the Netherlands. (Id. ¶ 23). During the class period, it was purported to be "among the 15 largest financial institutions in Europe." (Id. ¶ 21). Fortis securities were traded on the Euronext Brussels and Euronext

Amsterdam stock exchanges, the Luxembourg Exchange, as part of
the United States over-the-counter ("OTC") market, and on at
least one Canadian market.  (Id. ¶¶ 16, 25, 151).

        Between September 17, 2007 and October 14, 2008,
defendants concealed and misrepresented material information
about Fortis's true (precarious) financial condition as a means
of maintaining investor confidence and elevating its stock price.
(Id. ¶¶ 2, 326).  In particular, defendants misrepresented the
actual value of its collateralized debt obligations ("CDOs"), the
extent to which its assets were held as risky sub-prime mortgage-
backed securities, and the extent to which its decision to
acquire ABN AMRO Holding NV ("ABN AMRO") had compromised the
company's solvency.  (Id. ¶¶ 2-4).

        Ultimately, as Fortis's financial condition worsened
over the course of 2008, the governments of Belgium, the
Netherlands, and Luxembourg were forced to infuse Fortis with
capital as part of a "bailout" to prevent the entity from
collapsing.  (Id. ¶¶ 6-9).  Fortis exited the banking market.
(Id.).  Fortis's stock price plummeted from about 22 Euros per
share at the beginning of the class period to about 1 Euro per
share at the end of the class period.  (Id. ¶ 9).

**DISCUSSION**

I.  **Applicable Law**

    A.  **Rule 12(b)(1)**

        The Court's first inquiry must be whether it has the
constitutional or statutory authority to adjudicate a case.  If

there is no subject matter jurisdiction, the Court lacks power to consider the action further.  See Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008).

In considering a Rule 12(b)(1) motion to dismiss, courts "need not accept as true contested jurisdictional allegations."  Jarvis v. Cardillo, No. 98-5793 (RWS), 1999 WL 187205, at *2 (S.D.N.Y.  Apr. 6, 1999).  Rather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings, such as affidavits.  See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998).

As the party "seeking to invoke the subject matter jurisdiction of the district court," Scelsa v. City Univ. of New York, 76 F.3d 37, 40 (2d Cir. 1996), the plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in the case.  Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).  In a facial Rule 12(b)(1) challenge, the Court must accept the factual allegations of the complaint as true, but "refrain from drawing . . . inferences favorable to the party asserting [jurisdiction]."  APWU v. Potter, 343 F. 3d 619, 623 (2d Cir. 2003).

**B.  Extraterritorial Application of the Exchange Act**

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security.  15 U.S.C. §

- 4 -

78j(b).  Section 20(a) imposes joint and several liability on any
individual who "controls" someone who is liable under the
Exchange Act.  15 U.S.C. § 78t(a).

     The text of the Exchange Act does not specify whether
its provisions apply to fraud related to the trade of foreign
securities.  See Itoba Ltd. v. Lep Group PLC, 54 F.3d 118, 121
(2d Cir. 1995).  The Second Circuit has developed two tests to
determine whether "Congress would have wished the precious
resources of the United States courts and law enforcement
agencies to be devoted" to a particular case of alleged fraud.
Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir.
2008).  First, the "conduct" test asks whether alleged fraudulent
conduct was "conceived" and "executed" in the United States.  SEC
v. Berger, 322 F.3d 187, 192-93 (2d Cir. 2003).  Second, the
"effects" test asks whether alleged fraudulent conduct has a
"sufficiently serious effect" in the United States to warrant
assertion of jurisdiction.  Schoenbaum v. Firstbrook, 405 F.2d
200, 209 (2d Cir. 1968).

     The "conduct" and "effects" tests are designed to
ascertain whether an alleged fraud touches the United States to
such a degree that the exercise of jurisdiction is warranted.

          1.  **Conduct Test**

     A court finds subject matter jurisdiction under the
"conduct" test if any acts that took place in the United States
were "more than merely preparatory to a fraud."  Morrison, 547
F.3d at 171.  A court should undertake a factual analysis to

- 5 -

discover what conduct was "central or at the heart of a fraudulent scheme" as opposed to what conduct was "merely preparatory or ancillary." Id. at 174. "[J]urisdiction exists only when 'substantial acts in furtherance of the fraud were committed within the United States.'" Berger, 322 F.3d at 193 (quoting Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983)). Conduct in the United States must have "directly caused" the claimed losses. Itoba, 54 F.3d at 122.

If a court determines that "substantial [fraudulent] acts" occurred in the United States, it may exercise jurisdiction regardless of whether plaintiffs are foreign or domestic. "Congress did not want to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." Psimenos, 722 F.2d at 1045.

### 2.  **Effects Test**

"[T]he effects test concerns the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges." Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 128 & n.12 (2d Cir. 1998). The effects test relates to "fraud which takes place abroad which impacts on stock registered and listed on [an American] national securities exchange and [is] detrimental to the interests of American investors." Itoba, 54 F.3d at 124 (citations omitted). "Generalized effects[,] . . . such as loss of investor confidence or a decline in purchases by foreign

investors in U.S. markets, do not suffice." <u>In re SCOR Holding</u>
<u>(Switzerland) AG Litig.</u>, 537 F. Supp. 2d 556, 562 (S.D.N.Y. 2008)
(citing <u>Bersch v. Drexel Firestone, Inc.</u>, 519 F.2d 974, 988 (2d
Cir. 1975)). "[T]he United States prohibition of securities
fraud 'may be given extraterritorial reach whenever a
predominantly foreign transaction has substantial effects within
the United States.'" <u>North South Finance Corp. v. Al-Turki</u>, 100
F.3d 1046, 1051 (2d Cir. 1996) (quoting <u>Consolidated Gold Fields</u>
<u>PLC v. Minorco, S.A.</u>, 871 F.2d 252, 261-62 (2d Cir. 1989)).

        The allegations of the effects of alleged fraud on
foreign and domestic plaintiffs are examined separately.
Domestic plaintiffs have an easier time alleging a "substantial"
effect upon U.S. investors and markets than do foreign
plaintiffs.  Courts will sever a class composed of both foreign
and domestic plaintiffs if the domestic plaintiffs can make a
case for "substantial" U.S. harm arising from their losses, but
the foreign plaintiffs cannot do so.  <u>See e.g.</u>, <u>Bersch</u>, 519 F.2d
974; <u>SCOR Holding</u>, 537 F. Supp. 2d at 562.  "[A]n
undifferentiated class of foreign investors seeking damages will
typically be unable to identify any relationship between . . .
the harm its members suffered . . . and any harm to U.S. markets
or U.S. investors." <u>SCOR Holding</u>, 537 F. Supp. 2d at 562.

        The effects test may confer subject matter jurisdiction
on a particular foreign plaintiff in the limited circumstances
where the harm inflicted on the foreign plaintiff <u>actually</u> causes

harm to U.S. investors or markets because of the relationship between the foreign plaintiff and U.S. investors. See e.g., Itoba, 54 F.3d at 124 (jurisdiction exercised where plaintiff's parent, 50% of whose shares were held in the U.S., financed the foreign trading and actually bore the relevant loss); Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1338 (2d Cir. 1972) (jurisdiction exercised where nominally foreign purchaser was the alter ego of its American parent). In essence, the effects test examines (1) the harm that a particular plaintiff (or category of plaintiffs) alleges; (2) where that harm was actually felt; and (3) whether, if the harm was felt in the United States, it was "substantial."

## II. **Application**

The complaint is brought on behalf of a class of plaintiffs that includes foreign and domestic purchasers of Fortis securities. First, I apply the conduct test and examine whether any of the fraudulent conduct alleged in the complaint was "conceived" or "executed" in the United States. I conclude that no such conduct was "conceived" or "executed" here. Therefore, the conduct test does not confer subject matter jurisdiction. Second, I apply the effects test and examine whether the complaint properly alleges that Fortis's fraud produced "substantial effects" on U.S. investors or U.S. markets. I conclude that the allegations are insufficient to make such a finding as to either foreign or domestic plaintiffs.

## A.   Conduct Test

The complaint alleges that throughout the class period, Fortis executives made material false statements about the financial health of the company.  (Am. Compl. ¶ 2).  Plaintiffs split these alleged misstatements into three primary categories: (1) statements about the actual value of the company's CDOs and other risky assets (id. ¶¶ 71-97); (2) statements about the extent of the company's exposure to the sub-prime mortgage market (id. ¶¶ 106, 124-25, 128, 132); and (3) statements about the overall solvency of the company, and the company's ability to finance and integrate its planned acquisition of ABN AMRO (id. ¶¶ 105, 146, 148, 157, 162, 174, 189, 202, 221, 232, 237, 249, 290, 302, 307-08, 310).

The complaint does not allege that any of these categories of misstatements took place within the United States. Rather, the complaint reveals that executives in Brussels, Belgium made the decisions to misrepresent the company's financial health, and that they issued those misstatements from their Brussels headquarters.  I discuss each of the three categories of alleged misstatements.

### 1.   Valuation of CDOs

The complaint alleges that the mathematical valuation of Fortis's CDOs was performed in its New York office.  (Id. ¶ 46).  Employees in New York prepared daily reports on the value and status of CDO assets, including information about whether they had been "'put' on the market," the names and number of

buyers, and the quantity of Fortis's own assets and unsold inventory. (Id.). The reports also delineated whether the CDO assets were "sub-prime," "mezzanine," or "high-grade." (Id.).

Although all of the CDO valuation activity was performed by employees in New York City, the complaint alleges that all decisions on how to value the CDOs and how the company would report the values to the public were made in Brussels. (Id. ¶¶ 79-97). The complaint recites:

- "Fortis's Belgian management decided to mark the CDOs down by lesser amounts than they should have in this late 2007/early 2008 time frame." (Id. ¶ 81).

- "Fortis's Brussels headquarters had sent an email to management in New York, advising the New York office of the 'pricing strategy' for the CDOs, which resulted in the CDOs being insufficiently marked down." (Id.)

- In January 2008, the Deputy CFO held a conference call "from Fortis's Belgian headquarters" to discuss issues surrounding the valuation of CDOs. (Id. ¶ 85).

- "[R]evaluations and devaluations [of Fortis's CDO portfolio] had to be approved by top management in New York and senior-level management in Brussels." (Id. ¶ 92).

- When Fortis announced its 2007 financial results, "Fortis reported much better results . . . than were anticipated by personnel in the New York office." (Id. ¶ 94).

- Once personnel in the New York office was informed about Fortis's 2007 financial report, they concluded that "Fortis had elected to defer taking write-downs of impaired investments and assets until after the acquisition [of ABN AMRO] had been completed." (Id. ¶ 95).

- The reports that the New York office generated were reviewed and finalized by Brussels personnel before they were sent to senior management in Brussels because "senior management in Brussels was 'most comfortable' when working with the Risk Management team in Brussels as opposed to New York."  (<u>Id.</u> ¶ 331).

Based on the allegations in the complaint, I cannot conclude that Fortis's alleged fraud regarding the valuation of the CDO portfolio "occurred in the United States."  Rather, the complaint portrays the New York activities as primarily arithmetic -- performing calculations based on the instructions of the Belgian headquarters.  Fortis's Belgian office "masterminded" the alleged fraud, giving formulas to the New York office regarding the "pricing strategy" for CDOs, and then, apparently, disregarding the valuations that New York reported to Brussels when they turned out to be disappointing.  The CDO activity that took place in New York was "merely preparatory" to the alleged fraud, which was actually "conceived and executed" in Belgium.

Two Second Circuit decisions are particularly helpful to this analysis.  The first is a case in which the court <u>did</u> exercise subject matter jurisdiction on the basis of U.S. conduct.  <u>See</u> <u>Berger</u>, 322 F.3d at 187.  There, the defendant, Michael Berger, founded an offshore investment fund.  When the Fund began to lose money, Berger, operating out of New York City, created "fraudulent account statements that vastly overstated the market value of the Fund's holdings."  <u>Id.</u> at 189.  Berger forwarded the fraudulent statements to administrators in Bermuda, where they were sent to investors.  Although Berger argued that

- 11 -

his activity was "merely preparatory" to the fraud on investors,
the Second Circuit affirmed the district court's holding that the
fraud was "conceived and executed in New York" and that "the
decisions made in the United States were directly responsible for
investor losses." Id. at 190.

In Morrison, on the other hand, the Second Circuit
affirmed the district court's holding that subject matter
jurisdiction did not exist. In that case, the foreign defendant,
National Australia Bank ("NAB") owned an American subsidiary,
HomeSide Lending Inc., a Florida corporation. First, NAB
reported that Homeside had generated profits of 141 million
Australian dollars. Later, NAB revealed that Homeside had used
incorrect assumptions in its valuation model, and that NAB would
be forced to incur large write-downs. The Second Circuit held:

> [t]he actions taken and the actions not taken by
> NAB in Australia were . . . significantly more
> central to the fraud and more directly responsible
> for the harm to investors than the manipulation of
> the numbers in Florida. . . . NAB's executives
> possess the responsibility to present accurate
> information to the investing public . . . . When a
> statement or public filing fails to meet those
> standards, the responsibility, as a practical
> matter, lies in Australia, not in Florida.

Morrison, 547 F.3d at 176.

Second Circuit case law focuses on the location where a
fraud is "conceived" and "executed," and the location of the
party with ultimate decision-making authority. In the instant
case, the complaint describes the Brussels executives as the
masterminds, and portrays the New York office as uninvolved in
decision-making regarding information to be communicated to the

- 12 -

public.  In fact, the New York office was surprised to learn
about the CDO values that the Fortis headquarters ultimately
announced in the 2007 financial report.  (Am. Compl. ¶¶ 94-95).
The New York conduct is "ancillary" to the fraud that was
committed in Belgium.  It does not confer subject matter
jurisdiction.

## 2.  Statements about Sub-prime Exposure

The complaint also alleges that defendants deliberately
understated the percentage of Fortis's assets that were held in
risky sub-prime mortgage-backed securities.  (Id. ¶ 135).
According to the complaint, the New York office sent reports to
Fortis's Brussels headquarters -- reports that "contained
complete information regarding Fortis's sub-prime exposure."
(Id. at ¶ 332).  Rather than report the true figures to the
public, however, Fortis executives represented that the company's
exposure was "extremely limited."  (Id. ¶ 124).  In actuality,
Fortis's exposure to the sub-prime market was "far greater" than
Fortis publicly admitted, and the Fortis executives knew so
because the New York reports contained accurate figures.  (Id. ¶
135).

As with the CDO valuation, here, Fortis executives in
Brussels made misstatements about the company's sub-prime
exposure.  Far from "masterminding" the fraud, as the complaint
alleges, the New York office actually provided "complete"
information to Fortis's Brussels headquarters, but the executives
in Brussels deliberately disregarded that information in favor of

minimizing the company's sub-prime exposure. The complaint does not allege that any of this fraudulent conduct was "conceived" or "executed" in the United States. The allegations are insufficient, therefore, to confer subject matter jurisdiction.

### 3. Statements about Solvency and the ABN AMRO Acquisition

Fortis executives also allegedly made misstatements about the company's difficulties securing financing for its acquisition of ABN AMRO (a Dutch commercial banking entity), and the extent to which the acquisition had compromised the company's overall solvency. (Id. ¶¶ 5, 204, 234, 297). The conduct related to this aspect of the fraud is the least connected to the United States according to the allegations in the complaint.

To undertake the ABN AMRO transaction, Fortis joined with two other foreign companies: Royal Bank of Scotland and Banco Santander Central Hispano, S.A. (Id. ¶ 57). As time went on, Fortis's top executives made repeated statements about the positive progress of the acquisition in press releases, press conferences, and conference calls. All of these statements emanated from the Fortis headquarters in Brussels. (Id. ¶¶ 105, 146, 148, 157, 162, 174, 189, 202, 221, 232, 237, 249, 290, 302).

There is only one allegation that Fortis undertook any conduct -- fraudulent or otherwise -- in the United States in connection with the ABN AMRO acquisition. Plaintiffs allege that Fortis filed documents with the U.S. Securities and Exchange Commission ("SEC") about the acquisition because Fortis and its partners had offered to purchase all of the ABN AMRO securities,

- 14 -

including shares held by investors who were resident in the U.S. (Id. ¶ 16). But "the act of filing documents with the SEC is insufficient standing alone to confer jurisdiction in an action for damages." See SCOR Holding, 537 F. Supp. 2d at 568 (citing Itoba, 54 F.3d at 124). Accordingly, Fortis's allegedly fraudulent statements about the ABN AMRO acquisition do not confer subject matter jurisdiction.

### B.   **Effects Test**

Plaintiffs argue in favor of subject matter jurisdiction by pointing to the revenue that Fortis earned from the U.S. market, the number of full-time workers that Fortis employed in the U.S., and Fortis's "avail[ment]" of the U.S. judicial system.   (Pl. Mem. at 51; Am. Compl. ¶¶ 61-70). It is undisputed that Fortis is present in the United States and subject to personal jurisdiction in this Court.  The complaint's allegations of generalized U.S. activities, however, do not provide any evidence that Fortis conducted fraudulent activity in the U.S, and neither do these general allegations speak to the requirements of the "effects test."

"The effects test focuses principally on the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges." SCOR Holding, 537 F. Supp. 2d at 562.  It is noteworthy, therefore, that lead plaintiffs do not explicitly allege what percentage of Fortis's investors are U.S. residents, nor the effect that the fraud may have had within the United States.

The complaint alleges that Fortis's securities trade in the U.S. as American Depository Shares ("ADRs") on the over-the-counter ("OTC") market and that Fortis has filed documents relating to the planned ABN AMRO acquisition with the SEC. (Id. ¶¶ 16, 17). It alleges that 17.2% of all institutional investors were located in "North America." (Id. ¶ 16). It does not break down what percentage of those were located in the U.S. -- as opposed to Canada, Mexico, or any of the approximately 38 other countries on the continent.

An ADR "represents one or more shares of a foreign stock or a fraction of a share." (U.S. Securities & Exchange Commission, International Investing, http://www.sec.gov/investor/pubs/ininvest.htm). The complaint alleges that Fortis's ADRs were traded "on the over-the-counter ('OTC') market." (Am. Comp. ¶ 17). It does not specify whether they were traded on the OTC Bulletin Board or through "Pink Sheets." (U.S. Securities & Exchange Commission, Over-the-Counter Market, http://www.sec.gov/divisions/marketreg/mrotc.shtml). If they were traded through "Pink Sheets," Fortis would not have been required to make filings to the SEC about its offer of securities. (Id.). In either case, Fortis's securities were not traded on an official American securities exchange; instead, ADRs were traded in a less formal market with lower exposure to U.S.-resident buyers.

Trade in ADRs is considered to be a "predominantly foreign securities transaction." See SCOR Holding, 537 F. Supp. 2d at 561. Barring fraudulent conduct committed within the U.S.,

- 16 -

plaintiffs' complaint must make a showing that the Fortis fraud
produced effects in the United States and that the effects were
"substantial." Yet, the complaint makes <u>no</u> allegations about the
number or percentage of U.S. resident investors, or where U.S.
investors may have purchased their securities. It does not
allege that any foreign purchasers had a relationship to the
United States such that U.S. investors were actually affected by
the harm that the foreign purchasers suffered.

I have no doubt that <u>some</u> Fortis investors are U.S.
residents, and that Fortis's alleged fraud had <u>some</u> effect upon
U.S. investors and the U.S. securities market. From the
allegations in the complaint, however, I cannot determine that
the effect was "substantial." Plaintiffs bear the burden of
demonstrating that subject matter jurisdiction exists, and these
plaintiffs have not met that burden.

## IV. <u>Leave to Amend</u>

Plaintiffs requested leave to file an amended complaint
in the event the motion to dismiss was granted. "It is the usual
practice upon granting a motion to dismiss to allow leave to re-
plead. Although leave to re-plead is within the discretion of
the district court, refusal to grant it without any justifying
reason is an abuse of discretion." <u>Cortec Indus., Inc. v. Sum
Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991) (internal citations
omitted). "It is the plaintiffs' responsibility to plead their
case adequately, and a court may deny a plaintiff leave to re-
plead when that party has . . . been given ample prior

- 17 -

opportunity to allege a claim." In re Refco, Nos. 06 Civ. 643 (GEL), 07 Civ. 8686 (GEL), 07 Civ. 8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008).

The request for leave to re-plead is denied. First, plaintiffs have already had two bites at the apple, as they have already filed two complaints: the original complaint on October 22, 2008, and the first amended complaint on May 18, 2009. Second, plaintiffs should have been aware of the Second Circuit's longstanding requirements for subject matter jurisdiction when they drafted their first and second complaints. Third, the complaint is more than 350 paragraphs and 150 pages long, and is full of detailed factual allegations. It is difficult to imagine that plaintiffs did not allege all the facts they had a good faith basis for asserting. A third opportunity to plead would be futile. Finally, even if plaintiffs failed to allege all facts, it was their responsibility to plead their case adequately in the first instance, and they are not deserving of a third bite at the apple at this juncture of the case.

## CONCLUSION

For the reasons set forth above, the complaint is hereby DISMISSED for lack of subject matter jurisdiction. The Clerk of the Court shall enter judgment dismissing the complaint with prejudice.

SO ORDERED.

Dated:     New York, New York
           February 18, 2010

DENNY CHIN
United States District Judge

- 18 -